UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NORGES BANK | ) | Civil No. |
| Bankplasssen 2, P.O. Box 1179 | ) | |
| Sentrum, Oslo, Norway 0107, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| AOL TIME WARNER INC. | ) | |
| 1 Time Warner Center | ) | |
| New York, NY  10019 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICA ONLINE, INC. | ) | |
| 22000 AOL Way | ) | |
| Dulles, VA  20166 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TIME WARNER INC. | ) | |
| 1 Time Warner Center | ) | |
| New York, NY  10019 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STEPHEN M. CASE | ) | |
| 1718 M Street Northwest, Unit 249 | ) | |
| Washington, DC  20036 | ) | |
| | ) | |
| —————————————————— | ) | DEMAND FOR JURY TRIAL |

[Caption continued on following page.]

COMPLAINT FOR VIOLATIONS OF §§11, 12(a)(2) AND 15 OF THE
SECURITIES ACT OF 1933 AND §§10(b), 14(a) AND 20(a)
OF THE SECURITIES EXCHANGE ACT OF 1934

and                                              )
                                                 )
GERALD M. LEVIN                                  )
435 East 52nd Street, Unit 2C                    )
New York, NY  10022                              )
                                                 )
        and                                      )
                                                 )
RICHARD D. PARSONS                               )
166 Duane Street, Penthouse                      )
New York, NY  10013                              )
                                                 )
        and                                      )
                                                 )
KENNETH J. NOVACK                                )
81 Beacon Street                                 )
Boston, MA  02108                                )
                                                 )
        and                                      )
                                                 )
ROBERT W. PITTMAN                                )
47 East Lake Drive                               )
Katonah, NY  10536                               )
                                                 )
        and                                      )
                                                 )
J. MICHAEL KELLY                                 )
6726 Towne Center Court                          )
McLean, VA  22101                                )
                                                 )
        and                                      )
                                                 )
STEPHEN F. BOLLENBACH                            )
600 St. Cloud Road                               )
Los Angeles, CA 90077                            )
                                                 )
        and                                      )
                                                 )
WAYNE H. PACE                                    )
3131 Habersham Drive                             )
Atlanta, GA  30305                               )
                                                 )
        and                                      )
                                                 )
STEVEN RINDNER                                   )
10805 Riverwood                                  )
Potomac, MD  20854                               )
                                                 )

[Caption continued on following page.]

and                                            )
                                               )
DAVID M. COLBURN                               )
8704 Brickyard Road                            )
Potomac, MD  20854                             )
                                               )
    and                                        )
                                               )
ERIC KELLER                                    )
902 Turkey Run Rd                              )
McLean, VA  22101                              )
                                               )
    and                                        )
                                               )
JOSEPH A. RIPP                                 )
125 Cannon Drive                               )
Wilton, CT  06897                              )
                                               )
    and                                        )
                                               )
BARRY M. SCHULER                               )
2181 3rd Avenue                                )
Napa, CA  94558                                )
                                               )
    and                                        )
                                               )
PASCAL DESROCHES                               )
90 Yale Terrace                                )
Blauvelt, NY  10913                            )
                                               )
    and                                        )
                                               )
JOHN P. TULI                                   )
60 North Avenue                                )
Weston, MA  02493                              )
                                               )
    and                                        )
                                               )
MYER BERLOW                                    )
159 East 61st Street                           )
New York, NY  10021                            )
                                               )
    and                                        )
                                               )
PAUL T. CAPPUCCIO                              )
27 East Dilido Drive                           )
Miami, FL  33139                               )
                                               )

[Caption continued on following page.]

and                                         )
                                            )
                                            )
CITIGROUP GLOBAL MARKETS, INC.              )
388 Greenwich Street                        )
New York, NY  10013                         )
                                            )
        and                                 )
                                            )
CITIGROUP INC.                              )
399 Park Avenue                             )
New York, NY  10043                         )
                                            )
        and                                 )
                                            )
SALOMON SMITH BARNEY INC.                   )
388 Greenwich Street                        )
New York, NY  10013                         )
                                            )
        and                                 )
                                            )
MORGAN STANLEY & CO. INC.                   )
1585 Broadway                               )
New York, NY  10036                         )
                                            )
        and                                 )
                                            )
ERNST & YOUNG LLP                           )
5 Times Square, 14th Floor                  )
New York, NY  10036,                        )
                                            )
                        Defendants.         )
                                            )
                                            )

---

This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value to the underlying factual materials herein through one or more of the following: unique and original selection, coordination, expression, arrangement, and classification of the information.

No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports, news articles or books quoted within this work.

Copyright © 2006 by William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP. William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP will vigorously defend all of their rights to this writing/publication.

All rights reserved – including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP is prohibited.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

SUMMARY OF THE ACTION ..............................................................................7

JURISDICTION AND VENUE ............................................................................38

THE PARTIES.......................................................................................................38

FRAUDULENT SCHEME AND CONDUCT......................................................44

BACKGROUND TO THE MERGER...................................................................45

AOL'S AND AOLTW'S FALSE AND MISLEADING FINANCIAL STATEMENTS..........142

ERNST & YOUNG'S ROLE IN THE WRONGDOING ........................................179

MORGAN STANLEY'S AND SALOMON SMITH BARNEY'S ROLES IN THE
          WRONGDOING........................................................................................187

INSIDER SELLING ............................................................................................191

AOL SETTLEMENT OF DOJ AND SEC CRIMINAL AND CIVIL CHARGES ...................197

LOSS CAUSATION/ECONOMIC LOSS ...........................................................199

FIRST CLAIM FOR RELIEF .............................................................................200

          For Violation of §§11 and 15 of the 1933 Act Against AOLTW, Case, Levin,
          Parsons, Novack, Pittman, Kelly, Bollenbach, Cappuccio, Ernst & Young
          and Morgan Stanley ........................................................................................200

SECOND CLAIM FOR RELIEF ........................................................................203

          For Violation of §12(a)(2) of the 1933 Act Against Defendant AOLTW .......................203

THIRD CLAIM FOR RELIEF............................................................................205

          For Violation of §§10(b) and 20(a) of the 1934 Act and Rule 10b-5 Against
          Defendants AOL, AOLTW, Ernst & Young, Morgan Stanley, Salomon
          Smith Barney and the Individual Defendants (Except Bollenbach and
          Cappuccio) ...................................................................................................205

FOURTH CLAIM FOR RELIEF ........................................................................207

          For Violation of §14(a) of the 1934 Act and Rule 14a-9 Against AOL, Time
          Warner AOLTW, Case, Levin, Kelly, Cappuccio, Novack, Pittman, Ernst
          & Young and Morgan Stanley ..........................................................................207

PRAYER FOR RELIEF .......................................................................................208

JURY DEMAND ...............................................................................................................................209

## INTRODUCTION

1.      This is an action arising out of the sale of Time Warner Inc. ("Time Warner") to America Online, Inc. ("AOL"), which resulted in the formation of AOL Time Warner Inc. ("AOLTW" or the "Company") in 1/01 (the "Merger").  As a result of this Merger – which *Dow Jones* has since characterized as a "***terrible deal***," *Time* magazine has described as the "***worst deal of the century***," and *Fortune* has called "***one of the great train wrecks in corporate history***" – the former shareholders of Time Warner who exchanged their shares for new AOLTW shares and those investors who purchased the newly issued stock of AOLTW after the Merger – including the plaintiff in this action – lost billions of dollars as AOLTW's stock collapsed from as high as $58.51 per share to as low as $8.60 per share.  But the top AOLTW insiders, the two Wall Street banks – who helped them orchestrate the Merger and secure its approval by misleading Time Warner's shareholders and then inflated the trading price of the new stock of AOLTW after the Merger – and AOLTW's accountant, Ernst & Young, who helped falsify AOLTW's financial results before and after the Merger, all did quite well for themselves.  AOLTW insiders, including those named as defendants here, pocketed over ***$797 million in illicit benefits for themselves***, the Wall Street banks pocketed the largest investment banking fee in history (over $135 million) and the accounting firm retained the coveted AOLTW account – ***one of the largest and most lucrative public company accounts in the world***, worth over $1 million ***per week*** in fees.

2.      At the height of the Internet/dot-com frenzy during 98-99, AOL passed itself off as an emerging "Blue Chip" company, creating a high stock price – AOL peaked at $94 per share in 12/99 – and a market valuation of over $214 billion – larger than that of IBM or General Motors and Ford Motor ***combined***! By 98-99, the key to AOL's continuing high stock price was the belief that it was successfully transitioning its business by leveraging an ever-growing Internet access subscriber base to reap huge amounts of high-profit-margin e-commerce advertising revenues which would lead

to profitable growth for years to come.  Just as AOL's stock was hitting its all-time high, based on the apparent tremendous growth of AOL's subscriber base and the success and profitability of its e-commerce advertising business, AOL used its inflated shares as currency to purchase Time Warner and its substantial stable of media and entertainment properties, which had real value and proven earning power.  In order to inflate AOL's stock prior to the Merger and to secure Time Warner shareholder approval of the sale of Time Warner to AOL and then to continue to inflate the price of AOLTW stock after the Merger, defendants presented AOL's business as achieving record growth and profitability.  They assured Time Warner's shareholders that the terms of the sale of their company were "***fair***" and made extraordinarily strong assurances that the Merger would succeed and was succeeding, forecasting that the Merger would result in 12%-15% annual revenue growth, 30% annual EBITDA growth and 50% annual "free" cash flow growth for AOLTW both in the year immediately following the Merger and for the next several years.  AOLTW was to achieve these results due to the growing subscriber base and e-commerce advertising of AOLTW's "***crown jewel***" – AOL – as well as Time Warner's thriving cable TV business, all of which was creating a new "***blue chip***" ***powerhouse*** and "***large cap growth stock***" – a "***safe and secure place for people to put their money***," which was worth at least $115 per share.

3.    After the Merger, the successful synergies and economies, as well as revenue, cash flow and EBITDA growth, that had been promised, failed to occur.  The AOL unit not only failed to act as the driving force behind the growth of the combined companies, it turned out that AOL had been falsifying the growth of its Internet access subscribers (25 million at 9/30/00) and the growth and success of its e-commerce advertising revenues (over $2.3 billion in calendar 00) and backlog (over $3 billion by 9/30/00), by using tricks, contrivances and bogus transactions to boost these subscriber numbers and e-commerce advertising results and backlog.  Instead of driving the new AOLTW to the huge revenue, EBITDA and cash flow growth forecasted, AOL's corrupt accounting

practices, contracting e-commerce advertising and shrinking subscriber base badly damaged AOLTW, resulting in huge damage to former Time Warner shareholders, as well as investors in the new AOLTW enterprise.

4.      Shortly after the Merger, as management dissension and conflicts roiled the top ranks of AOLTW, AOLTW reported sharply slowing revenue, EBITDA and cash flow growth, principally due to advertising shortfalls at its AOL unit and a lack of the promised merger synergies and economies. After first scaling back its financial forecasts in the Fall of 01, during 02, AOLTW took $54 billion and $45 billion write-downs due to the over-valuation of its assets, resulting in an 02 loss of $100 billion – *the largest corporate loss in history* – as it revealed that AOL's supposedly multi-billion-dollar e-commerce advertising backlog had virtually disappeared, its e-commerce advertising revenues were falling by 50% and its subscriber numbers were actually declining! AOLTW also admitted that AOL had falsified its key e-commerce advertising revenues *before and after the Merger* by including in revenue one-time payments in connection with the termination of advertising contracts, as well as revenue from "barter," "swap" and "round trip" transactions, and by requiring customers to purchase advertising in return for offsetting investments from AOL, ultimately restating its prior financial reports to eliminate almost $200 million in phony e-commerce advertising revenues. It also came out that AOLTW had further artificially boosted its results by improperly accelerating the recognition of hundreds of millions of dollars of advertising revenues in its cable TV operations by reporting as advertising revenue initial cable licensing payments from new channels joining AOLTW's cable TV networks – payments that should have been accounted for as offsets against the monthly fees the AOLTW cable TV networks paid the new channels on an ongoing basis. AOLTW later admitted an additional $400 million in phony advertising revenues that would be restated, due to a reciprocal transaction with Bertelsmann AG. The Company subsequently restated AOL's 00 results due to a 3/17/00 transaction involving Bertelsmann. Thus, defendants have

essentially admitted that the 3/31/00 results included in the 5/19/00 Merger Registration Statement were false. The 3/31/00 results and prior results were also false due to other accounting manipulations described herein. The defendants' representations of successful merger integration, synergies and economies, as well as the forecasts of 12%-15% revenue growth, 30% EBITDA growth and 50% free cash flow growth in 01 and beyond, were thus false and not remotely obtainable. As a result of these financial reversals, AOLTW is now riddled with $28 billion in debt and its earning power is substantially impaired, requiring AOLTW to sell off billions of dollars of truly valuable assets to raise cash to try to restore its financial health. Rumors abound that AOLTW will even discard AOL.

5.      AOLTW's CEO (Gerald Levin), Co-COO (Robert Pittman) and its Chairman (Steve Case) have all been ousted from the Company. AOLTW's CFO, Michael Kelly (the former CFO of AOL), has been demoted and relieved of his accounting responsibilities. All of the AOL operation's top executives, including the former President (Barry Schuler) and all of the executives who ran AOL's e-commerce advertising business and structured the bogus deals there have also been kicked out of the Company. The head of AOLTW's cable TV operations has been ousted as well. The Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC") are pursuing widespread criminal and civil investigations of AOLTW's financial and accounting falsifications and phony forecasts. Several of AOL's advertising counter-parties have restated their financial results to eliminate hundreds of millions of dollars of revenues generated by their phony e-commerce deals with AOL. AOLTW was even named as a defendant in the Homestore.com securities class action suit based on detailed allegations that it participated in a scheme to inflate Homestore.com's and its own e-commerce advertising revenues by millions of dollars, via several specified phony advertising deals – transactions so fraudulent that several Homestore.com executives have pleaded guilty to

criminal charges of securities fraud.  In fact, a federal district court judge recently described the

actions of AOLTW with respect to Homestore.com harshly:

> *The acts alleged in the [Homestore.com complaint], which this Court must accept as true for purposes of this motion, describe a massive conspiracy driven by pure avarice.  In particular, the detailed factual allegations describing the role of AOL and its agents in helping Homestore please Wall Street and in boosting its own revenues through bogus commissions give this Court great pause.*

*In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1041 (C.D. Cal. 2003).

6.    As stated by *The New York Times*, Case, AOLTW's now ex-Chairman (and former

AOL Chairman/CEO), "*pulled off one of the sweetest deals in business history . . . by managing to*

*acquire Time Warner with AOL's inflated shares*."   Richard Parsons – AOLTW's current

Chairman/CEO (the last man standing) – has called the sale of Time Warner to AOL a "*silly*

transaction and a "*mistake*," with "*overly ambitious*" forecasts of 30% growth that were "*not the*

*real world*."   According to *The New York Times*, Parsons "*has acknowledged that in retrospect,*

*[Time Warner's then Chairman/CEO] Levin hurt Time Warner's shareholders by selling the*

*company for temporarily inflated shares of AOL stock*," because AOL's online business was "*the*

*principal source of the collapse of our value,*" and he has lamented: "*What were we thinking?*" –

"*There is no question that the price was way out of bounds*."  After the fact Parsons also admitted,

"*We have learned the lessons of over-promising and we won't repeat them*."  Even Case has now

admitted that AOLTW should "*obviously not*" have proceeded with its ambitious financial forecasts

and that among the mistakes made "*to be sure*" were "*setting profit expectations that were too high*

*and . . . sticking with them too long.*"   AOLTW's stock, which first traded at $49 after the Merger

and reached a post-merger high of $58.51, collapsed to as low as $8.60 as these shocking revelations

unfolded and currently changes hands at $17-$18 per share.

7.    In 7/00, while AOL's stock was being inflated in anticipation of the Merger, AOL

insiders, knowing that the later closing of the Merger would accelerate and vest all of their then

- 5 -

unvested AOL options, converting millions of them into new AOLTW options and allowing them to then exercise those new options and bail out of AOLTW, but fearing that their ongoing falsification of AOL's subscriber metrics and financial results could be discovered at any time – crushing AOL's stock and scuttling the Merger – exercised millions of their then existing and already vested cheap AOL stock options and immediately sold off 2.2 million shares of their inflated AOL stock, pocketing over $125 million. Then, after the Merger closed in 1/01 and converted all the old AOL and Time Warner stock options into new AOLTW stock options and caused them to immediately accelerate and vest, *top AOLTW insiders exercised millions and millions of these newly vested options and sold off more than 21.6 million shares of their AOLTW shares at inflated prices as high as $55.69 per share*, pocketing an additional $672 million before the revelations of financial and accounting improprieties, executive ousters and SEC and DOJ investigations crushed AOLTW's stock. Most of these post-merger stock sales by AOLTW insiders (over $440 million worth) took place in just a five-month period (2/01-6/01), at the same time that these same insiders were causing AOLTW to *spend over $3.1 billion of its corporate funds* on an open market common stock repurchase program – telling its shareholders that AOLTW's shares were "*undervalued*" – causing AOLTW to acquire *over 30 million shares of AOLTW stock* to manipulate and inflate the stock price higher as those insiders were selling off over 8.9 million of their own shares! In sum, AOL and AOLTW insiders pocketed a total of over $797 million in insider stock sale proceeds to take advantage of the inflated price of AOL and AOLTW stock. The investment advisors also got the largest merger fee in history, as when the Merger closed, Salomon Smith Barney and Morgan Stanley pocketed what has been termed the "*Godzilla fee*" of all time in investment banking, over $135 million. And Ernst & Young, the auditor for both AOL and Time Warner, held onto the new AOLTW account after the Merger – one of the largest and most lucrative public company accounts in the world, generating fees of $52 million in 01. And Levin, Time Warner's former

Chairman/CEO – the architect of the deal that virtually destroyed Time Warner and who had told investors at the time of the Merger that he had "***no intention of (ever) leaving***" **AOLTW, *as he made his mark on the world*** – pocketed a $625 million retirement package when he fled AOLTW – suddenly retiring in 12/01 as the Merger collapsed, supposedly to put "***more 'poetry' into his life***."

## SUMMARY OF THE ACTION

8.      In 12/96, seeking to boost its subscriber numbers, AOL introduced "flat-rate" subscription plans.  This had the effect of dramatically increasing member usage but drastically decreasing AOL's operating margins.  In the late 90s, the Internet access market – AOL's main business – was also becoming increasingly saturated and AOL was facing intensifying competition from low-cost or free Internet access providers.  This downward pressure on operating margins, increasing competition and the increasing likelihood that AOL's subscriber growth would plateau, put tremendous pressure on AOL's executives to generate ever-increasing numbers of subscribers ***and*** find additional higher profit margin revenue sources to continue its growth.  AOL's top executives, including Case, its Chairman/CEO, Kenneth Novack, its Vice Chairman, and Pittman, its President/COO, began to try to develop other sources of higher profit margin revenues to preserve AOL's profitable growth and thus support its high stock price, upon which their prestige, jobs, and not to mention their personal fortunes, largely depended.  Continuing subscriber growth and AOL's newest and most rapidly growing business area – online or e-commerce advertising – were the key to success.  In this regard, AOL's 97 annual report explained:

> Among the Company's business objectives are increasing the subscriber base and continuing to accelerate the change in its business model ***into one in which increasingly more revenues and profits are generated from sources other than online service subscription revenues, such as advertising and electronic commerce. The Company expects that the growth in other revenues, assuming such growth continues, will be the primary source of future profit growth, and will provide the Company with the opportunity and flexibility to fund the costs associated with flat-rate pricing as well as programs designed to grow the subscriber base and meet other business objectives. . . .  Advertising revenues are expected to grow in***

*importance as the Company is able to leverage its large and growing subscriber base*.

9.      Thus, continuing subscriber growth ***and*** accelerating e-commerce advertising growth were the keys to AOL's continued profitable growth.  And, according to AOL's public reports and statements, its subscriber base and online advertising grew during 97-99.  For fiscal 97, AOL reported e-commerce advertising revenues of $147 million.  For fiscal 98 this grew to $358 million. For fiscal 99, it reached $756 million.  This was by far the fastest growing part of AOL's business – and it was reported to be very profitable.  Also, AOL's e-commerce advertising backlog – the key indicator of the future growth of this key area of its business – was reported to be growing ***even more rapidly than revenues***, from $180 million at 6/30/97 to $1.5 billion at 6/30/99.  At the same time, AOL continued to report strong online access subscriber growth from 8.6 million at 6/30/97 to 12.5 million at 6/30/98 to 17.6 million at 6/30/99.  The apparent synergy of successfully monetizing this rapidly growing subscriber base to generate rapidly growing, high-margin e-commerce advertising revenues apparently enabled AOL to report consistently growing revenues and profits and to forecast fabulously profitable growth for years to come.

10.     While AOL's subscriber base and e-commerce advertising business both appeared to be achieving tremendous growth, in fact, behind the scenes, things were far different – and much worse.  After an initial burst of success and obtaining millions of dollars of multi-year advertising commitments (mostly from dot-com companies), by late 99, AOL's e-commerce advertising business was beginning to encounter problems due to several factors, including very poor consumer response to online advertising generally and extreme customer annoyance at "pop-up" ads, resulting in persistent complaints and much lower response rates than forecasted or necessary to justify the rates AOL needed to charge to maintain the high profit margins its e-commerce advertising was supposed to provide.  And because much of AOL's e-commerce advertising came from newer start-up companies – mostly dot-coms that utilized the proceeds of initial public offerings or venture

capital financings to purchase such advertising – as the business plans of an increasing number of these companies faltered or failed, they were curtailing, defaulting on, canceling or threatening to cancel their e-commerce advertising commitments with AOL.  And AOL's subscriber growth was not nearly as strong as represented either, both in the U.S. and internationally – and, in fact, AOL was inflating its subscriber numbers by several improper tactics, including counting non-paying free trial participants as paying subscribers and continuing to do so after their trial period had expired without them converting to paying status, and by giving paying subscribers that tried to cancel a free extension period for three to six months and continuing to count them as paying subscribers.

11.     This weakening of AOL's e-commerce advertising business, combined with the maturation and slowing growth of its core online access business, plus increasing competition in that market, was a potentially lethal combination as it indicated to AOL's sophisticated insiders that AOL's halcyon days as a premier growth company were seriously threatened and coming to an end. Thus, Case, Novack and Pittman decided that, while they still could, they would try to take advantage of the apparent success and fabulous growth prospects of AOL and use AOL's high priced stock to acquire a large company with real assets and proven earning power before the market learned of the difficulties afflicting AOL's business and crushed its stock price, making such an acquisition impossible, so that the real assets and proven earning power of the acquired company would cushion the coming downturn in AOL's business that they knew was likely inevitable and already beginning to occur.

12.     However, an acquisition of the type and size that Case and Pittman had in mind for AOL would take many months to negotiate and close.  So, in order to continue to cover up the truth about the deterioration in the growth in AOL's core online access business and the emerging problems in its e-commerce advertising business, AOL's executives engaged in contrivances and falsifications to inflate AOL's subscriber metrics and inflate its e-commerce advertising revenues

and backlog.  AOL did this by entering into an increasing number of bogus e-commerce advertising deals where the transactions lacked economic substance, and AOL was providing the funds to its purported customers to purchase the advertising – via "barter" or "swap" or "round trip" deals. These bogus transactions not only improperly inflated AOL's e-commerce ad revenues, but also grossly distorted AOL's e-commerce ad backlog, because these deals were, in many instances, one-time structured deals, not really entered into in the ordinary course of business or reflective of true ongoing demand for AOL's e-commerce ads.  AOL also failed to reveal that virtually all of its e-commerce backlog **could be canceled at will by the customer** without cost or any significant penalty, that many of the backlog commitments were from companies that lacked the financial wherewithal to honor them, and that increasing numbers of its customers were canceling their ad commitments or threatening to cancel them unless AOL cut their rates to far less profitable levels. Yet AOL continued to include in its reported backlog hundreds of millions of dollars of deals it knew were very likely to be canceled or could not be honored.  And, to make it appear that its Internet access subscriber base was not only continuing to grow, but that its growth was actually accelerating, AOL intensified its promotional giveaway activities to get millions of trial **non-paying** subscribers, but counted them as **actual paying subscribers**, even continuing to do so after their free trial period expired and they did not convert to paying status and should have been canceled.  To further artificially boost subscriber numbers, customers who had been paying customers and then tried to cancel the service were given six months of free service and then included in the count of subscribers, or, if this was refused, simply not purged or removed from the active subscriber list.

13.    In the Fall of 99, Case, Novack and Pittman identified Time Warner as the kind of company they wanted AOL to buy – a huge, well-established company with valuable assets and real earning power.  In 10/99, Case and Levin began discussions about AOL acquiring Time Warner. While Time Warner was a successful company with a stable of successful media and entertainment

businesses, its growth in recent years had slowed. Levin, Time Warner's Chairman, longed for the increased publicity and glamour that would be his as the CEO of a huge, rapidly growing media company successfully involved in the "Internet" – succeeding in the new digital age. Levin and Time Warner's other top insiders were anxious to find a way to boost Time Warner's growth, as this would enable them to preside over a larger, faster growing company and benefit them economically. And the executives from both AOL and Time Warner knew that any merger would trigger "change of control" provisions in their respective compensation plans, enriching them by hundreds of millions of dollars. As AOL continued to report record subscriber growth and record financial results, AOL's stock hit its all-time high of $94 per share on 12/13/99. After several weeks of discussions, Case would strike a final deal on 1/6/00 with Levin to buy Time Warner for AOL stock. It was agreed that AOL would acquire Time Warner in a stock-for-stock merger in which Time Warner shareholders would receive 1.5 shares of new AOLTW stock for each of their existing Time Warner shares, AOL shareholders would receive one share of new AOLTW stock for each of their AOL shares, and Case would be the Chairman of the new company, with Levin its CEO.

14.    The executives at both Time Warner and AOL and their respective firms' advisors and accountants all had huge personal motives to bring about the closing of the Merger. Due to "change of control" provisions in the executive compensation plans of both AOL and Time Warner, consummation of the Merger would convert all existing AOL and Time Warner stock options into new AOLTW stock options and trigger acceleration and immediate vesting of executive stock options and deferred compensation benefits that were worth hundreds of millions if not billions of dollars to the top executives. For instance, options to purchase 44 million shares of AOL stock (35 million of which were for the top five AOL executives) at $18.78 per share (with a market value of $48 per share) accelerated and vested, creating a $1.3 billion windfall benefit ($1 billion for the top five AOL executives alone). AOL's and Time Warner's financial advisors, the Salomon Smith

Barney division of CitiGroup Global Markets, Inc. and Morgan Stanley, were similarly motivated to get the Merger closed as they would split one of the largest investment banking fees of all time – over $135 million – immediately upon the closing of the Merger, regardless of how it worked out over time.  AOL's and Time Warner's accounting firm, Ernst & Young, hoped to retain both huge and lucrative accounts, becoming the accountants for AOLTW, one of the largest public corporations in the world.

15.    On 1/10/00, AOL and Time Warner announced that AOL would acquire Time Warner, subject to the approval of Time Warner shareholders at a meeting to be held in 6/00, with the Merger to close some months later after required regulatory approvals were obtained.  In announcing the Merger, Case and Levin said AOLTW was a "***tremendous company***" that "***can be the most valuable and the most respected company in the world***," and which had "***an extraordinary combined management team***."  After the AOL/Time Warner Merger was announced in 1/00, it was very important to executives at both companies, as well as their financial advisors involved in the Merger, to make it appear that AOL's and Time Warner's businesses were both continuing to succeed individually and would achieve the forecasted accelerated profitable growth when combined so that their companies' stock prices would continue to trade at high levels, the shareholders of Time Warner would approve the Merger, and the executives could reap the billions of dollars of benefits coming to them immediately upon the closing of the Merger, regardless of how it later turned out.  Thus, with the help and assistance of their financial advisors, Salomon Smith Barney and Morgan Stanley, AOL and Time Warner commenced a campaign of extremely bullish forecasts of growth for the new enterprise – ***telling investors AOLTW would achieve over $40 billion in 01 revenue, at least 30% EBITDA growth in 01 (a $1 billion EBITDA increase in the first year after the Merger) and 25% EBITDA growth per year going forward, with 50% free cash flow growth in 01 and in future years***.

16.     To support the prices of AOL and Time Warner stocks and to induce the shareholders of Time Warner to approve the sale of their company to AOL, after the Merger was announced in 1/00, the top officers of AOL and Time Warner and their financial advisors repeatedly extolled the success and strength of AOL's business and how its growing subscriber base and e-commerce advertising revenues would be the engine of growth, *i.e.*, the "***crown jewel***" of the new company – AOLTW – which would achieve huge synergies and economies resulting in large revenue, EBITDA and free cash flow growth ***immediately following the Merger and for years thereafter***.  In the months after the Merger was announced, AOL's reported subscriber metrics and advertising and e-commerce advertising revenue and backlog continued to soar.  This was critical as, in light of defendants' representations regarding the importance of e-commerce advertising revenue to AOL's and AOLTW's "future profit growth" (advertising revenue would generate 20%+ of AOLTW's total revenues post-merger and was to be its fastest growing business) and in the midst of the Internet frenzy, when investors were at their most skittish and stock prices at their most volatile, ***any indication that AOL's e-commerce advertising revenue growth was not sustainable, that its reported e-commerce advertising revenues on backlog had been or were being overstated, or that its e-commerce advertising backlog or online subscriber growth were no longer growing as rapidly as in the past would have had a devastating impact on the price of AOL's stock and the prospects of a merger with Time Warner***.[1]

17.     In order to accomplish the Merger, the Boards of Directors of AOL and Time Warner, with the help of their financial advisors, created, signed and filed with the SEC a registration statement providing for the issuance of the new stock of the merged enterprise – the "Merger

---

[1]     For example, the share price of Yahoo! Inc., a key AOL competitor, fell by 21% after the company reported strong advertising growth but acknowledged that its rate of growth could not be sustained.

Registration Statement." AOLTW used the Merger Registration Statement not only to issue the new shares of its stock, but also as part of obtaining Time Warner's shareholders' approval of the transaction. The Merger Registration Statement contained AOL's subscriber metrics and financial results, reporting dramatic increases in AOL's e-commerce advertising revenues (and backlog) and online access subscriber numbers. The Merger Registration Statement also contained the unqualified certification of AOL's 98 and 99 financial statements by its auditor, Ernst & Young.

18.    The financial and business metrics deceptions detailed above pervaded the Merger Registration Statement, which contained AOL's 98-99 annual financial statements and AOL's interim financial results through 3/31/00. The graph below shows the strong growth in AOL's subscriber and e-commerce revenues and backlog as presented to Time Warner's shareholders in the Merger Registration Statement:



19.    The Merger Registration Statement urged Time Warner's shareholders to vote in favor of the sale of their company to AOL because, among other things, the Merger was "*fair*" to Time Warner shareholders. The Merger Registration Statement said the transaction would create

"revenue opportunities and synergies in areas such as advertising by providing companies 'one-stop' shopping for their online as well as print and broadcast media advertising." It also stated that total ***EBITDA synergies would be approximately $1 billion in the first full year of operations, producing an EBITDA growth rate of approximately 30% in that first year***. In other communications, the Time Warner and AOL insiders and their financial advisors stated that the combined company "***will be a high growth vehicle***" with a "***long-term EBITDA growth rate of 30% plus***" and could or would create the "***most valuable***" company in the world.

20.     After the Merger was first announced in late 1/00, AOL continued to report record results – reporting for the quarter ending 12/31/99 a record number of new subscribers (1.8 million for a total of 20.5 million) with soaring and better-than-expected e-commerce revenues, ***double those in the prior year*** – and that its e-commerce ***backlog had now reached a record $2.4 billion***. AOL executives affirmed that AOLTW would have a 30% EBITDA growth rate, that "***everything really is on track***," online advertising was "***going great for us***" and subscriber growth was "***going quite well***." In early 2/00, Levin met with analysts and investors and said "***the new company's unique combination of strengths***" would lead to 30% EBITDA growth in 01 – ***a billion dollar first year gain*** – and that AOLTW would have such a strong financial condition that AOLTW would have "***no financial constraints***" on its growth.

21.     In 4/00, as the sale of Time Warner to AOL was pending before Time Warner shareholders for their approval, AOL ***again reported record results*** – 1.7 million new subscribers (22.2 million total), ***another 100% jump in e-commerce advertising revenue*** and a still growing e-commerce advertising backlog (***now $2.7 billion***). Investors were assured these results showed "***the tremendous strength of [AOL's] operations***," that "***we continue to see strong, underlying fundamentals in each of our operations***," that AOL was "***on a clear path to continued growth and increased profitability***" and that while AOL had taken online advertising "***to new heights, we've***

*barely scratched the surface*." AOL assured investors its e-commerce backlog counted only "***firm contractual backlog that is almost guaranteed revenue***," that the backlog was constantly reviewed and "***trim[med]***" on a quarterly basis and that AOL had no "***significant risks in the backlog***." Case also assured investors that AOL results showed that "***increasing competition with . . . free services, contrary to many dire predictions, certainly is not affecting us . . . especially when you see the 2 million members that we added worldwide during the quarter . . . . We've never been more bullish on the prospects for our combined company than we are today***." In 4/00, Levin affirmed that AOLTW would achieve 01 free cash flow of $5 billion and that free cash flow would "***grow[] at 50 percent a year***," yielding a "***very powerful balance sheet***." Salomon Smith Barney issued an extremely bullish report on AOL, stressing that its e-commerce advertising growth had "***several sustainable and predictable sources***," raising AOL's revenue and EPS forecasts, and stating that the new company, AOLTW, would be a "***free cash flow machine***" worth $115 per share. Morgan Stanley also pitched in with a report stating that "***we really like the merger***," which was "***very, very impressive***" and "***makes sense strategically and financially***." According to Morgan Stanley, "***few companies have the compelling financial and valuation characteristics of the combined [AOLTW]***," stressing its most unique asset – AOL's "***26 million[2] paying subscribers***." For AOLTW, Morgan Stanley forecast 28%-29% EBITDA growth in 01, "***conservatively***" 25% EBITDA growth in 00-05, and that e-commerce advertising revenues would grow at 20%-22% per year in 00-05 with 80% gross profit margins. The Merger Registration Statement became effective on 5/19/00 and included representations that AOL had just achieved record e-commerce advertising revenues, a 103% year-over-year increase, that AOL had 22.2 million members (subscribers) and an e-commerce advertising backlog of $2.7 billion, as of 3/31/00.

---

[2]     Including the CompuServe service.

22.    As a result of the contents of the Merger Registration Statement, the reported success of AOL's core business and its e-commerce advertising operations, Ernst & Young's certification and/or review and approval of AOL's financial results, Morgan Stanley's fairness opinion and the forecasts of merger synergies and economies and the revenue, EBITDA and free cash flow growth to be achieved by AOLTW, on 6/23/00, Time Warner shareholders approved AOL's acquisition of Time Warner.  However, even as the Merger Registration Statement was being circulated to Time Warner shareholders and they were voting to sell their company to AOL, behind the scenes, AOL and Time Warner top executives knew things were far different than what was being publicly represented or forecast.  They knew or should have known that the success of AOL's e-commerce advertising operations and backlog, as reported, were inflated by bogus one-time highly structured barter/swap/round trip and equity investment deals to create otherwise unavailable and unsustainable revenues.  In addition, the problems in AOLTW's core online subscription business had worsened due to market saturation and intensified low-price or no-cost access competition, requiring AOLTW to continue to engage in improper tactics to boost its subscriber numbers in an effort to conceal the deterioration of that core part of its business.

23.    Due to the regulated nature of Time Warner's and AOL's businesses, before the Merger could be closed, it was necessary to secure several regulatory approvals, a process that delayed the closing of the Merger for several months – as it turned out, until 1/01.  During the period following Time Warner stockholder approval of the Merger in 6/00 and the closing of the Merger in 1/01 upon receipt of the required regulatory approvals, it was more important than ever for defendants to continue to present AOL's core online access business and its e-commerce advertising as achieving rapid growth and success.  This was necessary not only to support AOL's stock price, but also because the Merger documents contained provisions that **_required_** Time Warner's Board to terminate the Merger in the event of any "**_material adverse change_**" in AOL's business or finances

and *permitted* Time Warner's Board to terminate the Merger for any reason upon a payment to AOL. Any revelation of business problems, slowing growth or financial falsification at AOL or indication that AOL's or AOLTW's growth forecasts were impaired would have crushed AOL's stock and resulted in tremendous pressure on Time Warner's Board and executives to terminate the Merger (and on Morgan Stanley to revise or revoke its fairness opinion) – something they did not want to do, since they all stood to gain hundreds of millions of dollars when the Merger closed, regardless of how it turned out later.

24.     During the months preceding the closing of the Merger, AOL's senior executives were frequently secretly briefed on the decline in advertising revenue, and held weekly meetings to discuss the increasingly devastating effect on AOL of the troubles suffered by the company's dot-com customer base.  Rather than disclose this adverse trend and risk derailing the Merger, AOL concealed it.  The company did not take non-paying dot-coms to court to collect for fear that public filings would disclose this growing weakness in AOL's business.  Instead, it charged failing dot-com customers a fee for shortening the term of their contracts and improperly recorded the fee as advertising revenue.  Additionally, AOL's Business Affairs unit structured increasing numbers of "unconventional" deals, *i.e.*, "***BA Specials***" – transactions used to inflate reported e-commerce advertising revenues and backlog.  For example, AOL improperly converted outstanding uncollected legal judgments and settlements into advertising revenues and even reported millions of dollars of revenue on advertisements it had run without the potential customers' consent.  Other "unconventional" transactions were "swaps" or "round trips," akin to those employed by Global Crossing and Enron Corp., in which AOL and other companies agreed to advertise with each other – swap deals with no real economic substance.  AOL did bogus deals with both Qwest and WorldCom – two companies whose own accounting has been shown to be grossly falsified – and Veritas, which has restated its results to eliminate millions in revenues from bogus deals with AOL, and

- 18 -

Homestore.com, which has not only restated its financial results due to phony deals with AOL, but has seen several of its top executives plead guilty to criminal charges for phony deals – ***including deals with AOL*** – which resulted in AOLTW being added as a defendant in the large securities class action suit on behalf of Homestore.com's shareholders alleging that AOLTW participated in a scheme to help inflate Homestore.com's (and its own) financial results via a host of phony e-commerce advertising deals.  The federal district court judge presiding over the *Homestore.com* case said that AOL's behavior was part of a "***massive conspiracy driven by pure avarice***."  An AOL deal with Bertelsmann AG was derived from AOL paying an extra $400 million to Bertelsmann for its stake in AOL Europe and Bertelsmann "buying" $400 million in advertising from AOL.

25.    Thus, following stockholder approval of the Merger in 6/00, the top executives at AOL and Time Warner continued to falsely reiterate their previous forecasts of synergies and economies the Merger would create, as well as the forecasts of huge revenue, EBITDA and cash flow growth immediately following the Merger and for years to come.  During 00, AOL continued to report its financial and operating results as a separate entity, and continued to report strong growth in its online access subscriber metrics, both domestically and internationally, as well as continued strong growth in the revenues of its high-margin e-commerce advertising business and an ever-growing backlog of e-commerce advertising commitments.  AOL and Time Warner continued to report these results and their executives continued to make these extraordinarily bullish forecasts of synergies and economies and future revenue and profit growth, even though during this period the dot-com boom imploded and the U.S. economy weakened, causing many honest companies to report curtailed advertising commitments and/or reduced advertising revenues or growth – leading to fears in the investment community that these same conditions would hurt AOL and Time Warner and thus AOLTW's business post-merger.

26.     However, AOL and Time Warner executives went to great lengths to negate any notion that the e-commerce advertising business of AOL or the cable TV advertising business of Time Warner was suffering any slowdown or that the economies, synergies and growth they were forecasting for AOLTW would not be achieved.  In mid-7/00, both Time Warner and AOL issued their financial results.  AOL again reported record results – 5.6 million new subscribers in F00 (a total of 23+ million) – driven by e-commerce advertising revenue which soared 160% to $609 million – with a backlog now of $3 billion.  AOL said its record results "*reflect our success in executing business plans*," "*underscoring [the] strength and sustainability of our business model*." AOL was "*continuing to drive up [its] advertising and e-commerce revenues through an increasing number of partnerships*," building "*backlog at a record pace*."  AOL's business "*has never been stronger, our growth opportunities have never been better*."  AOL stressed the quality of its e-commerce advertising backlog – "*more of the traditional blue chip names*" which "*account for the vast majority of our backlog*."  AOL assured investors that "*we actively monitor and manage the backlog and continue to have a very high confidence level in it … all the more so, as the trends of consolidation among the dot-coms [and] the adoption of the medium by established advertisers continues to accelerate*."  Finally, AOL told investors, "*[a]ll of this serves to underscore the strength of the foundation on which [AOLTW] will be built*."  In mid-7/00, Time Warner also reported its results for the quarter ended 6/30/00, stating that the new AOLTW management team was "*already working very well together*" and that  based on recent meetings, Levin was even "*more comfortable*" with the numbers, stating that the new company would show "*strong sustainable growth*" with 01 revenues "*north of $40 billion*," with annual revenue growth of "*12-15%*" thereafter, 01 EBITDA "*north of $11 billion*" with annual EBITDA growth of "*about 25%*" thereafter, and free cash flow growth of "*50% a year*."  All of this would "comfortably" yield EPS growth of 25%-30% annually.

27.     In fact, by at least 8/00, internal company documents showed that AOL was at risk to lose substantial advertising revenue from existing customers the following fiscal year.  According to a subsequent 7/02 *Washington Post* article, in 9/00, AOL documents had estimated that AOL was at risk to lose $108 million in advertising revenue in F01 (7/1/00-6/30/01) due to the financial difficulties of its advertising customers.  In early 10/00, defendant Pittman and other AOL executives were told that as a result of the Company's many failing dot-com customers, AOL was at risk to lose $140 million in advertising revenue in calendar year 01.

28.     As 00 unfolded and AOL and Time Warner continued to work on closing their Merger, the dot-com implosion accelerated and many analysts continued to fear a general slowdown in advertising spending – a combination of events some thought would hurt AOL's e-commerce advertising and Time Warner's cable TV business and AOLTW's growth and success after the Merger closed.  For instance, on 10/16-17/00, AOL's and Time Warner's stocks plummeted from $53.54 to $48 and from $80 to $65.40, respectively, on these concerns.  But AOL and Time Warner executives quickly put these concerns to rest.

29.     On 10/18/00, AOL and Time Warner again both reported very strong financial results *– in AOL's case including an 80% increase in e-commerce advertising revenues and a $3 billion e-commerce advertising backlog*!  AOL and Time Warner executives, in conference calls and media interviews, went to extraordinary lengths to calm investor concerns, assuring investors that "*AOL's advertising growth is right on target*," and that "*the current advertising environment benefits us because it will drive a flight to quality*."  As to any supposed industry-wide slowdown in advertising revenues, Pittman, AOL's President, and Levin, Time Warner's CEO, both said "*I don't see it and I don't buy it*," and Pittman stressed AOL's e-commerce revenue growth was "*very healthy . . . I can't say that strongly enough*."  Case attributed AOL's resilience to the fundamental strength of its business and reassured investors that the collapse of the Internet boom would not affect AOL.  Case

said: "*We have looked at our vulnerability to the dot-com sector, and only a few percentage points are potentially at risk*." Levin assured investors that the integration of the two companies was "*actually going . . . better than anything I've ever experienced*" and he was "*even more confident today . . . about our ability to meet our financial targets*." Case said "*our post-merger planning for integrating AOL and Time Warner is going exceedingly well*," "*we feel terrific about the way the new company is coming together and we are convinced that we'll meet the financial targets we have set*." Kelly said, "*[o]ur backlog of committed advertising and commerce revenues was more than $3 billion . . . we are extremely confident about the quality and composition of our backlog*," "*[w]e review our backlog carefully . . . it's in very good shape . . . [and] AOL's advertising commerce business is very healthy . . . .  I can't say that strongly enough*." Again, they told investors that in 01 AOLTW's "*revenues will be $40 billion plus*," "*revenue growth would be 12% to 15% annually, EBITDA . . . will be $11 billion plus*" and free cash flow would be "*growing at 50% a year*." As a result, investors were told that the AOL/Time Warner Merger would "*substantially driv[e] our growth [and] profitability*," and that "*[w]e are confident that AOL Time Warner will be able to deliver quickly on the promise of the merger*." These extraordinary assurances, representations and forecasts halted the sharp decline in AOL's and Time Warner's stocks. By early 11/00, AOL's stock recovered and was up to $58.50 per share. Time Warner's stock had recovered to $87 per share. The Merger, and the insiders and their financial advisor's hopes to cash in, remained on track.

30.     Between late 99 and early 01, the period corresponding to the time between the start of merger discussions and the close of the Merger, "unconventional," *i.e.*, bogus, transactions accounted for several hundreds of millions of dollars of AOL's reported e-commerce advertising revenue and ad backlog. *Without these unconventional deals, AOL would have fallen far short of analysts' estimates of its growth in advertising revenue in 00 and 01*, and the growth of its backlog

would have slowed sharply if not actually declined. The "unconventional" (*i.e.*, bogus) deals thus enabled AOL to delay the time when the adverse impact of the collapse of dot-com advertising on its business would be apparent. Worse yet, in order to cover up and conceal the deterioration in AOLTW's own cable network advertising business – one of the true mainstays of the Time Warner empire – which was being badly hit by intensifying competition and a slowdown in advertising, the AOLTW executives were engaging in a number of tricks to artificially and improperly boost AOLTW's cable TV advertising revenues, including counting as advertising revenues initial new channel licensing fees which, in fact, were not advertising revenues at all. The hundreds of millions in fabricated advertising revenues and e-commerce advertising backlog was critical in allowing AOL and Time Warner to beat Wall Street analysts' expectations for earnings during a time when the advertising business overall seemed to be suffering a slowdown, but one not impacting AOL or Time Warner overall, making seem credible AOLTW's reported assurances that the dot-com implosion and advertising slowdown was not only not hurting them, but was actually benefiting them, as the current conditions drove a "flight to quality."

31.    When the AOL/Time Warner Merger closed in 1/01, AOLTW reaffirmed the previous forecasts of Merger synergies and economies, as well as the growth in revenues, EBITDA and cash flow to be achieved by the new enterprise, telling investors a top flight "*exceptional*" management team **had already made substantial progress in successfully integrating the operations of the two companies**. The stock of the new company initially traded at $49 per share. And, as the new company came into existence, its Board announced a $5 billion common stock repurchase program, whereby AOLTW would repurchase hundreds of millions of shares of its stock on the open market,  because, in the opinion of AOLTW's management, **that stock was** "**undervalued**." At the end of 1/01, a few weeks after the Merger closed, AOLTW held one of the largest investor meetings in the history of any public company in New York City. During their

discussions with analysts in connection with that meeting, the top executives of AOLTW, *i.e.*, Levin, Case, Pittman and Parsons, again forecast AOLTW 01 revenues of $40 billion and 01 EBITDA profit growth of 30% – a giant 01 $1 billion increase – as well as 50% free cash flow growth in 01 and future years. They extolled AOLTW as a "***one-of-a-kind company positioned for sustainable high growth***," and stressed that strong growth in AOL's online subscriber numbers and its e-commerce advertising revenues would be a major driver of growth for AOLTW going forward. AOLTW's important cable TV operations, especially its advertising, was also represented to be achieving record results. Time Warner's financial advisor – Morgan Stanley – repeated all these glowing assurances and forecasts. However, at this time AOLTW ***stopped AOL's prior practice of reporting its e-commerce advertising backlog***! When asked why AOLTW had done this, Kelly, AOLTW's CFO, told analysts that the e-commerce advertising backlog figure was ***no longer*** "***meaningful***" due to the increased size of the new company and its diverse advertising revenue streams. In truth, AOL's previously claimed e-commerce advertising backlog was bogus, inflated by hundreds of millions of dollars of bad, one-time, not-to-be-repeated and cancelable-at-will deals – and even despite these falsifications was now falling sharply and thus had to be concealed from investors to perpetuate the false illusion that the Merger was a success.

       32.    Upon the closing of the Merger, Morgan Stanley and Salomon Smith Barney immediately pocketed cash fees of over $100 million – the largest merger advisory fees in history. Realizing that their representations and forecasts were at best reckless, if not deliberately false, due to the host of intensifying negative factors that were hurting AOLTW's business and would inevitably crush its stock when they ultimately could no longer be concealed, as soon as the Merger closed, AOLTW's top executives took steps to protect themselves financially from the impending collapse of AOLTW stock. Because the Merger had now closed, ***all of their previously unvested AOL and Time Warner stock options had converted to AOLTW stock options and immediately***

*accelerated and vested*.  Thus, they were now in a position to bail out of AOLTW.  And bail out they did.  Beginning only days after the Merger closed – and *the very day after the huge and extraordinarily* bullish analysts' conference in New York at which they assured investors of the success of the Merger and forecast years of strong financial growth for AOLTW – AOLTW top executives began to spend over one billion dollars of AOLTW's corporate funds to repurchase millions and millions of shares of AOLTW's "*undervalued*" stock on the open market – to manipulate upward and artificially inflate the stock – while at the *same* time, these *same* executives began to unload millions of shares of their own AOLTW stock at what they knew were artificially inflated prices, to benefit from that stock price inflation and shield themselves from the economic calamity and the stock collapse they knew was coming.  Starting the very next day, and continuing *between 2/2/01 and 6/14/01, while these AOLTW top insiders caused AOLTW to spend $1.3 billion in AOLTW's corporate funds to repurchase some 30.2 million shares of AOLTW stock on the open market, these same AOLTW insiders unloaded 8.9 million shares of their own AOLTW stock for some $440 million in insider trading proceeds*!

33.  During late 4/01 and early 5/01, the large stock selling by AOLTW insiders began to attract notice in the investment community due to required SEC filings disclosing these sales.  When analysts and members of the media questioned those sales as inconsistent with the AOLTW buy-back of its "*undervalued stock*," AOLTW spokespersons Jim Whitney and Ed Adler lied, telling them that the sales were prompted by a "*change in AOL's compensation structure*," a need to raise money for executives' "*charitable giving*" and "*philanthropic activities*," and were "*part of their long-term personal financial planning*," as the buy-back program "*has nothing to do with the individual selling by executives*."  In fact, the buy-back program was designed and intended to support the stock sales by the executives which were a bail-out by them to pocket hundreds of

millions of dollars before the truth about the failure of the Merger and problems with AOLTW became public and the stock collapsed.

34.    Following the Merger, continuing concerns over the impact of the dot-com collapse and an advertising slowdown in AOLTW's business persisted, hurting AOLTW's stock, driving it down to as low as $33 in early 4/01, just as the massive AOLTW insider bail-out was underway.  In 4/01, AOLTW was to report its 1stQ 01 results – *its critical first quarter as a newly merged enterprise* – which would be intensely focused on by analysts and investors for any sign that AOLTW's business was faltering, due to the advertising slowdown or otherwise.  When the reported results *beat expectations*, AOLTW assured investors that this showed that the Merger integration had succeeded and the promised synergies and economies were being achieved – reporting *strong subscriber growth, e-commerce and cable TV advertising revenues and EBITDA*.  AOLTW's executives told investors that these *results* "*underscore the unique promise of AOL Time Warner*," that "*this is just the beginning*" and that the "*businesses are working together as one, unified organization to deliver shareholder value over the near- and long-term*."[3]  As a result of these

---

[3]    The statements that AOLTW would have or had an excellent or outstanding management team that was working together effectively to integrate AOL's and Time Warner's separate operations to achieve the proposed Merger synergies and economies were false.  The executives for the two companies hated each other, were constantly fighting with each other and attempting to aggrandize their own positions in the combined Company.  As *The New York Times* reported on 1/19/03:

> But all the happy talk about a new common ground leaves a bitter taste among those who are no longer part of the effort.

> "They hated us and did everything they could to make sure that we got no cooperation and made no progress, including Logan," said a former senior AOL executive.  "It reminds me of the child who killed his mother and father and then threw himself on the mercy of the court as an orphan."

Even Morgan Stanley has admitted after the fact (in 12/02):

assurances and forecasts, AOLTW stock strengthened, soaring from $43 on 4/17 to $50 on 4/18. The stock continued to move higher during 5/01, within weeks reaching its post-merger high of $58.51 as the AOLTW insiders continued their bail-out, assisted by the expenditure of hundreds of millions of dollars of AOLTW's cash to buy back AOLTW shares on the open market while they were selling their own AOLTW shares.

35.    On 5/17/01, Levin spoke at the AOLTW Annual Meeting of Shareholders, stating:

> Last year, on this same stage, I said our intention was to come out fast from the starting gate as a single entity focused on executing one strategy. ***Although the regulatory process delayed our start, there was a silver lining. During that time, our board and management became thoroughly acquainted. The degree of cooperation and consultation was extraordinary*** . . . .

> Under CFO Mike Kelly, we formed a high-powered financial group that has done a remarkable job of designing a set of metrics for a company in a category all its own. . . . ***As a result, we're comfortable with our 2001 year-end targets of revenues of $40 billion and EBITDA of $11 billion. They're grounded in the operating strengths of AOL Time Warner and its demonstrated potential***.

---

> In our view, the biggest disappointment[] post the combination of AOL and Time Warner [is] . . . the inability of the AOL and Time Warner divisions to work together. On the last point, we believe the company suffered from the antithesis of a post-merger honeymoon – the management team seemed too focused on revenue and EBITDA targets at the expense of running the business and, simply, the people refused to work together. Something had to break, and break it did.

*The Daily Deal* reported (12/21/02):

> Steve Case thought he was buying Time Warner and one day he woke up to find the Warner guys in charge . . . . Now, however, the Warner guys face an extremely old, very daunting problem that is largely of their own making . . . ***AOL Time Warner consists of a number of . . . companies that don't talk to each other, don't like each other and treat each other as competitors***.

On 7/7/02, *The New York Times* reported:

> Morale among executives of the former Time Warner has plummeted steadily since the merger was announced at the start of 2000. Many had chafed at what they considered the initially condescending attitude among executives of the former America Online toward the stodgy world of old media, and they especially resented the cost cuts imposed to make the combined company's aggressive earnings goals.

*Key to our performance is AOL. . . .  I've described AOL as our crown jewel. . . .  AOL is a transforming catalyst that immeasurably strengthens all our businesses*.

\*       \*       \*

*AOL's 2000 performance was truly outstanding.  Subscriptions grew by 30%, from 20.5 to 26.7 million.  Internationally, AOL added 2 million subscribers and the possibilities for accelerating this growth are dramatic*.

*In the first quarter of 2001 – our first as a combined company – the momentum stayed strong*.

36.    Then, in mid-6/01 – *just days after top AOLTW executives* had unloaded over 8.9 million shares of their AOLTW stock at inflated prices and pocketed $440 million for themselves – it leaked out that AOLTW had suspended Eric Keller and another top AOL executive who had both been e-commerce deal negotiators in AOL's Business Affairs unit, leading to speculation in the financial media, which AOLTW denied, of financial improprieties in AOL's e-commerce business. As those initial concerns over the reliability of AOL's e-commerce advertising figures grew and additional revelations came forth, AOLTW stock, which traded as high as $55 per share in mid-6/01, began a descent from which it would not recover.  However, AOLTW executives denied any accounting improprieties, while providing false assurances to investors regarding the success of the Merger, the continuing success of AOLTW's core Internet access business, its e-commerce advertising business and the success of AOLTW's cable TV advertising business, insisting that AOLTW's forecasts of 12%-15% revenue growth, 30% EBITDA growth and 50% free cash flow growth were still accurate and were being achieved – thus causing the stock to continue to trade at artificially inflated, albeit lower, levels for many more months.  For instance, in late 6/01, Levin assured investors that "*advertising revenues are . . . stabilizing,*" "*[w]e have several high-growth areas and we expect to grow at a healthy pace*," and that AOLTW was "*on track*" to meet its 01 forecasts.  Internally, lower level executives at AOLTW reacted with stunned disbelief to what they knew were false assurances.

- 28 -

37.     In mid-7/01, AOLTW reported its 2ndQ 01 results – its second quarter as a combined company.  Again, AOLTW was extremely bullish.  Again, the highly focused-on results were outstanding, with record AOL online subscriber numbers both domestically and internationally (30 million subscribers), and very strong AOL e-commerce advertising and Time Warner cable advertising revenue growth.  The executives told investors that these "***record results***" were further proof that "***we are delivering on the promise of the AOL Time Warner Merger [and] . . . we have just begun to tap the enormous potential***."  They stressed AOLTW's "***outstanding bottom-line results [and] dramatic improvement in profit margins***" – "***proof that we are delivering on the promise of the merger***."  They also stressed the "***great progress [in] integrating the Company***" and that they "***have made and are making great strides in driving efficiencies . . . and expanding our EBITDA margins***."  Levin said AOLTW was now a "***premier growth company, a safe and secure place for people to put their money***."

38.     In late 8/01, AOLTW stated that its prior forecast of $40 billion in 01 revenue was now "***at the top of the range***" for 01.  But then, in late 9/01, AOLTW began to dramatically cut back its previous forecasts of post-merger revenue, EBITDA and cash flow growth, disingenuously blaming it on the events of 9/11/01.  AOLTW stock plunged lower, falling to $30 per share by late 9/01.  While AOLTW stock would continue to trade at artificially inflated prices due to defendants' continued false assurances and promises regarding AOLTW's business and continued reporting of false financial results, after 9/01 there unfolded a shocking course of events exposing the AOLTW deal as one of the worst corporate mergers of all time, where executives had "cooked" corporate books and misled investors and, with help from their Wall Street bankers, had inflated AOLTW's stock so that they could pocket over a billion dollars for themselves while AOLTW shareholders were decimated.

39.     In 11/01, Kelly, AOLTW's CFO (and the prior CFO of AOL), was ***relieved of his accounting responsibilities***.  Levin pretended this was a promotion for Kelly ("***a super CFO***") when, in fact, Kelly was demoted for participating in the gross falsification of AOL's financial reports prior to the Merger.  Then, in early 12/01, Levin – AOLTW's CEO – just 61 years old and who had promised never to retire, suddenly retired, stating he wanted "***more 'poetry' in his life,***" a move that "***stunned***" investors and that the media termed a "***shocker***."  AOLTW stock declined from $36 to $31 over the next few days.  In 1/02, just after Levin left, AOLTW again slashed its revenue, EBITDA and cash flow forecasts, this time for ***both*** 01 and 02, now projecting single digit revenue growth in 02 with advertising revenue to show no growth.

40.     In early 4/02, Barry Schuler was ousted as the head of AOLTW's AOL unit.  In 4/02 or early 5/02, AOLTW's top insiders learned that as a result of the Keller suspension and Schuler ouster, press speculation over the legitimacy of AOL's e-commerce deals, AOLTW's CFO's demotion and Levin's sudden, startling departure, certain members of the financial press were now intensely investigating the Company – especially the activities of AOL's e-commerce advertising business.  Knowing that this would ultimately lead to the exposure of AOL's prior phony accounting practices and crush AOLTW's stock even further, in mid-02, several AOLTW top insiders unloaded even more of their AOLTW shares, selling off another 11.2 million shares for $205.2 million between 5/10/02 and 7/15/02, continuing to sell as they learned that *The Washington Post* was preparing to publish a major exposé on AOL's e-commerce advertising accounting practices, which would expose widespread irregularities and Pittman's role in them.

41.     On 7/18/02, just three days after this insider bailout by AOLTW executives, *The Washington Post* published an extensive investigative exposé laying out Pittman's role in falsifying AOL's financial reports.  *The Washington Post* exposé reported:

In October 2000, a critical question confronted America Online Inc. as it sought to cinch the largest merger in U.S. history: Was it feeling the effects of an industry-wide slowdown in advertising?

*AOL's president at the time, Robert W. Pittman, offered a resounding answer: "I don't see it, and I don't buy it," he told Wall Street stock analysts and the media.*

Other AOL officials were less optimistic. . . . *[I]nternal company projections raised caution about one sector: dot-coms. Failures were accelerating among those Internet start-ups, which represented a significant amount of the company's ad business.*

About two weeks before Pittman's declaration on Oct. 18, he and other executives were told in a meeting at Dulles headquarters that AOL faced the risk of losing more than $140 million in ad revenue the following year.

. . . [T]he internal warning came when investors were highly alert to any weakness in online advertising. Just a week before Pittman's public statements, for example, shares of AOL's key competitor, Yahoo! Inc., plunged 21 percent after the company reported strong ad growth but acknowledged that the pace could not be sustained. . . .

In such an atmosphere, and with its takeover of Time Warner Inc. imminent, AOL sought to maintain its breakneck growth in advertising and commerce revenue. . . . AOL boosted revenue through a series of unconventional deals from 2000 to 2002, before and after the merger, according to a *Washington Post* review of hundreds of pages of confidential AOL documents and interviews with current and former company officials and their business partners.

AOL converted legal disputes into ad deals. It negotiated a shift in revenue from one division to another, bolstering its online business. It sold ads on behalf of online auction giant eBay Inc., booking the sale of eBay's ads as AOL's own revenue. AOL bartered ads for computer equipment in a deal with Sun Microsystems Inc. AOL counted stock rights as ad and commerce revenue in a deal with a Las Vegas firm called PurchasePro.com Inc.

AOL also found ways to turn the dot-com collapse to its advantage, renegotiating long-term ad contracts it risked losing into short-term gains that boosted its quarterly revenue.

*       *       *

Without the unconventional deals, AOL would have fallen short of analysts' estimates of the company's growth in ad revenue (which is reported in a category that also includes revenue from commerce) in three quarters in 2000 and 2001.

Collectively, the deals helped AOL beat Wall Street analysts' expectations for earnings per share – a critical profit yardstick for investors – by a penny per share

in two quarters in 2000.  At the time, investors punished companies whose earnings were off by even a cent.

Alec Klein, *Unconventional Transactions Boosted Sales; Amid Big Merger, Company Resisted Dot-Com Collapse*, Wash. Post, 7/18/02, at A01.  The next day – 7/19/02 – former AOL President and now AOLTW Co-COO Pittman was kicked out of the Company.[4]

42.    The collapse of AOLTW's e-commerce ad revenues are shown below in a chart demonstrating AOL's advertising and e-commerce revenues after restatement to eliminate the bogus transactions AOLTW has admitted:



43.    In late 7/02 and early 8/02, AOLTW confirmed it was the subject of SEC/DOJ civil and criminal investigations regarding its e-commerce advertising deals, including those with WorldCom, Sun Microsystems, Qwest, Oxygen Media, PurchasePro, DirectTV and Homestore.com,

---

[4]        According to *The Daily Deal* (12/21/02):

Is AOL's advertising in the tank?  Well, a lot of its advertising, hype to the contrary, **was always in the tank.  Much of it was a barter business, not a cash business, and trying to stay afloat in an angry sea by selling advertising was a mug's game** . . . .  AOL, like a lot of '90s stuff, was always something of a Potemkin village, and now it has no bubble to hide behind.  This is the true story of what went on, and it is the true story of today.

as well as AOLTW's forecasts of strong financial growth before and after the Merger, while insiders were bailing out, unloading hundreds of millions of dollars worth of their AOL and AOLTW shares at inflated prices. On 7/25/02, AOLTW stock hit its post-merger low of just $8.60 per share. "***This is the end of a fiasco***," said one analyst. On 8/9/02, AOLTW publicly admitted for the first time that AOL had previously improperly recorded millions of dollars of e-commerce advertising revenues. And a few days later, on 8/14/02, it was revealed that David Colburn, the senior AOL executive in charge of e-commerce advertising had also been kicked out of the Company. On 9/18/02, AOLTW was named a defendant in the *Homestore.com* securities class action suit based on very detailed allegations that it had participated in a scheme to inflate Homestore.com's, and its own, advertising revenues via millions of dollars of specified phony transactions. Several Homestore.com executives have now pleaded guilty to criminal securities fraud charges arising from these transactions with AOLTW. AOLTW then restated several prior quarters of its financial results to eliminate almost $200 million in improperly recognized e-commerce advertising revenue – much of which was recognized and reported prior to the Merger. AOLTW then admitted to improperly accelerating the recognition of hundreds of millions of dollars of cable TV payments as advertising revenues and also made accounting changes and adjustments, reducing its previously reported advertising revenues by many millions of dollars more. Finally, after repeatedly denying it would do so (*i.e.*, on 8/23/02, AOLTW's CFO said "it's absolutely premature and inappropriate to do an impairment charge at this time"), in early 03, AOLTW took a gigantic goodwill write-off ($45 billion) related to the over-valued assets of AOL, ***resulting in AOLTW suffering a loss of approximately $100 billion for 02 – the largest annual corporate loss of all time***! At the same time, Case, the Chairman of AOLTW, was forced out of the Company. On 3/28/03, AOLTW filed its 02 Form 10-K in which it disclosed that the SEC had informed the Company that its accounting for $400 million in advertising from a deal with Bertelsmann AG was improper. AOLTW has restated its results to eliminate $400 million

- 33 -

from its advertising revenues.  The SEC ultimately concluded that AOL's accounting for AOL

Europe was improper beginning in 3/00, the same 3/00 financial statements which were included in

the Merger Registration Statement.  The SEC has also investigated AOL's reported subscriber

metrics.  AOLTW stock now trades at just $17-$18 per share.

44.    As the figures below show, the promised Merger synergies, economies and growth

did not occur, as AOL's e-commerce advertising revenues collapsed, its backlog evaporated and its

substantial membership stagnated and then fell (in part because AOL began to remove non-paying

customers from the subscription number):

|  | 3/31/99 | 6/30/99 | 9/30/99 | 12/31/99 |
|---|---|---|---|---|
| AOL Advertising & Commerce Revenues | $20M | $233M | $350M | $437M |
| EBITDA – AOL | $259M | $343M | 386M | $453M |
| EPS | $0.17 | $0.07 | $0.07 | $0.10 |
| Backlog of Ad Rev | $1.3B | $1.5B | $2.0B | $2.4B |
| AOL Subscribers | 16.9M | 17.6M | 18.7M | 20.5M |

|  | 3/31/00 | 6/30/00 | 9/30/00 | 12/31/00 |
|---|---|---|---|---|
| AOL Advertising & Commerce Revenues | $557M | $609M | $649M | $741M |
| EBITDA – AOL | $492M | $572M | $599M | $652M |
| EPS | $0.17 | $0.13 | $0.13 | $0.01 |
| Backlog of Ad Rev | $2.7B | $3.0B | $3.0B | N/R |
| Subscribers | 22.2M | 23.2M | 24.6M | 26.7M |

|  | 3/31/01 | 6/30/01 | 9/30/01 | 12/31/01 |
|---|---|---|---|---|
| Ad & Commerce Rev – AOLTW | $2.05B | $2.28B | $1.93B | $2.22B |
| AOL Ad & Commerce Rev | $721M | $706M | $624M | $637M |
| EBITDA –AOLTW | $2.1B | $2.5B | $2.5B | $2.8B |
| EBITDA – AOL unit | $684M | $801M | $742M | $718M |
| EPS | ($0.31) | ($0.17) | ($0.22) | $(0.41) |
| Backlog of Ad Rev | N/R | N/R | N/R | N/R |
| AOL Subscribers | 28.8M | 30.1M | 31.3M | 33.2M |

|  | 3/31/02 | 6/30/02 | 9/30/02 | 12/31/02 |
|---|---|---|---|---|
| Ad & Commerce Rev – AOLTW | $1.83B | $2.07B | $1.7B | $2.2B |

Ad & Commerce

| | | | | |
|---|---|---|---|---|
| Rev – AOL | $497M | $409M | $324M | $388M |
| EBITDA – AOLTW | $2.1B | $2.5B | $2.2B | $2.8B |
| EBITDA – AOL unit | $433M | $473M | $432M | $474M |
| EPS | ($12.25) | $0.09 | $0.01 | ($10.04) |
| Backlog of Ad Rev | N/R | N/R | N/R | $555M |
| AOL Subscribers | 34.6M | 35.1M | 35.3M | 35.2M |

| | 03/31/03 | 06/30/03 | 09/30/03 | 12/31/03 |
|---|---|---|---|---|
| Ad & Commerce Rev – AOLTW | $1,338 | $1,678 | $1,424 | $1,742 |
| Ad & Commerce Rev – AOL | $240 | $183 | $180 | $184 |
| EBITDA – AOLTW | $1,985 | $2,165 | $2,278 | $2,359 |
| EBITDA – AOL unit | $404 | $431 | $371 | $301 |
| EPS | $0.09 | $0.24 | $0.12 | $0.14 |
| Backlog of Ad Rev | N/R | N/R | N/R | N/R |
| AOL Subscribers | 34,400,000 | 31,500,000 | 31,000,000 | 30,700,000 |

| | 03/31/04 | 06/30/04 | 09/30/04 | 12/31/04 |
|---|---|---|---|---|
| Ad & Commerce Rev – AOLTW | $1,445 | $1,846 | $1,646 | $2,016 |
| Ad & Commerce Rev – AOL | $228 | $225 | $259 | $295 |
| Operating Income Bef Amortization/Depreciation – AOLTW | $2,413 | $2,637 | $2,392 | $2,428 |
| Operating Income Bef Amortization/Depreciation – AOL Unit | $489 | $487 | $459 | $326 |
| EPS | $0.21 | $0.17 | $0.11 | $0.24 |
| Backlog of Ad Ref | N/R | N/R | N/R | N/R |
| AOL Subscribers | 30,400,000 | 29,700,000 | 29,000,000 | 28,500,000 |

| | 03/31/05 | 06/30/05 | 09/30/05 | |
|---|---|---|---|---|
| Ad & Commerce Rev – AOLTW | $1,647 | $2,020 | $1,776 | |
| Ad & Commerce Rev – AOL | $313 | $319 | $325 | |
| Operating Income Bef Amortization/Depreciation – AOLTW | $2,595 | $2,570 | $2,601 | |
| Operating Income Bef Amortization/Depreciation – AOL Unit | $540 | $550 | $481 | |
| EPS | $0.20 | ($0.07) | $0.19 | |
| Backlog of Ad Rev | N/R | N/R | N/R | |
| AOL Subscribers | 28,000,000 | 27,000,000 | 26,200,000 | |

45.    During 7/00-8/00, when AOL stock was artificially inflated in anticipation of the sale of AOL to another company, as set forth earlier, top AOL insiders sold off some 2.2 million shares of their AOL stock at as high as $58 per share, pocketing over $125 million.  Virtually all these

shares were acquired by the sellers via the exercise of stock options pursuant to the AOLTW stock option plan.

46.     AOL's acquisition of Time Warner was accomplished through the falsification of AOL's financial results and other false statements and forecasts, and the stock of AOLTW after the Merger was artificially inflated by the continued falsification of AOLTW's financial results and other false statements concerning the success of the Merger, as well as false forecasts of the future profitable growth that would result.  The Board of Time Warner and Time Warner's financial advisor failed in their duties and obligations to protect Time Warner shareholders and were grossly negligent if not willfully indifferent to the dangers posed by the acquisition of Time Warner by AOL via merger, as well as the falsifications and manipulations engaged in by AOL to bring about that transaction, while the AOL insiders and AOL's financial advisor were actively seeking to inflate AOL's results and prospects to bring about its purchase of Time Warner, and inflate the stock of AOLTW after the Merger.  The former shareholders of Time Warner and those who purchased AOLTW stock after the Merger have suffered billions of dollars of losses, including the plaintiff in this action.  But the AOL, Time Warner and AOLTW insiders, named as defendants herein, who brought about this transaction and who manipulated and artificially inflated the price of AOL stock prior to the Merger and AOLTW stock after the Merger have not fared nearly so badly.  *They unloaded 23.8 million shares of their AOLTW stock at inflated prices, pocketing over $797 million of illegal insider trading proceeds, while the architect of this fiasco – Levin – walked away from the smoldering ruins with a $625 million retirement package, including $1 million per year to "advise" AOLTW and $400,000 per year for life as a pension*!  The graph which follows shows the AOL, Time Warner and AOLTW stock prices and other key events during the relevant period:

**BLANK PAGE FOR LARGE FOLD-OUT CHART (RYAN K)**

## JURISDICTION AND VENUE

47.    The claims asserted herein arise under and pursuant to §§10(b), 14(a) and 20(a) of the

Securities Act of 1934 (the "1934 Act") [15 U.S.C. §§78j(b), 78n(a) and 78t(a)] and Rule 10b-5

promulgated thereunder by the SEC [17 C.F.R. §240.10b-5] and §§11, 12(a)(2) and 15 of the

Securities Act of 1933 ("1933 Act") [15 U.S.C. §§77k, 77l(a)(2) and 77o]. Jurisdiction is conferred

by §22 of the 1933 Act and §27 of the 1934 Act and venue is proper pursuant to §22 of the 1933 Act

and §27 of the 1934 Act.  In connection with the acts complained of, defendants used the

instrumentalities of interstate commerce and the U.S. mails.

48.    The violations of law complained of herein occurred in part in this District, including

the dissemination of materially false and misleading statements complained of herein into this

District.  AOLTW has operations located in this District.  Venue is proper because defendants

AOLTW, Ernst & Young and Morgan Stanley are found, are inhabitants, and/or transact business in

this District, as alleged herein; all defendants were party to the common scheme of acts or

transactions to violate the federal securities laws; and at least one act or transaction constituting the

violation occurred in this District, including the dissemination of the false and misleading Merger

Registration Statement and press releases and filing of statements with the SEC in this District.

## THE PARTIES

**Plaintiff**

49.    Plaintiff Norges Bank owned shares of Time Warner and AOL and exchanged those

shares for new shares in AOLTW in the Merger.  Plaintiff also purchased AOLTW shares after the

Merger on the open market.  As a result of these transactions, plaintiff has suffered damages, the

details of which will be provided in subsequent discovery in this action.

**Defendants**

50.    (a)    Defendant AOLTW is a corporation which was the issuer of the AOLTW

stock pursuant to the Merger Registration Statement and the Stock Option Registration Statements

(as defined herein in the First Claim for Relief). AOLTW has since been renamed Time Warner, Inc.

(b)    Defendant AOL, founded in 85, was engaged in interactive services, web brands, Internet technologies and electronic commerce ("e-commerce") services.

(c)    Defendant Time Warner was a media and entertainment company, operating cable networks as well as book, magazine and music publishing businesses, filmed entertainment and digital media.

51.    (a)    Defendant Stephen M. Case ("Case") was Chairman and CEO of AOL prior to the Merger and Chairman of AOLTW after the Merger, until he was forced to resign in early 03. He authorized the signing on his behalf of the Merger Registration Statement.

(b)    Defendant Gerald M. Levin ("Levin") was Chairman and CEO of Time Warner prior to the Merger and CEO and a director of AOLTW after the Merger, until he resigned in 12/01 and left the Company in 5/02. He consented to being named a director in the Merger Registration Statement and authorized the signing on his behalf of the Stock Option Registration Statements.

(c)    Defendant Richard D. Parsons ("Parsons") was President of Time Warner prior to the Merger and Co-Chief Operating Officer and a director of AOLTW after the Merger, until he was later promoted to Chairman and CEO of AOLTW. He consented to being named a director in the Merger Registration Statement

(d)    Defendant Kenneth J. Novack ("Novack") was Vice Chairman of AOL prior to the Merger and Vice Chairman of AOLTW after the Merger. He consented to being named a director in the Merger Registration Statement.

(e)    Defendant Robert W. Pittman ("Pittman") was President, Co-Chief Operating Officer and a director of AOL prior to the Merger and Co-Chief Operating Officer and a director of

AOLTW after the Merger, until he was forced out of the Company in 7/01. Also in 4/01, Pittman resumed his prior responsibilities over operations at the AOL subsidiary of AOLTW. He consented to being named a director in the Merger Registration Statement.

(f)    Defendant J. Michael Kelly ("Kelly") was Senior Vice President, Chief Financial Officer and Assistant Secretary of AOL prior to the Merger and Executive Vice President and Chief Financial Officer of AOLTW after the Merger until he was demoted in 11/01 and relieved of his accounting responsibilities. He signed the Merger Registration Statement and authorized the signing on his behalf of the Stock Option Registration Statements.

(g)    Defendant Stephen F. Bollenbach ("Bollenbach") was a director of Time Warner before the Merger and a director of AOLTW after the Merger. He consented to being named a director in the Merger Registration Statement.

(h)    Defendant Wayne H. Pace ("Pace") held multiple executive positions with Time Warner, from 7/93 to 3/01, including that of Chief Financial Officer. Following the Merger, in 3/01, Pace became Vice Chairman and Chief Financial and Administrative Officer of Turner Broadcasting System, Inc. In 11/01, Pace became Executive Vice President and Chief Financial Officer of AOLTW.

(i)    Defendant Steven Rindner ("Rindner") was Senior Vice President of Business Affairs & Development in 01 for AOL.

(j)    Defendant David M. Colburn ("Colburn") was President of AOL's Business Affairs unit, continuing in that position after the Merger, until he was ousted in 8/02. During the time he was President of AOL's Business Affairs unit, Colburn reported directly to defendant Pittman. Colburn was AOL's and AOLTW's chief deal-maker as far as e-commerce advertising was concerned. Colburn has been identified as a subject of DOJ and SEC investigations.

(k)     Defendant Eric Keller ("Keller") was an executive in AOL's Business Affairs unit, continuing in that position after the Merger, until he was ousted in 6/01.  Keller reported directly to defendant Colburn prior to and after the Merger.  Keller has been identified as a subject of DOJ and SEC investigations.

(l)     Defendant Joseph A. Ripp ("Ripp") was Chief Financial Officer of Time Warner prior to the Merger and Chief Financial Officer of AOLTW's AOL unit after the Merger, until he was replaced in 03.

(m)     Defendant Barry M. Schuler ("Schuler") was President of AOL's Interactive Services before the Merger and CEO of AOLTW's AOL unit after the Merger, until he was fired.

(n)     Defendant Pascal Desroches ("Desroches") was AOLTW's Assistant Controller since 01 and its Vice President and Deputy Controller since 5/02.  Prior to joining the Company, Desroches was a partner at KMPG, L.L.P., and served as a Professional Accounting Fellow with the SEC's Office of the Chief Accountant.  Desroches was a chief participant in the Company's internal "CFO Review."  In 3/04, the SEC issued a Cease and Desist Order regarding his violations of federal securities laws relating to his role in the accounting treatment of AOL advertising revenue pertaining to the Bertelsmann transactions.

(o)     Defendant John P. Tuli ("Tuli") was a Vice President in the NetBusiness unit at AOL.  Among other responsibilities, Tuli managed the development of the NetBusiness platform of which PurchasePro's marketplace was a key component.  On 1/10/05, Tuli was indicted on federal charges of securities fraud, conspiracy, making false statements to auditors, and wire fraud.

(p)     Defendant Myer Berlow ("Berlow") was Vice President for National Accounts at AOL.  Subsequently, he became President of AOL's Worldwide Interactive Marketing Division in the Business Affairs unit.  Following the Merger, he became President of the Global

Marketing Solutions Group under the direction of "AOL Time Warner's Advertising Council Body," which is comprised of the top sales executive in each of AOL Time Warner's divisions.

(q)     Defendant Paul T. Cappuccio ("Cappuccio") was Senior Vice President and General Counsel of AOL from 8/99 until the Merger.  Upon the Merger, Cappuccio became Executive Vice President, General Counsel and Secretary of AOLTW.  Cappuccio authorized the signing on his behalf of the Merger Registration Statement and Stock Option Registration Statements.

(r)     Each of the named defendants in ¶51(a)-(q) (the "Individual Defendants") participated in the Merger by, among other things, preparing, reviewing and/or signing or authorizing the signing of the Merger Registration Statement and the Stock Option Registration Statements.

52.     (a)     Defendant CitiGroup Inc. is a large integrated financial services institution that through subsidiaries and divisions (such as defendant Salomon Smith Barney Inc., a division of defendant CitiGroup Global Markets, Inc.) (collectively "Salomon Smith Barney") provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities.  Salomon Smith Barney acted as financial advisor to AOL in connection with the Merger, helping to craft and circulate the false and misleading Merger Registration Statement.  Salomon Smith Barney issued false and misleading reports on AOL prior to the Merger and AOLTW subsequent to the Merger, which helped to artificially inflate the market prices of AOL and AOLTW stocks.

(b)     Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley") is an integrated financial services institution that provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities.  Morgan Stanley acted as financial advisor to Time Warner in connection with the Merger and issued a false

opinion that the Merger was fair to Time Warner and its shareholders.  Morgan Stanley also issued false and misleading reports on Time Warner and AOL prior to the Merger, which helped to artificially inflate the prices of Time Warner and AOL stocks prior to the Merger and bring about the Merger, and on AOLTW after the Merger, which artificially inflated the market price of AOLTW stock.

(c)     Salomon Smith Barney and Morgan Stanley, as the financial advisors that helped bring about this disastrous Merger, pocketed the largest investment banking fee in history for helping orchestrate this deal, by issuing false reports on the impact of the Merger and AOL's, Time Warner's and AOLTW's businesses and, in the case of Morgan Stanley, a false opinion that the terms of the sale of Time Warner to AOL via the Merger was "fair" to the Time Warner shareholders.  These fees – over $135 million – were designed to and did motivate these financial advisors to do whatever was necessary to bring about the close of the Merger and support – inflate – the price of AOL's and Time Warner's stock before, and AOLTW's stock after, the Merger.  For instance, Salomon Smith Barney, after getting $5 million at the signing of the Merger deal, got $7.5 million when Time Warner's shareholders voted to approve the Merger, and another $47.5 million when the deal closed.  Morgan Stanley got $17.5 million when the deal was signed, another $42.5 million when the Merger closed *and another $15 million if the new AOLTW stock traded at certain high levels in the several days after the Merger*.  Thus, both Salomon Smith Barney and Morgan Stanley had enormous economic motives to bring about Time Warner shareholder approval of the Merger, get the Merger closed, and inflate AOL's and AOLTW's stock prices.  But, worst of all, in violation of SEC standards and regulations and court decisions prohibiting indemnity agreements to hold persons harmless of their liability under the securities laws, both these investment advisors involved in the Merger forced AOL and Time Warner (and AOLTW) to agree to hold them harmless, *i.e.*, indemnify them against any exposure or liability arising from their participation in the

Merger. These illegal indemnity agreements purported to immunize Salomon Smith Barney and Morgan Stanley from their important legal obligations of due diligence and honesty to protect the investors involved in this Merger and enabled them to disregard or act in denigration of their duties of honesty and/or diligence.

53.     On and after the closing of the Merger, Morgan Stanley and Salomon Smith Barney were constantly buying and selling AOLTW stock in their own proprietary trading accounts as well as accounts they managed for other entities and investors.

54.     Defendant Ernst & Young LLP ("Ernst & Young") was AOL's, Time Warner's and AOLTW's supposedly independent accountant and provided accounting services for AOL, Time Warner and AOLTW prior to, in connection with, and after the Merger, which included "clean" or "unqualified" opinions on AOL's, Time Warner's and AOLTW's 98, 99, 00 and 01 annual audited financial statements. Ernst & Young also reviewed and approved the unaudited financial statements of AOL and Time Warner issued in connection with the Merger, including those in the Merger and Stock Option Registration Statements, and also including the "pro forma" AOLTW financial statements included in the Merger and Stock Option Registration Statements. Ernst & Young was not independent with respect to the Merger, as it was the accountant for both AOL and Time Warner and had been promised it would be the auditor/accountant for the gigantic new Company – AOLTW – after the Merger and thus would garner huge amounts of accounting, auditing and consulting fees post-merger for years to come.

## FRAUDULENT SCHEME AND CONDUCT

55.     Each defendant is liable for making false statements, or for failing to disclose adverse facts while selling and/or offering to sell AOLTW securities, and/or for willfully participating in a scheme to defraud and/or aiding and abetting such illegal conduct, which damaged Time Warner's shareholders in the Merger and purchasers of AOLTW's stock after the Merger (the "Wrongful

Conduct"). This Wrongful Conduct enabled AOLTW to issue (sell) over four billion newly issued shares of AOLTW stock in the Merger and over 108 million additional shares pursuant to the AOLTW stock option plan thereafter, allowed the AOL and AOLTW insiders to sell 23.8 million shares of AOL or AOLTW stock at artificially inflated prices for over $797 million in illegal insider trading proceeds and obtain hundreds of millions of dollars in additional retirement or deferred compensation, allowed the financial advisors to pocket some $135 million in merger advisory fees and allowed Ernst & Young to pocket huge fees as AOL's and Time Warner's accountants and consultants before the Merger and retain the huge and highly lucrative AOLTW account (worth $1 million per week) post-merger.

## BACKGROUND TO THE MERGER

56.    In 12/96, seeking to boost its subscriber numbers, AOL introduced "flat-rate" subscription plans. This had the effect of dramatically increasing members and their usage but drastically decreasing AOL's operating margins. In the late 90s, the Internet access market – AOL's main business – was also becoming increasingly saturated and AOL was facing intensifying competition from low-cost or free Internet access providers. This downward pressure on operating margins and increasing competition put tremendous pressure on AOL's executives to generate ever-increasing numbers of subscribers **and** find additional revenue sources to continue its growth. AOL's top executives, including Case, its Chairman/CEO, and Pittman, its President/COO, began to try to develop other sources of revenue to preserve AOL's rapid growth and thus support its high stock price upon which their prestige, as well as their personal fortunes, largely depended. Continuing subscriber growth and online or e-commerce advertising were the key. In this regard, AOL's 97 annual report, stated:

> Among the Company's business objectives are increasing the subscriber base and continuing to accelerate the change in its business model ***into one in which increasingly more revenues and profits are generated from sources other than online service subscription revenues, such as advertising and electronic commerce.***

*The Company expects that the growth in other revenues, assuming such growth continues, will be the primary source of future profit growth, and will provide the Company with the opportunity and flexibility to fund the costs associated with flat-rate pricing as well as programs designed to grow the subscriber base and meet other business objectives. . . . Advertising revenues are expected to grow in importance as the Company is able to leverage its large and growing subscriber base*.

57.     Issued in 9/98, AOL's 98 annual report for the year ended 6/30/98 stated:

AOL Advertising and Commerce Leads the Industry. . . .  [W]e now have more than 50 agreements that are valued in excess of $1 million each.  In fiscal 1998, advertising, commerce and other revenues climbed to $439 million, 71% higher than the previous year.  *And our backlog of advertising and commerce revenues – contracted agreements that have not yet been recognized as revenue – rose from $180 million at the end of fiscal 1997 to $511 million at the end of fiscal 1998*.

58.     On 7/21/99, AOL issued a release reporting its results for F99 – the period ended 6/30/99 – headlined and stating:

*Advertising, Commerce and Other Revenues Rise 87% to $306 Million, Totaling $1 Billion for the Full Year*

*        *        *

Advertising, commerce and other revenues reached $306 million, up 87% over fiscal 1998's fourth quarter.

. . . Advertising, commerce and other revenues for the year amounted to $1 billion, an 84% climb over fiscal 1998.

The AOL service set records for fourth quarter membership growth, 755,000, and for subscriber growth over the fiscal year, 5.1 million.  At the end of the quarter, AOL totaled 17.6 million members . . . [including] more than 3 million non-US members.

*        *        *

Steve Case, Chairman and Chief Executive Officer, said:  "*This has been a year of tremendous growth and achievement.  We added more than five million new members to our flagship AOL service, generated $1 billion in advertising and commerce revenues, and achieved record operating profits.*"

59.     On 7/21/99, AOL held a conference call for analysts, money managers and institutional investors to discuss AOL's business:

CASE:  . . .  This was yet another tremendous quarter for America Online, topping off a truly great year in which we not only delivered a very solid financial

- 46 -

performance of a blue chip, but also continued to position the company strategically for the next wave of growth. Three key metrics highlight how much we achieved this year. First, ***we had record results in terms of membership growth in the past quarter and over the past year*** . . . which shows the strength of our franchise. And we added 755,000 new members, making it the biggest fourth quarter in our history. The results over the past year were also impressive, as we added five million new members. . . . Second, ***we generated $1 billion in advertising and e-commerce revenues, up from virtually nothing three years ago. In addition, our backlog of advertising and e-commerce commitments grew to more than $1.5 billion. And third, we achieved record profits with operating income*** for the quarter surging to $226 million . . . a 183% increase over last year and a sequential increase of 81%. That means that operating income is now approaching an annualized run rate of $1 billion, ***which I think cements our position as the blue chip in the Internet sector***. . . .

KELLY: . . . ***This quarter's results reflect the strength of operations as well as the power of AOL's business model. The growing momentum of the operation is reflected by the records we have set in the quarter*** . . . for consolidated revenue, operating income, earnings per share and EBITDA. . . . Advertising commerce and other revenues of $306 million, increased again 87% on a year-over-year basis . . . . ***And, as the fastest growing component of our multi-revenue streams, advertising, commerce and other revenues now represent 22% of consolidated revenues, compared with 17% a year ago. This will continue to increase over time***. During the quarter, we signed 33 multi-year deals in excess of $1 million and our backlog now stands at 1.5 billion, up $200 million from the end of the quarter.

60.    On 7/22/99, *The Wall Street Journal* reported on AOL's 4thQ 99 results and

conference call:

AOL said revenue from online advertising, electronic commerce and other sources apart from monthly membership fees grew to $306 million, compared with $164 million a year earlier. ***Those lines of business are closely watched because they are considered an indicator of AOL's ability to expand its profitability. Advertising, e-commerce and the like typically have fatter profit margins than AOL's basic online subscription service*** . . . .

AOL executives were characteristically jubilant about the company's earnings and revenue growth. "***This was another great quarter***," AOL Chairman and Chief Executive Steve Case said in an interview. ***Mr. Case said he was particularly encouraged by the fact that AOL's advertising and e-commerce revenue reached $1 billion for the full fiscal year, a first for the company***.

61.    On 8/13/99, AOL filed its Report on Form 10-K with the SEC for the year ended

6/30/99, which was later incorporated in the Merger Registration Statement. The 10-K included an

unqualified Ernst &Young audit report and represented that AOL had 17.6 million subscribers.

AOL's 99 10-K also discussed AOL's e-commerce advertising business:

Advertising and Commerce

*An important component of the Company's strategy in its Interactive Online Services business is to increase revenues from advertising and commerce sources and from the sale of merchandise. The Company continues to establish a wide variety of relationships with advertising and commerce partners to grow and diversify its non-subscription based revenues . . . . Additionally, the Company has renewed and extended or expanded relationships with existing advertising and commerce partners.*

62.    AOL's 99 10-K reported very strong financial results, including e-commerce advertising revenue and backlog growth:

The following table and discussion highlights the revenues of the Company for the years ended June 30, 1999, 1998 and 1997.

|  | Year Ended June 30, | | | | | |
|---|---|---|---|---|---|---|
|  | 1999 | | 1998 | | 1997 | |
|  | (Dollars in millions) | | | | | |
| Revenues: | | | | | | |
| Subscription services | $3,321 | 69.5% | $2,183 | 70.6% | $1,478 | 67.3% |
| *Advertising, commerce and other* | *1,000* | *21.0* | *543* | *17.6* | *308* | *14.0* |
| Enterprise solutions | 456 | 9.5 | 365 | 11.8 | 411 | 18.7 |
| Total revenues | $4,777 | 100% | $3,091 | 100% | $2,197 | 100% |

*            *            *

Advertising, Commerce and Other Revenues

*An important component of the Company's business strategy . . . is an increasing reliance on advertising, commerce and other revenues. . . . The growth of advertising, commerce and other revenues is important to the Company's business objectives, as these revenues provide an important contribution to the Company's operating results. Advertising revenues are expected to grow in importance as the Company continues to leverage its large, active and growing user base. . . . Affecting the growth in advertising, commerce and other revenues is the backlog balance as of June 30, 1999, 1998 and 1997 of $1,519 million, $511 million and $180 million, respectively.*

63.    AOL's 99 10-K also discussed AOL's e-commerce business in greater detail:

The following table summarizes the material components of advertising, commerce and other revenues for the years ended June 30, 1999, 1998 and 1997.

|  | *1999* | | *1998* | | *1997* | |
|---|---|---|---|---|---|---|
| | | | *Year Ended June 30,* | | | |
| | | | *(Dollars in millions)* | | | |
| *Revenues:* | | | | | | |
| *Advertising and electronic* | | | | | | |
| *commerce fees* | *$765* | *76.5%* | *$358* | *65.9%* | *$147* | *47.7%* |
| *Merchandise* | *134* | *13.4* | *103* | *19.0* | *109* | *35.4* |
| *Other* | *101* | *10.1* | *82* | *15.1* | *52* | *16.9* |
| *Total advertising, commerce and other revenues* | *$1,000* | *100%* | *$543* | *100%* | *$308* | *100%* |

Advertising, commerce and other revenues increased by 84%, from $543 million in fiscal 1998 to $1,000 million in fiscal 1999. . . .   Advertising and electronic commerce fees increased by 114%, from $358 million in fiscal 1998 to $765 million in fiscal 1999.

Advertising, commerce and other revenues increased by 76%, from $308 million in fiscal 1997 to $543 million in fiscal 1998. . . .   Advertising and electronic commerce fees increased by 144%, from $147 million in fiscal 1997 to $358 million in fiscal 1998.

64.    In 9/99, AOL published its 99 annual report for the year ended 6/30/99, which stated:

**The Company's record financial and operational performance across our brands . . . has generated tremendous momentum for the coming year. . . . America Online has never been stronger**.

\*        \*        \*

. . . [O]ur Company set . . . records for advertising and commerce revenues . . . .   During fiscal 1999, we signed 58 multi-year advertising and commerce agreements, each worth in excess of $1 million.

65.    On 10/20/99, AOL announced its **better-than-expected** 1stQ 00 results for the period

ended 9/30/99 via a release headlined and stating:

**America Online, Inc. FY2000 First Quarter Fully Taxed Income More Than Triples to $184 Million, or $0.15 Per Share**

**First Quarter Revenues Climb 47% to $1.5 Billion**

**Subscription Revenues Reach Nearly $1 Billion and Advertising, Commerce, and Other Revenues Double to $350 Million**

***AOL Service Sets First Quarter Record with Nearly 1.1 Million Net New Members***

[AOL] today announced results for the first quarter of fiscal 2000 ended September 30, 1999 – ***setting new records for consolidated revenues, advertising and commerce revenues, operating income, and membership growth in the first quarter***.

The Company's fully taxed net income totaled $184 million, or $0.15 per diluted share, up from $50 million, or $0.04 per diluted share, on the same basis in fiscal 1999's first quarter. . . .

First quarter revenues rose to $1.5 billion, or 47% over last year's first quarter, and advertising, commerce, and other revenues reached $350 million, doubling over the fiscal 1999's September quarter.

\*       \*       \*

At September 30, the Company had a worldwide total of 16.7 million AOL . . . members.

\*       \*       \*

***Industry Leadership and Growing Earnings Power***

Steve Case, Chairman and Chief Executive Officer of America Online, said: "***This quarter's results clearly demonstrate America Online's . . . growing earnings power . . . .***"

\*       \*       \*

Bob Pittman, President and Chief Operating Officer, said: "***Our growth is accelerating across the board***."

\*       \*       \*

−     ***Advertising, Commerce and Other Revenues: Revenues from advertising, commerce and other revenues climbed to $350 million, doubling from $175 million during the year ago quarter***.

−     Backlog:  ***The Company brought its consolidated backlog of advertising and commerce revenue to over $2.0 billion at the end of the quarter, adding a net of more than $500 million since June 30, 1999***.

66.     On 10/20/99, AOL held a conference call for institutional investors, analysts and money managers, in which Case, Pittman and Kelly stated:

CASE: . . . [T]he results really speak for themselves.  ***We saw record membership growth . . . , we saw record advertising e-commerce revenues and we saw record profits. . . .***  [I]t really was an outstanding quarter financially . . . .

- 50 -

PITTMAN: . . . This quarter's results demonstrate that America Online is now operating on a whole new level. . . .

KELLY: . . . The financial highlights for the quarter were *strong subscriber growth both domestically and internationally . . . . Advertising, e-commerce and other revenues increased 100% over last year to $350 million. . . . Advertising, commerce and other revenues continue to be the fastest growing component of our revenue streams reflecting our increasing ability to monetize our relationship with members* . . . . [T]hese revenues now represent nearly 24% of revenue compared to [the] 16.4% . . . we saw last year. During the quarter we signed 36 multi-year deals in excess of a million dollars, three of those in excess of $50 million and, again, backlog now stands at $2 billion, up $500 million from what we saw last quarter.

67.    On 10/20/99, Case was interviewed by *Bloomberg*:

QUESTION: . . . I am interviewing Steve Case . . . . Steve, today you reported your fiscal first quarter earnings and they were great. Let's go over some of the highlights.

CASE: *It really was outstanding across the board. There was record membership growth . . . record advertising commerce and record profits. . . . [A]ll the metrics we hit, in most cases we exceeded . . . people's expectations*.

QUESTION: . . . [Y]our next quarter, the Christmas quarter, what do you expect for e-commerce and subscriber growth?

CASE: Well, it's always been our best quarter and we expect to show new records. We do believe that we're moving into a wonderful period.

68.    In fact, during this time, AOL's insiders were seeing signs of a slow down in

advertising revenue. As Alec Klein's book, *Stealing Time*, noted:

Six months after Colburn mused about the notion of AOL becoming a trillion-dollar company, the dream was turning into a nightmare. Case began receiving internal company reports pointing to a stark reversal of fortune on the horizon. Investors didn't know it, but suddenly AOL's backlog – its pipeline of ad deals – was showing a disturbing downward trajectory.

A confidential report dated November 4, 1999, showed just how bad the situation was: The company had signed forty-seven deals valued at $694 million from July to September 1999, but in the next three-month period, from October to December, so far only fourteen deals had been signed, valued at $457 million. Less than a week later, on November 10, another internal report showed the same weakness. And by January 14, 2000, four days after the AOL-Time Warner merger was announced, a further report indicated there was still no pickup.

69.    On 11/2/99, AOL filed its Report on Form 10-Q with the SEC for the quarter ended 9/30/99, which was later incorporated by reference in the Merger Registration Statement.  The report included the following financial information:

|  | Three Months Ended September 30, | |
| --- | --- | --- |
|  | 1999 | 1998 |
|  | (Amounts in millions, except per share data) | |
| Revenues: | (Unaudited) | |
|  |  |  |
| Subscription services | $995 | $723 |
| *Advertising, commerce and other* | *350* | *175* |
| Enterprise solutions | 122 | 101 |
| Total revenues | 1,467 | 999 |

\*    \*    \*

| Net income | $184 | $76 |
| --- | --- | --- |
| Earnings per share-diluted | $0.14 | $0.06 |

70.    AOL's 9/30/99 Report on Form 10-Q also included "Management's Discussion and Analysis of Financial Condition and Results of Operations," which stated:

> *At September 30, 1999, the Company had approximately 18.7 million AOL service subscribers, including 16.2 million in the United States and 2.5 million in the rest of the world.*

71.    AOL's 9/30/99 10-Q also discussed AOL's e-commerce advertising business in more detail:

The following table summarizes the material components of advertising, commerce and other revenues for the three months ended September 30, 1999 and 1998:

|  | *Three Months Ended September 30,* | | | |
| --- | --- | --- | --- | --- |
|  | *1999* | | *1998* | |
|  | *(Dollars in millions)* | | | |
|  |  |  |  |  |
| *Advertising and electronic commerce fees* | *$272* | *77.7%* | *$132* | *75.4%* |
| *Merchandise* | *$47* | *13.4%* | *$21* | *12.0%* |
| *Other* | *$31* | *8.9%* | *$22* | *12.6%* |
| *Total advertising, commerce and other revenues* | *$350* | *100%* | *$175* | *100%* |

Advertising, commerce and other revenues . . . increased by 100%, from $175 million in the quarter ended September 30, 1998 to $350 million in the quarter ended September 30, 1999. . . .  Advertising and commerce fees increased by 106%, from $132 million in the three months ended September 30, 1998 to $272 million in the three months ended September 30, 1999. . . .  *At September 30, 1999, the Company's advertising and commerce backlog, representing the contract value of advertising and commerce agreements signed, less revenues already recognized from these agreements, was approximately $2 billion, up approximately $500 million from June 30, 1999*.

72.     Continuing subscriber growth *and* accelerating e-commerce advertising growth were the keys to AOL's continued profitable growth, as AOL's growth strategy was to monetize an ever-growing number of subscribers, principally by selling e-commerce advertising at very profitable rates.  And, according to AOL's public reports and statements, grow its subscriber base and online advertising it did.  For fiscal 97, AOL reported e-commerce advertising revenues of $147 million.  For fiscal 98 this grew to $358 million.  For fiscal 99, e-commerce advertising revenues reached $756 million.  This was by far the fastest growing part of AOL's business – and it was believed to be very profitable.  Also, AOL's e-commerce advertising backlog – the key indicator of the future growth of this key area of AOL's business – *was reported to be growing even more rapidly than revenues* – from $180 million at 6/30/97 to $1.5 billion at 6/30/99.  At the same time, AOL continued to report strong online access subscriber growth from 8.6 million at 6/30/97 to 12.5 million at 6/30/98 to 17.6 million at 6/30/99.  The apparent synergy of a rapidly growing subscriber base leading to rapidly growing, high-margin e-commerce advertising revenues was forecast to lead to fabulous growth for AOL for years to come.

73.     By late 99, AOL's core online access subscriber base and e-commerce advertising business both appeared to be achieving tremendous growth.  But, in fact, behind the scenes things were far different.  After initial success, AOL's e-commerce advertising business was encountering significant problems due to several factors, including customer annoyance at such advertising (especially "pop-up" ads), resulting in persistent complaints and low response rates.  And because

much of the e-commerce advertising came from start-up or dot-com companies which had utilized the proceeds of initial public offerings or venture capital financing to initially purchase such advertising, as the business plans of an increasing number of these companies faltered or failed, they were drastically curtailing, defaulting on or cancelling their advertising commitments to AOL or demanding huge price cuts which would greatly curtail the profitability of such advertising. And AOL's subscriber growth was not nearly as strong as represented, either in the U.S. or internationally – in fact, AOL was inflating its subscriber growth numbers by several tactics, including counting non-paying free trial participants as subscribers, which constituted as much as 10% of AOL's subscribers, and continuing to do so after their trial period had expired without converting to paying status, and opening thousands of accounts for persons who had not, or had not yet, signed up. This weakening of AOL's e-commerce advertising business, combined with the maturation of its core online access business and increasing competition, was a potentially lethal combination and indicated to AOL's sophisticated insiders (Case, Novack and Pittman) that AOL's halcyon days as a growth company were seriously threatened and, indeed, coming to an end. Thus, Case, Novack and Pittman decided that they would try to use AOL's still high priced stock while they still could to acquire a large company with real assets and proven earning power before the market learned of the true difficulties afflicting AOL's business so that the assets and earning power of the acquired company would help cushion the coming downturn in AOL's business which they knew was not only inevitable but was beginning to occur.

74.     However, an acquisition of the type and size which Case and Pittman had in mind for AOL would take months to negotiate and close. In order to prevent the truth about the deterioration of the growth in AOL's core online access business being revealed and to cover up the growing problems in its e-commerce advertising business while they located and negotiated and then closed an acquisition, AOL's executives engaged in a series of tricks, contrivances and falsifications to

inflate AOL's domestic and international subscriber metrics and artificially inflate its e-commerce advertising revenues and backlog. AOL did this by entering into an ever-increasing number of bogus e-commerce advertising deals where the transactions lacked real economic substance, as directly or indirectly AOL was actually providing the funds to its purported customers to purchase the advertising by engaging in "barter" or "swap" or "round trip" deals. These bogus transactions not only improperly inflated AOL's e-commerce advertising revenues as reported, but, even more importantly, also grossly distorted AOL's reported backlog of e-commerce advertising, because these deals were, in many instances, one-time structured deals, not really entered into in the ordinary course of business or reflective of true ongoing demand for AOL's e-commerce advertising, and had been entered into with companies that lacked the financial ability to honor their commitments and as such could not legitimately be counted as revenue in any event. And most of AOL's e-commerce advertising commitments were, in fact, cancelable by the customer at will or with an insignificant economic penalty. To make it appear that its Internet access subscriber base was not only continuing to grow but that its growth was accelerating, AOL intensified its promotional giveaway activities to get millions of trial non-paying subscribers, counting millions of them as actual subscribers and continuing to do so after their free trial period expired when they did not convert to paying status and should have been canceled, and opening thousands of accounts for persons who had not, or had not yet, signed up.

75.    In the Fall of 99, Case, Novack and Pittman identified Time Warner as the kind of company they wanted AOL to buy – a huge, well-established company with valuable assets and real earning power. In 10/99, Case and Levin began discussions about AOL acquiring Time Warner. While Time Warner was a successful company with a stable of successful media and entertainment businesses, its growth in recent years had slowed and it had apparently missed out on the digital revolution and Internet boom. Levin and Parsons were both anxious to find a way to boost Time

Warner's growth as this would enable them to preside over a larger, faster-growing company and thus benefit them economically, and Levin especially yearned for the publicity and prestige that would come from being CEO of a huge international enterprise with a major "high-tech" component. And they – and other top AOL and Time Warner executives – knew that a merger would trigger "change of control" provisions in their compensation agreements and plans, enriching them by hundreds of millions of dollars if they could get Time Warner's shareholders to approve selling their company to AOL. As AOL continued to report record subscriber growth and record financial results, AOL's stock hit its all-time high of $94 per share on 12/13/99. Days later, Case would strike a financial deal with Levin to buy Time Warner for AOL stock in a meeting on 1/6/00.

76.    It was agreed that AOL would acquire Time Warner in a stock-for-stock merger in which Time Warner shareholders would receive 1.5 shares of new AOLTW stock for each of their existing Time Warner shares and AOL shareholders would receive one share of new AOLTW stock for each of their AOL shares. On 1/10/00, AOL and Time Warner announced that AOL would acquire Time Warner via a stock-for-stock merger worth some $350 billion, the largest merger in history. Executives at both Time Warner and AOL had huge personal motives to bring about the closing of the Merger. Due to "change of control" provisions in the executive compensation plans of AOL and Time Warner, closing the Merger would trigger acceleration and/or immediate vesting of executive stock options and deferred compensation benefits that were worth hundreds of millions, if not billions, of dollars to the top executives of both companies. For instance, options to purchase 44 million shares of AOL stock (35 million of which were for the top five AOL executives) at $18.78 per share (with a market value of $48 per share) accelerated and vested, creating a $1.3 billion windfall benefit ($1 billion for the top five AOL executives alone). The financial advisors to both companies would get $135 million in consulting fees to help bring about the Merger if, but only if,

the Merger closed.  Thus, if the Merger closed, these actors **stood to gain hundreds of millions of dollars in the short-term regardless of how the Merger actually turned out over time**.

77.    On 1/10/00, Case and Levin were interviewed on CNBC, and during their joint interview Case stated:

> *So I think this is a tremendous company, really a company that I think can be the most valuable and the most respected company in the world. . . . [T]his AOL/Time Warner company, is the best positioned [company] in the world . . . .*

> \*       \*       \*

> *[W]e have an extraordinary combined management team, and this is an extraordinary business with extraordinary opportunities. . . . [W]e've got a great team at AOL. . . . [T]he combined AOL/Time Warner management team is really going to be second to none, and that's why we're going to take this company to the next step and be the most valuable, most respected company in the world.*

78.    On 1/10/00, AOL and Time Warner held a joint press conference to discuss the Merger and stated:

> CASE: . . . [The] merger . . . will bring together the best of both worlds and **create one of the most . . . valuable companies in the world . . . .  And AOL Time Warner together will be a perfect fit as one company**.

> \*       \*       \*

> I'm pleased to say that we're starting today on a real fast track by also announcing several ground breaking new commercial ventures that really underscore **the remarkable value of this merger**.

> \*       \*       \*

> LEVIN: . . . [B]oth are blue chip companies with very significant management.

> \*       \*       \*

> PITTMAN: . . . *America Online and Time Warner are two companies that do see the world the same way. . . .  In this merger, we're combining those one-of-a-kind companies . . . .  This is the perfect one-plus-one equals three opportunity.  We are the missing piece of each other's puzzle.*

> \*       \*       \*

> KELLY: . . . I'm feeling real good right now. . . .  *The combination here is so compelling and I'm just here to say that the financial aspects of this transaction are just as compelling.  The merger of AOL and Time Warner will strengthen our*

- 57 -

> *ability to generate growth, EBITDA growth, free cash flow growth . . . . If you step back and look at the new combined organization on a pro forma basis, it really is compelling. . . . [W]e've been saying that over time, our first full year of operation as a merged entity, the synergies will be approximately $1 billion.*

In meetings with analysts and investors on 1/10/00, Kelly, Levin, Pittman and Case forecast that

AOLTW in 01 would achieve revenues of $40 billion, with 12%-15% revenue growth thereafter, and

01 EBITDA of $11 billion, with ongoing EBITDA growth of 25%-30%.

      79.    On 1/10/00, AOL and Time Warner held a joint conference call hosted by Pittman

and Parsons who stated:

> QUESTION:  I have a question about the growth rate of this company.  AOL and Time Warner have both been growing, AOL obviously more rapidly than Time Warner.  Curious how you're expecting the newly combined company will grow relative to how AOL was growing and relative to how Time Warner was growing, we'll start with AOL.

> PITTMAN:  . . . *You really have to say is AOL going to grow faster in this combined company than it would freestanding?  I think the answer is yes*.

>                \*       \*       \*

> PARSONS: . . . *[T]his company is more valuable together with ours because it will grow faster with . . . access to our assets . . . .  [T]he future cash flows that the combination generate and what the present value of that is and we're convinced beyond, beyond doubt that together we will generate more revenue by creating new businesses and growing our existing businesses faster than we ever could have apart*.

      80.    After the AOL/Time Warner Merger was announced in 1/00, it was very important to

the executives at both companies to make it appear that their businesses were continuing to succeed

individually and would achieve accelerated growth and profitability when combined, so that their

companies' stock prices would continue to trade at high levels and the shareholders of Time Warner

would approve the sale of their company to AOL via the Merger.  In order to support or boost the

prices of AOL and Time Warner stocks and to induce Time Warner shareholders to approve the

Merger, the top officers of AOL and Time Warner repeatedly extolled the success and strength of

AOL's business and how its growing subscriber base and e-commerce advertising revenues would

be the engine of growth of the combined companies, and that the new company – AOLTW – would achieve huge Merger synergies and economies resulting in large revenue, EBITDA and free cash flow growth *immediately following the Merger and for years thereafter*.  In the months after the Merger was announced, AOL's reported subscriber metrics, advertising and commerce revenue and backlog continued to soar.  This was critical as, in light of defendants' representations regarding the importance of advertising revenue to AOL's "future profit growth" (advertising revenues would generate 20% of AOLTW's total revenues post-merger) and in the midst of the Internet frenzy, when investors were at their most skittish and stock prices at their most volatile, *any indication that AOL's subscriber growth or e-commerce advertising revenue growth was not sustainable, that its reported e-commerce advertising revenues had been or were being overstated*, or that its backlog was dubious or falling, would have had a devastating impact on the price of AOL's stock and the prospects of its acquisition of Time Warner.  From 1/00 through the vote on the sale of their company to AOL by the Time Warner shareholders in 6/00, AOL and Time Warner and their financial advisors peppered the markets with an unceasing series of very positive representations, assurances and forecasts regarding AOL, Time Warner and AOLTW.  As described in *Stealing Time*:

> With the merger still pending, there could be no hiccups – or so came the directive from David Colburn to his deal makers in business affairs and across the company. AOL's quarterly earnings reports should show – *must* show – that the on-line giant was maintaining its financial momentum.  Had AOL failed to so do, officials feared a terrible chain reaction:  Wall Street would begin to lose confidence in the company, investors would clamor for drastic action, AOL's stock would suffer even more than it was, and Time Warner would have to pull out of the proposed merger.

> "There was always pressure," said an AOL official.  The feeling was "We have to hit the quarter, there's no other way but to hit the quarter, or we're screwed," he said.  "The company, our stock will tank.  It's like breathing air."  As a result, executives concluded that they could not lower their financial targets, lest they alarm Wall Street and their dance partner, Time Warner.

"We had to maintain this façade, to show the Street that AOL was not backing away from its numbers," the AOL official said.  "At this point, we understood we couldn't tell the Time Warner side how much trouble we were in."

Throughout the yearlong merger review, from January 2000 to January 2001, the same scenario played out quarter after quarter.  As a fiscal period was coming to a close, AOL officials would find they were in jeopardy of falling short of the conpany's revenue projections.  Deal makers would be pressured to construct unconventional deals to inflate AOL's advertising revenue.  The greyhound ad deal with Wembley wasn't the only one.

"They're called 'BA specials,'" said an AOL official, referring to business affairs.  He said that some who refused to cooperate in these schemes were "cleared out of the department, paid off, marginalized, or destroyed in the company."

(Emphasis in original.)

81.    On 1/10/00, Morgan Stanley issued a report on the proposed Merger, which was

reviewed by Levin, Parsons or Ripp, stating:

America Online has generated significant advertising/commerce revenue to date. ***AOL's advertising and commerce revenue backlog reached a record $2B in CQ3, up from $1.5B in CQ2***.

\*          \*          \*

Drivers of America Online's revenue growth have been growth in access subscribers . . . [and] ***AOL's ability to monetize that traffic through advertising and e-commerce deals*** . . . .

. . . The increasing mix of high-margin advertising and e-commerce oriented revenues has also aided the expansion of operating margins.

82.    On 1/11/00, Salomon Smith Barney issued a report on the Merger which was

reviewed and approved by Case, Novack, Pittman or Kelly and which stated:

***The $350 billion merger of America Online and Time Warner creates the defining media and communications company of the Internet era, with $40 billion in projected annual revenue, [and] more than $10 billion in projected annual EBITDA*** . . . .

***We estimate that the new combined company will have a long-term EBITDA growth rate of 30%-plus . . . .  We . . . believe the combined company represents a "must own" investment holding*** . . . .

\*          \*          \*

KEY TRANSACTION POSITIVES

We estimate about $1 billion in incremental revenue/cost savings potential in 2001 and about $1.5 billion in 2002-2003. On a more fundamental front, we would highlight the following favorable implications of the transaction:

<div align="center">*     *     *</div>

2.    *Advertising platform greatly enhanced.  Time Warner already is an advertising powerhouse.  We estimate about 15%-20% of Time Warner's revenues are tied to advertising.  AOL should see a major surge in its advertising revenue generating potential as Time Warner's content and advertising relationships are exploited*.

<div align="center">*     *     *</div>

*Within a few years, we believe the positive impact on combined overall EBITDA should materially exceed the $1 billion initial level*.

83.    On 1/9-13/00, Salomon Smith Barney held its Entertainment, Media and Telecommunications Conference with 2,000 attendees.  On 1/12/00, Parsons, Pittman and Kelly presented for AOLTW.  Salomon Smith Barney reported what they told attendees:

*The combined company will be a high growth vehicle. . . .  [T]he new combined company will have a long-term EBITDA growth rate of 30%-plus . . . .*

84.    On 1/19/00, AOL reported its 2ndQ 00 results – the quarter ending 12/31/99. Because AOL's stock had fallen after the 1/11/00 announcement of the Merger, investors and Time Warner shareholders were intensely focused on this report to see if AOL's business was continuing to achieve strong subscriber growth, as well as very rapid, profitable growth overall, and especially in its e-commerce advertising business.  AOL did not disappoint, as it again reported better-than-expected results across the board.  The release was headlined and stated:

*America Online, Inc. FY2000 Second Quarter Income, Fully Taxed and Excluding One-Time Items, Rises 160% to $224 Million, or $0.09 Per Share*

*EBITDA Increases 108% to $453 Million*

<div align="center">*     *     *</div>

*Second Quarter Revenues Climb More Than 41% to $1.6 Billion*

*Advertising, Commerce and Other Revenues Rise 79% to Record $437 Million*

*Company Adds Record 1.8 Million AOL Subscribers*

<div align="center">- 61 -</div>

[AOL] today announced results for the second quarter of fiscal 2000 ended December 31, 1999 – *setting new records for consolidated revenues, advertising and commerce revenues, operating income and quarterly membership growth*.

\*       \*       \*

Second quarter revenues rose to $1.6 billion, or 41% over last year's second quarter, and advertising, commerce and other revenues reached $437 million, 79% over fiscal 1999's December quarter.

Reported earnings per share, including one-time items, increased to $0.10 per diluted share on $271 million of net income, up from $0.05 per share on $115 million of net income in last year's second quarter.

*The AOL service set a quarterly membership growth record, adding 1.8 million new members worldwide and finishing the quarter with 20.5 million subscribers*.

\*       \*       \*

Steve Case, [Chairman/CEO] said: *"This is a momentous time for America Online, as we're announcing the strongest results in our Company's history. During the quarter, we achieved record growth in revenues, advertising and commerce, operating income and subscriber growth . . . ."*

Mr. Case added: *"With Time Warner . . . [o]ur combined company will be uniquely equipped to take full advantage of the Internet's growth to create value for our shareholders . . . ."*

\*       \*       \*

Key operating metrics from the quarter included:

\*       \*       \*

–    Advertising, Commerce and Other Revenues . . . climbed to $437 million, an increase of 79% from $244 million during the year-ago quarter.

–    Backlog: *The Company brought its consolidated backlog of advertising and commerce revenue to more than $2.4 billion at the end of the quarter*.

85.    On 1/19/00, after releasing its quarterly results, AOL held a conference call for

analysts, money managers and institutional investors.  Case, Pittman and Kelly stated:

CASE:  . . . As today's results show pretty clearly, AOL's operational performance strongly positions us to extend the leadership of our current brand and make the most of new business opportunities.  We could not be more pleased with these record results for the quarter.  Our revenues increased 41% over last year to $1.6 billion. Subscription revenues reached the billion dollar mark for the first time.  *And growing even faster, our advertising commerce and other revenues rose 79% to a*

*record $437 million.  Once again, we set a record for quarterly membership growth with more than 2.1 million new subscribers, 1.8 million net new members for AOL and more than 300,000 net new CompuServe members . . . .*  [W]e kicked off the first year of the new millennium with our historic merger with Time Warner. . . . When it comes to valuing our combined company, we realize that we are creating enterprise that has no direct comparable. . . .  We believe AOL Time Warner will grow EBITDA by about 30% which is comparable to the growth rates of other leading Internet powered companies like Cisco and Microsoft.  Given the trading multiples leaders like these enjoy in the market today, it is clear that there is lots of value to be created for our shareholders and we look forward to doing just that. . . . *We will see spectacular new economies of scale for our technologies along with tremendous potential for cross-promotion and audience building across all of our brands . . . .  That, and more will help us make AOL Time Warner the most valuable company . . . in the world . . . .*

PITTMAN:  . . .  The quarter's exceptional results underscore the powerful momentum behind our global businesses and how we can use our cost effective infrastructure to accelerate growth across all of our brands.  Both our *paid subscription services* and our free web services around the world . . . .  Our merger with Time Warner is at the heart of that move. . . .  *I'd like to . . . offer some more perspective on the merger and then review this quarter's across-the-board successes with some specific thoughts on how the incredible combined capabilities of the new company will drive us forward much faster than either of us could achieve alone*. . . .  I know partly what's on your mind is what the growth rate will be for the new company.  Well, let me address it head on.  With the combined companies' assets, there are many significant opportunities for us to drive dramatic and dynamic growth. . . . *Behind the merger is our strong confidence that you'll be seeing the same explosive and transforming growth with AOL Time Warner, if not even more spectacular. . . . AOL Time Warner's combined capabilities will give it limitless potential* . . . .  Let's move now onto e-commerce. . . .  AOL has hit a new high in revenues.  A big part of that involved the growth we're seeing in advertising commerce and other revenues, which have grown to 27% of our total revenues.  *Our consolidated backlog of advertising and e-commerce revenues rose to more than $2.4 billion at the end of the quarter . . . .  Our continuing success in this area is clearly driven by the increasing mass market acceptance of e-commerce . . . .  So, all-in-all, it was a remarkable quarter in which AOL continued its spectacular growth and momentum in the same way we always have . . . .  AOL Time Warner represents a rare opportunity for the market to get in on the ground floor of an all new medium like nothing we've ever seen before*.

KELLY: . . .  [W]e had an extremely strong quarter on all fronts. . . .  *[T]hese results underscore the positive trends in all of our operations as well as how we continue to transfer our successes with consumers into strong financial results*.  In addition to our record membership gains, the strong growth we're experiencing in key metrics like online shopping and time spent online, all indicate that our strategy of putting the consumer first is continuing to pay off. . . .  The key take-aways for the quarter: we grew subscribers for AOL and CompuServe by 2.1 million, a 31% increase over our growth a  year ago. . . .  Advertising, commerce and other revenues continue to be our fastest growing component of revenue, reaching $437 million in the quarter,

that's up almost 80% on a year-over-year basis. This total includes $352 million in advertising and commerce, $47 million in merchandise and $38 million in other revenues. Looking at just the ad commerce portion, we saw sequential revenue growth of $80 million or more than 29%. This absolute growth, not to mention the percentage growth, compares very favorably with other Internet companies and demonstrates AOL's ability to grow this business at a rapid rate even though we're growing from a substantially larger base. In total, advertising commerce and other revenues now represent 27% of revenues which compared to 21% from a year ago. . . . ***During the quarter we signed 28 multi-year deals in excess of $1 million and backlog now stands at $2.4 billion, up $365 million from last quarter and that's over three times the size of our backlog we had just last December. . . .*** [T]he opportunities and synergies that Bob outlined earlier would drive incremental revenue and EBITDA growth that neither AOL nor Time Warner could have achieved on its own. ***The combined company will have a revenue base in excess of $40 billion our first full year and EBITDA of approximately $10 billion. Our plan is to achieve an increase in EBITDA in excess of $1 billion that's not included in the above total. That would mean that we'd see an EBITDA growth rate for the combined company in the range of 30%.*** When you look at such companies like Microsoft, Cisco, Oracle and others, market leaders in their segments, their effective EBITDA growth rates are either lower than our targets or roughly the same as the new AOL Time Warner. Yet, their shares have significantly higher EBITDA multiples [than] the applied multiple today for AOL Time Warner. For instance, AOL Time Warner will have approximately the same EBITDA growth rate as Cisco. However, they are trading at two times the EBITDA multiple. And Microsoft, which is estimated to have an EBITDA growth of approximately 20%, is trading at an EBITDA multiple which is 40% higher than the new company. The leader in any segment trades at a premium to the sector. As the results we announced today underscore, AOL has dramatically strengthened its leadership in the Internet consumer services. And by integrating our assets, capabilities with the rich content, strong brands and infrastructure of Time Warner, we will create even a more valuable Internet media communications company in the future.

*     *     *

QUESTION: . . . [M]aybe you could distill down everything you said related to the Time Warner combination. In the context of the very strong quarter that you just reported and the key metrics that we watch to gauge your momentum, and will watch over the coming 12 months, namely subscribers, ad commerce revenue, margins, cash flow. Talk specifically about how the combination with Time Warner will allow you to accelerate those AOL specific metrics? . . .

CASE: . . . *[W]e're talking about a 30% kind of growth rate. . . . [This] puts us on this path to be the most valuable . . . company on earth*.

86.     On 1/19/00, Case was interviewed by *Bloomberg*:

QUESTION: . . . I'm interviewing Steve Case, the CEO of America Online. Steve, this afternoon your company announced its fiscal second quarter earnings and you

said that America Online gained 1.8 million new subscribers . . . can AOL keep gaining new members at that pace?

CASE:  Well, we have seen considerable growth over the past year . . . *and we continue to expect growth* . . . .

                              *        *        *

QUESTION:  AOL's stock has dropped slightly . . . probably about 13% since it announced the plans to buy Time Warner.  Does that concern you or the management team at AOL?

CASE: . . . [W]e recognize that there is no direct comparable to the company that we've created here with AOL and Time Warner . . . .  *[L]ooking at the combined growth rate of the company, which we expect to be in the range of a 30% growth rate in terms of EBITDA.*  That's really comparable to the kind of growth experienced by other Internet powered leaders like Cisco and like Microsoft.  So, over time, we'd expect our multiple to start being closer to where companies like Cisco and Microsoft trade. . . .  *I think stockholders will really benefit from the kind of value we can create over the coming months and years.*

87.    On 1/20/00, Salomon Smith Barney issued a report on AOL, which was reviewed and approved by Case, Kelly and/or Pittman, which stated:

AOL reported stronger than expected growth in F2Q00, led by the addition of 1.8 million new members to the core AOL service.  The primary AOL brand now has 20.5 million members . . . .  AOL's overseas operations contributed a strong 610,000 new subscribers to the service's overall growth, with AOL International now boasting just over 3 million members. . . .

Total revenue rose to $1.6 billion in F2Q00, a +10% sequential increase from F1Q00 and a +41% gain versus F2Q99. . . .  *As the AOL revenue base has grown and its composition has shifted toward the more profitable advertising/e-commerce business over the subscription-based online access business, operating ad EBITDA margins are expanding. . . .*  Advertising and e-commerce accounted for +27% of sales in F2Q00, compared to 24% in the previous quarter and 21% in the year earlier quarter.

We are raising our EPS estimates to $0.35 per share for F2000 and $0.50 per share for F2001, . . . certainly a conservative view of the future.  On the revenue line, we believe F2000 will reach $6.65 billion, a 40% increase over F1999.  Looking out to 2001, we now project total revenue of $8.6 billion, a significant increase over our $8.0 billion prior estimate.  *The primary change behind our more aggressive stance on F2001 revenues stems from AOL's advertising, e-commerce and other revenue streams, which are now running at an annualized rate of $1.75 billion as of F2000. To see that high-margined revenue source reach $2.5 billion-plus in fiscal year 2001 is well within reason, in our view.  AOL's advertising and e-commerce revenue grew 25% sequentially in F2Q99 and nearly 90% year over year in the*

*most recent quarter. We project 40-50% growth in those lines in 2001 in our new model for AOL. Clearly, the more aggressive stance on advertising and e-commerce revenue is justified in light of AOL's current $2.4 billion backlog of business, and accelerating growth here might logically argue for even greater earnings upside out in 2001, due to the high margins associated with revenue of this type*.

88.    On 1/20/00, *The Wall Street Journal* reported:

*America Online Net More Than Doubled – Fiscal 2nd-Quarter Profit Jumped to $271 Million On Subscription Growth*

*[AOL] executives **yesterday moved to calm Wall Street concerns about the company's proposed . . . merger with . . . Time Warner . . . .***

\*        \*        \*

*Analysts were impressed with AOL's performance in one closely watched area: advertising and commerce revenue. The company said that figure almost doubled to $437 million from $244 million a year earlier. Advertising and commerce fees tend to carry a higher profit margin than other areas of AOL's business. "We knew it was going to be strong, but it was really, really strong," James Preissler, an analyst at PaineWebber Inc., said of AOL's revenue in that category.*

\*        \*        \*

*AOL offered bullish growth predictions for the new AOL Time Warner, saying the companies' combined earnings before interest, taxes, depreciation and amortization could grow at a 30% annual rate.*

\*        \*        \*

*So far . . . free Internet providers don't appear to be denting AOL's growth. The company added 1.8 million new members to the AOL service in the quarter. In the past two years, it has added a whopping 10 million subscribers, more than the combined membership base of most of its major competitors.*

*AOL executives steadfastly have maintained they have little to fear from such competitors.*

89.    On 2/2/00, Time Warner reported its 4thQ 99 and 99 results and held an

analyst/investor conference in New York City to brief analysts, money managers and investors about

the Merger. On 2/2/00, *Business Wire* reported:

*Time Warner CEO Reaffirms Confidence in Exceptional Growth Potential of AOL Time Warner*

. . . In a presentation to Wall Street analysts, Gerald M. Levin, chairman and CEO of Time Warner Inc. today *reaffirmed his confidence in the exceptional growth potential of AOL Time Warner . . . . [B]ased on the new company's unique combination of strengths, he is comfortable with projected EBITDA growth in the 30 percent zone for 2001 over 2000, representing more than $11 billion in EBITDA for 2001, including synergies*.

\*    \*    \*

AOL Time Warner, Levin said, will have the financial capacity to be opportunistic in developing new businesses and the flexibility to adapt quickly to emerging trends. *He added that AOL Time Warner will have "no financial constraints" on its growth and will "start out of the box" with a solid investment-grade balance sheet*.

90.    On 2/3/00, Morgan Stanley issued a report on Time Warner. The report was reviewed and approved by Levin, Parsons or Ripp, and stated:

Time Warner reported its 4Q99 results on February 2, 2000, at an analyst meeting in New York. At the meeting, CEO Gerald Levin discussed several issues that will be important to the company in 2000.

\*    \*    \*

AOL Time Warner. Levin walked analysts through what his views are on the potential new company; he believes that there are three things that investors and analysts should focus on when evaluating the combination.

- *. . . Time Warner has announced that it expects that the combined company will have $40 billion in revenue . . . . Over time, Levin believes that advertising and commerce will be the fastest growing part of the business*.

\*    \*    \*

- . . . Levin stated that in 2001, the first full year of results for the merged AOL Time Warner, *EBITDA should total more than $11 billion, including synergies. This figure represents growth in the 30% zone over the company's estimate for 2000*.

91.    On 2/11/00, AOL and Time Warner and AOLTW filed the initial draft registration statement for the shares to be sold and issued in the Merger. From and after this date, AOL, Time Warner and AOLTW were "in registration" and all their (and their agents Salomon Smith Barney's and Morgan Stanley's) subsequent written and oral statements prior to the 6/23/00 shareholder votes approving the Merger give rise to §11 and §12(a)(2) 1933 Act liability under SEC regulations.

92.    On 2/14/00, AOL filed its Report on Form 10-Q for the quarter ended 12/31/99 with the SEC, which was later incorporated by reference in the Merger Registration Statement.  The 10-Q contained AOL's recently reported better-than-expected 2ndQ 00 results as earlier set forth and stated:

The following table and discussion highlights the revenues of the Company for the three and six months ended December 31, 1999 and 1998:

| | Three Months Ended December 31, | | | | Six Months Ended December 31, | | | |
| | 1999 | | 1998 | | 1999 | | 1998 | |
| | | | (Dollars in millions) | | | | | |
| Revenues: | | | | | | | | |
| Subscription services | $1,067 | 65.8% | $786 | 68.5% | $2,062 | 66.8% | $1,509 | 70.3% |
| *Advertising, commerce and other* | *437* | *27.0* | *244* | *21.2* | *787* | *25.5* | *419* | *19.5* |
| Enterprise solutions | 117 | 7.2 | 118 | 10.3 | 239 | 7.7 | 219 | 10.2 |
| Total revenues | 1,621 | 100% | $1,148 | 100% | $3,088 | 100% | $2,147 | 100% |

\*        \*        \*

*At December 31, 1999, the Company had approximately 20.5 million AOL service subscribers, including 17.4 million in the United States and 3.1 million in the rest of the world. . . .*

Advertising, Commerce and Other Revenues

The following table summarizes the material components of advertising, commerce and other revenues for the three and six months ended December 31, 1999 and 1998:

| | Three Months Ended December 31, | | | | Six Months Ended December 31, | | | |
| | 1999 | | 1998 | | 1999 | | 1998 | |
| | | | (Dollars in millions) | | | | | |
| *Advertising and electronic commerce fees* | *$352* | *80.5%* | *$188* | *77.1%* | *$624* | *79.3%* | *$321* | *76.6%* |
| Merchandise | $47 | 10.8% | $33 | 13.5% | $93 | 11.8% | $53 | 12.7% |
| Other | $38 | 8.7% | $23 | 9.4% | $70 | 8.9% | $45 | 10.7% |
| Total advertising, commerce and other revenues | $437 | 100% | $244 | 100% | $787 | 100% | $419 | 100% |

Advertising, commerce and other revenues . . . increased by 79%, from $244 million in the quarter ended December 31, 1998 to $437 million in the quarter ended

December 31, 1999.  For the six months ended December 31, 1999, advertising, commerce and other revenues increased 88% from $419 million in the six months ended December 31, 1998 to $787 million in the six months ended December 31, 1999.

Advertising and commerce fees increased by 87%, from $188 million in the three months ended December 31, 1998 to $352 million in the three months ended December 31, 1999.  Advertising and commerce fees increased by 94%, from $321 million in the six months ended December 31, 1998 to $624 million in the six months ended December 31, 1999. . . . *At December 31, 1999, the Company's advertising and commerce backlog, representing the contract value of advertising and commerce agreements signed, less revenues already recognized from these agreements, was approximately $2.4 billion, up approximately $1.7 billion from December 31, 1998*.

93.    On 3/22/00, Salomon Smith Barney issued a report on the Merger which was reviewed and approved by Case, Kelly and/or Pittman, stating:

AOL and Time Warner Link

*The Dynamic Duo Form a Free Cash Flow Dynamo*

\*    \*    \*

•      We believe AOL Time Warner's leadership advantages . . . will equate to rapid revenue growth, attractive profit margins, powerful free cash flow, and the potential to create significant shareholder value.

\*    \*    \*

*We value the combined company at $115 per share. . . .  We believe AOL Time Warner will be the most attractive place to invest in free cash flow growth among the stock market's existing leadership*.

\*    \*    \*

*How fast can the new company grow long term?  At least 25% per year on the EBITDA line, according to our analysis.*

94.    On 4/12/00, Levin was interviewed on CNBC and stated:

*[T]he $5 billion is a number that the Street has attached to the 2001 free cash flow, and we have said that we see that number growing at 50 percent a year . . . when you have that kind of cash-flow growth you have a very powerful balance sheet, so, all the growth dynamics that have been projected are separating apart from the deployment, what I call the smart execution of this capacity and this cash to reinforce the growth that is there*.

- 69 -

95.    On 4/18/00, AOL reported its 3rdQ 00 results.    Investors and Time Warner shareholders were intensely focused on this report to see if AOL's business was continuing to achieve strong subscriber growth in the U.S. and internationally, as well as very rapid, profitable growth overall and especially in its e-commerce advertising business.    AOL did not disappoint, as it again reported *better-than-expected results across the board*.    On 4/21/00, AOL filed a Report on Form 8-K for the quarter ended 3/31/00, which was later incorporated in the Merger Registration Statement.    The Form 8-K included AOL's 4/18/00 3rdQ 00 release and results, as well as a transcript of its 4/18/00 conference call with investors, analysts, money managers and the like.

(a)    The 8-K stated:

On April 18, 2000, America Online, Inc. ("AOL") issued a press release announcing fiscal year 2000 third quarter results . . . [and] held a telephone conference with analysts and others . . . .

(b)    AOL's press release stated:

***America Online Posts Record Earnings . . . AOL Service Adds 1.7 Million New Members for Total of 22.2 Million***

. . . America Online, Inc. today announced record results for the third quarter of fiscal 2000, ended March 31, 2000 – ***reaching new highs for consolidated revenues, advertising and commerce revenues, operating income, and EBITDA***.

The quarter's net income, fully taxed and excluding one-time items, totaled $271 million, or $0.11 per diluted share, up from $104 million, or $0.04 per diluted share, on the same basis last year.    The Company reported net income of $438 million, or $0.17 per diluted share, up from $411 million, or $0.16 per diluted share, in fiscal 1999's third quarter. . . .

. . . ***Advertising, commerce and other revenues climbed 103% over fiscal 1999's third quarter to $557 million – marking a record $120 million increase, or 27%, over this year's second quarter***.

. . . ***In total, the Company added 2.0 million new subscribers worldwide and ended with 25.8 million subscribers of its family of interactive services***.

Steve Case, Chairman and Chief Executive Officer, said:    ***"This quarter's results underscore the tremendous strength of America Online's operations, and demonstrate that we are on a clear path to continued strong growth and increased profitability.    Since we announced our landmark merger with Time Warner, we haven't missed a beat.***

"*. . . In short, our results highlight just how strong America Online is today, and how well-positioned it is for the future.*"

Bob Pittman, President and Chief Operating Officer, said: "***This quarter is an excellent example of how America Online is uniquely positioned . . . .  We're taking online advertising and commerce to new heights, yet we've barely scratched the surface . . . .***"

\*       \*       \*

Key operating metrics from the quarter included:  . . . \*\*Backlog:  ***The Company brought its consolidated backlog of advertising and commerce revenue to more than $2.7 billion at the end of the quarter, up from $2.4 billion on December 31, 1999.***

(c)    The conference call transcript stated:

[Mike Kelly (SVP/CFO):]

. . . ***[T]his is the best quarter in AOL's history.  This performance underscores the strong momentum in our operations as well as the strong economic foundation we have built at AOL***, which we will further energize when we merge with Time Warner.

\*       \*       \*

***We finished the quarter with 22.2 million AOL members worldwide, increasing the number of new subscribers to nearly 4.6 million in the first three quarters of the fiscal year***.  This compares to just 4.3 million new net adds during the same time frame last year.

Turning now to the ***fastest-growing portion of the business, the $557 million in total Advertising, Commerce and Other Revenues is composed of $463 million in Advertising and Commerce***, $58 million in Merchandise, and $36 million in Other Revenues.

***Focusing for a moment on just Ad/Commerce, we saw sequential growth of $111 million, or 32%, and year-over-year growth of $251 million, or 118%.  These results underscore how we are succeeding . . . .***

***In total, Advertising, Commerce, and Other Revenues now comprise over 30% of our total revenues, compared to just 22% a year ago.***

\*       \*       \*

***During the quarter we signed 37 multi-year deals in excess of $1 million to help bring backlog to a total of $2.7 billion, up over $300 million from last quarter***.

\*       \*       \*

*[W]e continue to see strong, underlying fundamentals in each of our operation* . . . .

96.    On 4/18/00, AOL held a conference call for investors during which Case, Pittman and

Kelly stated:

CASE: . . .  If there is one clear takeaway from this quarter *it is America Online's business has never been more robust. . . . [O]ur results demonstrate that we are on a clear path to continued strong growth and increased profitability.*  There is no question that this quarter marked a watershed in the company's history.  Not only did we announce our landmark merger with Time Warner but we also have not missed a beat in building our core interactive businesses. . . .  *In short, our results highlight just how strong America Online is today and how well positioned it is for the future. . . .*  [O]ur advertising commerce and other revenues doubled to a record $557 million.  Our worldwide membership base expanded by more than 2 million new subscribers including 1.7 million new AOL members for a total of 25.8 million across all of our subscription brands by the end of the quarter.  *This is one of the best quarters we have ever had in AOL membership growth*.  It means we will add significantly more AOL subscribers this year than last putting us ahead of where we said we'd be for our year end total.  We are particularly pleased with our subscriber growth because it proves that we have kept our eye on the ball even with the pending merger with Time Warner.  *And it also shows increasing competition with . . . free services, contrary to many dire predictions, certainly is not affecting us . . . especially when you see the 2 million members that we added worldwide during the quarter. . . .  We've never been more bullish on the prospects for our combined company than we are today. . . .*

PITTMAN: . . .  [E]ven as we've made great strides in our merger with Time Warner, we're not slowing down one bit.  What we have done is open the throttle and accelerate the America Online growth engine.  This quarter is an excellent example of how America Online is uniquely positioned in the Internet industry. . . .  Now I'd like to take a few minutes to highlight just how successful this quarter was.  From the success of our subscription services and our web-based brands to the record growth in advertising and commerce.  Our flagship AOL service added another 1.7 million subscribers for a total of 22.2 million members worldwide. . . .  Finally, let's review this quarter's advertising and commerce success. . . .  *[A]dvertising commerce and other revenues climbed 103% over last year to a new high of $557 million and marking a record $120 million, or 27%, increase over the previous quarter.  And another advertising commerce milestone, our consolidated backlog, grew by more than $300 million to more than $2.7 billion*.  Helping to drive this growth during the quarter have been a number of strategic alliances with such companies as General Motors, Sears, Kinkos, Foot Locker.com, Oxygen Media and PurchasePro.com. . . .

KELLY: . . . We were clearly pleased with this quarter's strong performance not only from a financial perspective, but also from an operational one. . . .  [T]his is the best quarter in AOL's history.  The performance underscores the strong momentum in our operations, as well as the strong economic foundation we have built at AOL, which we further energized when we merged with Time Warner.  Now, as you are aware,

Time Warner reported results last week that were quite strong **and the pro forma results for the combined company are very impressive even before taking into consideration the synergies and new business opportunities that we anticipate. . . . During the quarter we signed 37 multi-year deals in excess of a million dollars to help bring backlog to a total of $2.7 billion, that's up over $300 million from last quarter**.

\*      \*      \*

QUESTION: . . . [C]an you talk a little bit about what's in the backlog? How it gets accounted? And any sort of risk to that backlog number that you might be seeing because some small companies may not be around six months from now? . . .

KELLY: . . . **[W]e take a look at the backlog each and every quarter. We account for backlog as firm contractual backlog that is almost guaranteed revenue, if you will. . . .** We look at each one of the customers that we do business with and we structure our contract in such a way that if we have some financial risks with a given customer, we ask, usually receive, up-front payments on that backlog so a lot of the backlog as you see in our deferred revenue, a fair amount of that, is what we've already received in cash. In addition, we go through each quarter an analysis of our backlog to see who is advertising in it, what comprises the backlog overall, and we make any adjustments that we feel are appropriate given the risks we see in the business. . . . **[S]o we go through that and trim that on a quarterly basis. We don't see any significant risks in the backlog. We've taken a good hard look at it this quarter, as we do every quarter**.

97.    On 4/19/00, Salomon Smith Barney issued a report on AOL, which was reviewed and

approved by Case, Novack, Kelly or Pittman, stating:

AOL reported an all-around excellent fiscal 3Q 2000, highlighted by a 32% sequential increase in advertising and e-commerce revenue. EPS . . . were two cents ahead of our expectations. AOL's ad/e-commerce revenue rose from $352 million in F2Q 2000 to $463 million in F3Q 2000, a $111 million gain. **Seeing as both Yahoo! and DoubleClick saw sequential revenue growth in advertising revenue in the 13-14% range in the Mar. qtr, AOL's +32% improvement marks a significant market share gain for the company. Ad/e-commerce is now 25% of sales and more than 45% of gross profit . . . .  Raising revenue and EPS estimates, continue to value combined [company] at $115**.

\*      \*      \*

**We are raising our projections for AOL . . . for fiscal 2001. . . .**

**We continue to recommend purchase of AOL, particularly with an eye toward owning the to-be-formed AOL Time Warner free cash flow machine. . . .**

**From a financial perspective, we believe AOL-Time Warner will be a free cash flow engine, turning out more than $5 billion ($1.15/share) in free cash flow**

*in 2001, with an ability to grow that free cash flow 50% per year for the next several years. . . . [W]e believe AOL Time Warner would be fairly valued at $115 per share. . . .*

. . . In our opinion, one of the most proven and profitable segments of the broad Internet business landscapes is and will remain the online advertising marketplace. *We believe AOL is gaining market share within this segment, and developing trends within AOL's business point to continued, if not accelerated, growth here, in our opinion.* The media business models behind the leading companies in the Online advertising field are inherently highly profitable given 1) operating cost leverage stemming from audience scale, 2) revenue leverage growing out of audience leadership, and 3) the well-established margin structure of existing and competing traditional media business (generally in the 20-35% op. margin range).

Given that AOL's advertising/e-commerce revenue growth rate was roughly double that of Yahoo! and DoubleClick in the March quarter, and since the dollar-value of AOL's sequential advertising/e-commerce revenue growth was four-times greater than Yahoo!'s, *it is patently clear that AOL gained market share within the most important and profitable segment of the Online Media marketplace – the advertising and e-commerce arena*.

*We believe AOL's strong growth in ad/e-commerce has several sustainable and predictable sources . . . .*

\*       \*       \*

### SUBSCRIBER GROWTH REMAINS STRONG

On the subscriber side, AOL added 1.2 million net new members to the core domestic AOL service and another 500,000 new AOL members overseas in F3Q 2000. *Worldwide membership to AOL climbed 1.7 million, or +8%, to 22.2 million over the course of the March quarter*.

98.    On 5/4/00, Morgan Stanley issued a report on AOL and Time Warner, written by

Mary Meeker, which was reviewed and approved by Levin, Parsons or Ripp, which stated:

*How Big is Big?  Big!*

\*       \*       \*

. . . [W]e . . . detail why we think this merger makes sense strategically and financially. . . .

Our investment thesis for the new company is simple:  1) the whole is greater than sum of the parts; and 2) AOL Time Warner's ability to generate multiple annuity-like revenue streams from hundreds of millions of customers over many years . . . is, well, very, very impressive.

- 74 -

. . . [W]e admit, we really like the merger of America Online and Time Warner.

\*       \*       \*

**[F]ew companies have the compelling financial and valuation characteristics of the combined AOL Time Warner.**

\*       \*       \*

Combined Asset Sets of AOL and Time Warner **Are Unique in the World** . . .

- **Unparalleled Internet Positioning – AOL has . . . 22 million paying online subscribers . . . .**

\*       \*       \*

- Great Management Team – Led by Steve Case (AOL), Gerald Levin (HBO), Bob Pittman (MTV), and Ted Turner (TBS) . . . – **and this team is just the tip of this management iceberg**.

\*       \*       \*

**AOL Time Warner's Financial Outlook Compelling. . .**

**As a combined company, we expect that AOL Time Warner can achieve 25% pro forma compound annual EBITDA growth for 2000-2005**. . . . EBITDA growth should leap to 28-29% in 2001, the first full year as a combined company. The 2001 forecast includes the first stage of business synergies. . . .

. . . **AOL Time Warner's Valuation Kind of Jumps Out at You**

\*       \*       \*

**Cash earnings per share should grow 23-25% . . . in 2000-2005, strong by any measure**.

\*       \*       \*

**Conservatively, 25% Five-Year Average EBITDA Growth with 14-15% Revenue Growth . . .**

\*       \*       \*

- **We estimate that the compound annual growth rate for advertising and e-commerce revenues is 20-22% in 2000-2005**.

\*       \*       \*

**We expect that online advertising and e-commerce revenues can sustain 80% gross margins and will provide operating leverage**.

- 75 -

99.    On 5/17/00, AOL filed its Report on Form 10-Q for the quarter ended 3/31/00 with the SEC, which was later incorporated by reference in the Merger Registration Statement.  The 3/31/00 Form 10-Q contained AOL's previously announced and better-than-expected financial results for the quarter ended 3/31/00.  It also stated:

Advertising, Commerce and Other Revenues

The following table summarizes the material components of advertising, commerce and other revenues for the three and nine months ended March 31, 2000 and 1999:

| | Three Months Ended March 31, | | | | Nine Months Ended March 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2000 | | 1999 | | 2000 | | 1999 | |
| | | | (Dollars in millions) | | | | | |
| *Advertising and electronic commerce fees* | *$463* | *83.1%* | *$211* | *76.7%* | *$1,087* | *80.9%* | *$532* | *76.7%* |
| Merchandise | $58 | 10.4% | $38 | 13.8% | $151 | 11.2% | $91 | 13.1% |
| Other | $36 | 6.5% | $26 | 9.5% | $106 | 7.9% | $71 | 10.2% |
| Total advertising, commerce and other revenues | $557 | 100% | $275 | 100% | $1,344 | 100% | $694 | 100% |

Advertising, commerce and other revenues . . . increased by 103%, from $275 million in the quarter ended March 31, 1999 to $557 million in the quarter ended March 31, 2000.  For the nine months ended March 31, 2000, advertising, commerce and other revenues increased 94% from $694 million in the nine months ended March 31, 1999 to $1,344 million in the nine months ended March 31, 2000.

Advertising and electronic commerce fees increased by 119%, from $211 million in the three months ended March 31, 1999 to $463 million in the three months ended March 31, 2000.  Advertising and electronic commerce fees increased by 104%, from $532 million in the nine months ended March 31, 1999 to $1,087 million in the nine months ended March 31, 2000. . . .  *At March 31, 2000, the Company's advertising and commerce backlog, representing the contract value of advertising and commerce agreements signed, less revenues already recognized from these agreements, was approximately $2.7 billion, up approximately $1.3 billion from March 31, 1999*.

*              *              *

Advertising, Commerce and Other Revenues

*An important component of the Company's business strategy . . . is an increasing reliance on advertising, commerce and other revenues. . . . The growth of advertising, commerce and other revenues is important to the Company's*

*business objectives, as these revenues provide an important contribution to the Company's operating results. Advertising revenues are expected to grow in importance as the Company continues to leverage its large, active and growing user base. . . . Affecting the growth in advertising, commerce and other revenues is the backlog balance as of June 30, 1999, 1998 and 1997 of $1,519 million, $511 million and $180 million, respectively. . . .*

The following table summarizes the material components of advertising, commerce and other revenues for the years ended June 30, 1999, 1998 and 1997.

| | | Year ended June 30, | | | | |
|---|---|---|---|---|---|---|
| | 1999 | | 1998 | | 1997 | |
| | (Dollars in millions) | | | | | |
| *Advertising and electronic commerce fees* | *$765* | *76.5%* | *$358* | *65.9%* | *$147* | *47.7%* |
| Merchandise | $134 | 13.4% | $103 | 19.0% | $109 | 35.4% |
| Other | $101 | 10.1% | $82 | 15.1% | $52 | 16.9% |
| Total advertising, commerce and other revenues | $1,000 | 100% | $543 | 100$ | $308 | 100% |

Advertising, commerce and other revenues increased by 84%, from $543 million in fiscal 1998 to $1,000 million in fiscal 1999. . . . Advertising and electronic commerce fees increased by 114%, from $358 million in fiscal 1998 to $765 million in fiscal 1999.

Advertising, commerce and other revenues increased by 76%, from $308 million in fiscal 1997 to $543 million in fiscal 1998. . . . Advertising and electronic commerce fees increased by 144%, from $147 million in fiscal 1997 to $358 million in fiscal 1998.

100.    In order to accomplish the Merger, with the help and assistance of their respective

financial advisors, Salomon Smith Barney and Morgan Stanley, the Boards of Directors of AOL and

Time Warner created, signed and filed with the SEC the Joint Proxy-Prospectus/Merger Registration

Statement providing for the initial offering and issuance of the new stock of the merged enterprise.

AOLTW used the Merger Registration Statement not only to issue the new shares of its stock to be

issued in the Merger, but also as part of obtaining the approval of the shareholders of Time Warner

for the sale of their company to AOL. The Merger Registration Statement contained AOL's historic

subscriber metrics and financial results, reporting dramatic increases in AOL's e-commerce

advertising revenues (and backlog) and its online access subscriber numbers, both in the United

States and internationally.  The Merger Registration Statement also contained the opinion of Morgan Stanley that the Merger was "fair" to Time Warner's shareholders and the unqualified certification of AOL's financial results for the fiscal years ended 6/30/98 and 6/30/99 by its auditor, Ernst & Young, without which the Merger never would have been approved by Time Warner's shareholders.

101.    On 5/19/00, the Merger Registration Statement for the initial public offering and sale of the new shares of AOLTW stock to be issued in connection with the Merger became effective with the SEC.  The Merger Registration Statement incorporated the following documents by reference:

- All documents filed by AOL or Time Warner with the SEC "after the date of this joint proxy statement-prospectus and before the date of each company's special meeting."

- AOL's Annual Report on Form 10-K for the fiscal year ended 6/30/99.

- AOL's Quarterly Report on Form 10-Q for the quarterly period ended 9/30/99.

- AOL's Quarterly Report on Form 10-Q for the quarterly period ended 12/31/99.

- AOL's Quarterly Report on Form 10-Q/A for the quarterly period ended 3/31/00.

- AOL's Report on Form 8-K dated 12/1/99.

- AOL's Report on Form 8-K dated 12/21/99.

- AOL's Report on Form 8-K dated 1/10/00 (filing date 1/14/00).

- AOL's Report on Form 8-K dated 1/19/00.

- AOL's Report on Form 8-K dated 1/10/00 (filing date 2/11/00).

- AOL's Report on Form 8-K dated 3/17/00.

- AOL's Report on Form 8-K dated 4/3/00.

- AOL's Report on Form 8-K dated 4/18/00.

102.    The Merger Registration Statement represented that AOL's subscriber base exceeded 22 million:

The Interactive Services Group develops and operates branded interactive services, including:

- the AOL service, a worldwide Internet online service with more than 22 million members . . . .

103.  The Merger Registration Statement included AOL's historical financial results. AOL's 97, 98 and 99 annual results were audited and certified by Ernst & Young, while AOL's interim results were reviewed and approved by Ernst & Young:

|  | Nine Months Ended March 31, | | Year June 30, |
|  | 2000 | 1999 | 1999 |
| --- | --- | --- | --- |
|  | (Amounts in millions, except per share data) | | |
| Statement of Operations Data: | | | |
| Revenues | $4,924 | $3,400 | $4,777 |
| Business segment operating income (loss) | $1,034 | $299 | $529 |
| Interest and other, net | $533 | $608 | $638 |
| Net income (loss) | $910 | $602 | $762 |
| Net income (loss) per share | | | |
| Basic | $0.40 | $0.29 | $0.37 |
| Diluted | $0.35 | $0.24 | $0.30 |

(Footnote omitted.)

104.  The Merger Registration Statement also included AOLTW's "pro forma" financial statements reviewed and approved by Ernst & Young, as follows:

Management believes that it is meaningful to present pro forma financial information based on the calendar year-end of the combined company to facilitate an analysis of the pro forma effects of the merger.

|  | Nine Months Ended March 31, 2000 | Year Ended June 30, 1999 | Three Months Ended March 31, 2000 | Year Ended December 31, 1999 |
| --- | --- | --- | --- | --- |
|  | (in millions, except per share amounts) | | | |
| Statement of Operations Data: | | | | |
| Revenues | $26,184 | $31,259 | $8,385 | $33,051 |
| Amortization of goodwill and other intangible assets | $(6,325) | $(8,392) | $(2,110) | $(8,393) |
| Business segment operating income (loss) | $10 | $(2,106) | $(511) | $(70) |
| Interest and other, net | $(1,328) | $(1,402) | $(472) | $(1,099) |

| | | | | |
|---|---|---|---|---|
| Loss before extraordinary item | (2,095) | $(3,913) | $(1,039) | $(2,522) |
| Loss before extraordinary item per basic and diluted share | $(0.50) | $(1.10) | $(0.25) | $(0.63) |
| Average common shares | $4,195 | $3,928 | $4,240 | $4,090 |
| EBITDA (/1/) | $7,500 | $7,749 | $1,996 | $9,802 |

> /1/ EBITDA consists of business segment operating income (loss) before depreciation and amortization. AOL Time Warner considers EBITDA to be an important indicator of the operational strength and performance of its businesses, including the ability to provide cash flows to service debt and fund capital expenditures. EBITDA, however, should not be considered an alternative to operating or net income as an indicator of the performance of AOL Time Warner, or as an alternative to cash flows from operating activities as a measure of liquidity, in each case determined in accordance with generally accepted accounting principles. In addition, this definition of EBITDA may not be comparable to similarly titled measures reported by other companies.

(Footnote omitted.)

105.    The Merger Registration Statement also described AOL's agreement with Bertelsmann:

> Recent Developments.   On March 17, 2000, America Online and Bertelsmann AG announced a global alliance to expand the distribution of Bertelsmann's media content and electronic commerce properties over America Online's interactive brands worldwide.   America Online and Bertelsmann also announced an agreement to restructure their interests in the AOL Europe and AOL Australia joint ventures.

106.    AOL would subsequently (in 11/04) admit that this restructuring should have resulted in AOL consolidating its AOL Europe results, beginning in 3/00, and has restated its 00 and 01 financial results to reduce 00 Operating Income from $1.76 billion to $1.46 billion.

107.    The 3/31/00 Form 10-Q, incorporated by reference in the Merger Registration Statement, represented AOL's purported backlog:

> At March 31, 2000, the Company's advertising and commerce backlog, representing the contract value of advertising and commerce agreements signed, less revenues already recognized from these agreements, was approximately $2.7 billion, up approximately $1.3 billion from March 31, 1999.

108.    In the Merger Registration Statement, defendants urged shareholders to vote in favor of the Merger because, among other things, they represented that the Merger would create "revenue

opportunities and synergies in areas such as advertising by providing companies 'one-stop' shopping for their online as well as print and broadcast media advertising," and management stated that total *EBITDA synergies would be approximately $1 billion in the first full year of operations, producing an EBITDA growth rate of approximately 30% in that first year*.

109.    The Merger Registration Statement also included the opinion of Morgan Stanley that the terms of the sale of Time Warner to AOL, *i.e.*, the Merger terms, were fair to the Time Warner shareholders from a financial point of view.

110.    The Merger Registration Statement contained the "clean" unqualified opinion of Ernst & Young, certifying that Ernst & Young had audited AOL's annual financial statements for the years ended 6/30/97, 6/30/98 and 6/30/99 in accordance with Generally Accepted Auditing Standards ("GAAS") and that those financial statements fairly presented AOL's financial results in accordance with Generally Accepted Accounting Principles ("GAAP").

111.    As a result of the reported success of AOL's core business and its e-commerce advertising operations, the Morgan Stanley fairness opinion, Ernst & Young's certification of AOL's prior financial results, the statements regarding the strength and success of AOL's business and the forecasts of Merger synergies and economies and the resulting revenue, EBITDA and free cash flow growth to be achieved by AOLTW, on 6/23/00, the shareholders of Time Warner approved AOL's acquisition of Time Warner.

112.    Even as the Joint Proxy-Prospectus/Merger Registration Statement was being circulated to get the Time Warner shareholders to vote to approve the sale of their company to AOL, behind the scenes AOL's and Time Warner's top executives knew that the emerging dot-com implosion and advertising slowdown were hurting both their companies – and would hurt AOLTW as well – making the repeated forecasts of strong profitable growth of AOLTW increasingly unrealistic.  Thus the success of AOL's e-commerce operations was being increasingly inflated by

the use of bogus one-time barter/swap advertising transactions and by exchanging equity investments for advertising to create otherwise unavailable and unsustainable advertising revenues. In addition, the problems in AOLTW's core online subscription business had intensified due to market saturation and intensified low-price or no-cost access competition, requiring AOLTW to engage in a raft of improper tactics to boost its subscriber numbers in an effort to conceal the deterioration of that business domestically and internationally.

113.    The financial deceptions detailed above pervaded the Merger Registration Statement, which contained AOL's 98-99 annual financial statements and AOL's interim financial results through 3/31/00.  The graph below shows the strong growth in AOL's subscriber and e-commerce revenues and backlog as presented to Time Warner's shareholders in the Merger Registration Statement:



The Merger Registration Statement urged Time Warner's shareholders to vote in favor of the sale of their company to AOL because, among other things, the Merger was "*fair*" to Time Warner shareholders.  The Merger Registration Statement said the transaction would create "revenue

opportunities and synergies in areas such as advertising by providing companies 'one-stop' shopping

for their online as well as print and broadcast media advertising."  It also stated that total ***EBITDA***

***synergies would be approximately $1 billion in the first full year of operations, producing an***

***EBITDA growth rate of approximately 30% in that first year***.  In other communications, the Time

Warner and AOL insiders and their financial advisors stated that the combined company "***will be a***

***high growth vehicle***" with a "***long-term EBITDA growth rate of 30% plus***" and could or would

create the "***most valuable***" company in the world.

       114.    On 6/19/00, AOL held a conference call, hosted and conducted by Meeker of Morgan

Stanley:

> MEEKER:  Thank you very much.  On behalf of Morgan Stanley . . . I would like to
> welcome you to this call.  We have Bob Pittman, Mike Kelly and Richard Hanlon
> from America Online on the phone. . . .  The purpose of this call is to really get an
> update on  the lay of the land on a whole bunch of different fronts. ***This is certainly***
> ***a company we are very enthusiastic about***.  I think there has been a little bit of baby
> with the bathwater stuff going on with the stock in recent days.  I think this is a great
> time to get an update and an overview . . . .
>
>                       *        *        *
>
> PITTMAN:  . . . ***I appreciate this opportunity to update you on how well the***
> ***company is doing. . . .  [L]ast week, AOL brand membership topped 23 million***
> ***worldwide reflecting continued strong membership growth in both the U.S. and***
> ***abroad. . . .***  Of course, expanding member time online as well as extending our
> reach is key to building on our advertising and commerce success.  In addition, we're
> seeing accelerating industry consolidation and a growing number of major offline
> brands and retailers coming on line and we believe that both will benefit our
> advertising and commerce.  As we've long predicted, we're finally seeing the
> consolidation underway on the Internet as it relates to advertising.  ***Increasingly,***
> ***advertisers and marketers are concentrating their buys through industry leaders***
> ***and because we are the industry leader, we'll be able to extend our competitive gap***
> ***through this consolidation and I think you've seen evidence of that in the last few***
> ***quarters. . . .  Once again, as we have predicted before, leaders tend to do business***
> ***with leaders and we are uniquely positioned.  And our positioning to the leaders***
> ***has paid off for us.***  In fact, you can look at our advertising commerce
> announcements over the past few months to see this trend.

       115.    On 6/20/00, Morgan Stanley issued a report on AOL based on the 6/19/00 conference

call with Pittman and Kelly, repeating their assurances.  The report stated:

AOL International – *In Europe, AOL is experiencing strong growth in subscribers and penetration in key markets. . . .*

Key Progress in AOL Time Warner Merger – Management emphasized that . . . *the transition process is on track*.

116.    On 6/23/00, AOL held its shareholders meeting to vote on the Time Warner transaction.  Case stated:

> *[T]hrough merging AOL and Time Warner [we] will have a substantially stronger company.  Very well positioned, strategically very well positioned.  Financially, the first year for example, AOL and Time Warner are in business, the combined company will do $40 billion in revenues.  So, it's a very significant company.  It's very profitable . . . .*

117.    On 6/23/00, after the shareholders of Time Warner voted to approve the sale of their company to AOL and to form AOLTW, AOLTW issued a release stating:

> Steve Case, Chairman and Chief Executive Officer of America Online, said: "*. . . Everyday since we announced this merger, we are seeing more and more potential for what America Online and Time Warner can achieve together . . . .*"

> Gerald M. Levin, Chairman and Chief Executive Officer of Time Warner, said:  ". . . *We are continuing to make great progress in our transition process . . . .*"

118.    Due to the regulated nature of Time Warner's and AOL's businesses, before the Merger could be closed, it was necessary to secure several regulatory approvals, a process that delayed the closing of the Merger for several months – as it turned out, until 1/01.  During the period following stockholder approval of the Merger in 6/00 and the closing of the Merger upon receipt of the required regulatory approvals in 1/01, it was more important than ever for AOLTW to continue to present AOL's core online access business and its e-commerce advertising as continuing to achieve success.  This was necessary not only to support AOL's stock price, but also because the Merger documents contained provisions that would require Time Warner's Board to terminate the Merger in the event of any "*material adverse change*" in AOL's business or finances and *permitted* Time Warner's Board to terminate the Merger for any reason upon a payment to AOL.  Thus, if the deterioration of AOL's business became public and its stock price fell sharply, tremendous pressure

would be put on Time Warner's top executives and directors to terminate the proposed sale of Time

Warner to AOL and for Morgan Stanley to revise or revoke its fairness opinion – something they did

not want to do, as they had put the Merger together, gotten it approved and stood to immediately

gain hundreds of millions of dollars for themselves if and when the Merger closed, while Morgan

Stanley was to get $47.5 million upon closing, regardless of how the Merger ultimately worked out,

and up to another $15 million in extra compensation the higher AOLTW stock traded in the five

days after the Merger was completed.

119.    During 00, AOL's senior executives were frequently secretly briefed on the material

decline in e-commerce advertising revenue, and held weekly meetings to discuss the potentially

devastating effect on AOL of the increasing troubles being suffered by the company's dot-com

customer base.  Rather than disclose this adverse trend and risk derailing the Merger, AOL

concealed it.  The company did not take non-paying dot-coms to court to collect for fear that the

public filing would disclose the weakness in AOL's business.  Instead, it charged failing dot-com

customers a fee for shortening the term of their contracts and improperly recorded the fee as

advertising revenue.    Additionally, AOL structured numerous "unconventional," *i.e.*, illicit,

transactions to boost reported revenues – deals structured by the Business Affairs unit and known

internally as "***BA Specials***."  For example, AOL improperly converted outstanding uncollected legal

judgments and settlements into advertising revenues and, in one case, to meet revenue projections,

reported millions of dollars of revenue on advertisements it had run without the potential customers'

consent. Other "unconventional" transactions were swaps, akin to those employed by Global

Crossing and Enron Corp., in which AOL and other companies agreed to advertise with each other –

swaps with no real economic substance.  AOL did suspect deals with both Qwest and WorldCom –

two companies whose own accounting has been shown to be grossly falsified – and Veritas, which

has restated its results, and Homestore.com, which has not only restated its financial results, but has

seen several of its top executives plead guilty to criminal charges for phony deals – including deals

with AOL – which resulted in AOLTW being named as a defendant in the large securities class

action suit on behalf of Homestore.com's shareholders alleging that AOLTW participated in a

scheme to help inflate Homestore.com's (and its own) financial results via a host of phony e-

commerce advertising deals.  The federal district court presiding over the *Homestore.com* case

wrote:

> The acts alleged in the [*Homestore.com* complaint], which this Court must accept as
> true for purposes of this motion, describe a massive conspiracy driven by pure
> avarice.  In particular, the detailed factual allegations describing the role of AOL and
> its agents in helping Homestore please Wall Street and in boosting its own revenues
> through bogus commissions give this Court great pause.

*In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1041 (C.D. Cal. 2003).

120.    Also during 00, AOL's e-commerce advertising backlog was increasingly inflated and

misleading.  First of all, most of the "firm contractual" commitments in the backlog were not really

commitments at all, as they could be canceled by the customer with little or no financial payment to

AOL.  Further, the backlog was inflated and misleading because most of the backlog was not only

cancelable at will, but more and more customers were indicating an intention to cancel.  And the

backlog also contained millions of dollars of one-time highly structured or re-structured deals which

were not indicative of ongoing demand as they were extremely unlikely to ever be repeated, as well

as "barter," "swap" and "round trip" deals which lacked economic substance, and even if they

occurred, could not generate legitimately recognized revenue.  Also, the backlog increasingly

included hundreds of millions of dollars of old e-commerce advertising commitments from

companies whose failing business plans and weakening financial condition caused them to exercise

the right to cancel those commitments or threaten to cancel them absent drastic price cuts, which

would have gutted the profitability of the e-commerce advertising business.  The true backlog – of

orders from solvent companies likely to actually honor their existing commitments and continue to do business with AOL – was hundreds of millions of dollars less than reported.

121.    Following stockholder approval of the Merger in 6/00, the top executives at AOL and Time Warner continued to reiterate their previous forecasts of synergies and economies the Merger of the two companies would create, as well as the forecasts of huge revenue, EBITDA and cash flow growth to occur immediately following the Merger, and for years to come.  During this time period, as AOL continued to report its financial and operating results as a separate entity, it continued to report strong growth in its online access subscriber metrics, both domestically and internationally, as well as continued strong growth in the revenues of its high-margin e-commerce advertising business, as well as an ever-growing backlog of e-commerce advertising commitments.  Worse yet, in order to cover up and conceal the deterioration of AOLTW's own cable advertising business – one of the true mainstays of the Time Warner empire – which was being badly hit by intensifying competition and a slowdown in advertising, the Time Warner executives were engaging in tricks to artificially and improperly boost Time Warner's cable TV advertising revenues, including counting as advertising revenue hundreds of millions of dollars of initial license payments from new channels joining the Turner cable TV system, which, in fact, were not advertising revenues at all.  AOL and Time Warner continued to report these results, while AOL and Time Warner executives continued to make these extraordinarily bullish forecasts of Merger synergies and economies and future revenue and profit growth, even though during this period the dot-com boom imploded and the economy weakened, leading to many other honest companies reporting curtailed advertising commitments and/or reduced advertising revenues, leading to fears these same conditions would hurt AOLTW's business post-merger, concerns which AOL and Time Warner executives repeatedly assured investors were not applicable to them – pointing to AOL's and Time Warner's own strong results as evidence that if

there was any slowdown, it was not impacting, and would not adversely impact, AOL, Time Warner or AOLTW.

122.    On 6/27/00, Salomon Smith Barney issued a report on AOL, which was reviewed and approved by Case, Kelly or Pittman, which stated:

- . . . AOL has the . . . most . . . proven profitable business model in the online field.

- **With over 22 million paying subscribers** . . . AOL has clear strategic advantages.

                              *        *        *

- The AOL Time Warner merger will be an attractive place to invest in high quality, free cash-flow growth among the stock market's existing leadership.

                              *        *        *

*[W]e believe AOL is positioned to sustain its rapid subscriber-base growth. . . .* Leading newspaper franchises exceed $80-$100 of operating profit per reader per year, *and we foresee AOL reaching and surpassing that level of subscriber profitability in the long term. AOL's highly leveragable business model, in which gains in advertising and e-commerce revenues power significant increases in overall profitability, provides the basis for AOL's investment appeal*.

                              *        *        *

Profitable Business Model:  AOL's business model generates more revenue in a month than all but a handful of other online firms do in an entire year and AOL does so with steadily rising margins. *AOL's leveragable model has an increasingly well-balanced revenue mix* . . . .

123.    On 7/18/00, Time Warner issued a release reporting its 2ndQ 00 results, headlined and stating:

*Time Warner Businesses Report Record Second Quarter Operating Results*

                              *        *        *

Time Warner Inc. today reported record operating results for the second quarter of 2000.

Operating income before amortization of intangible assets (EBITA) grew 12% over the comparable 1999 quarter . . . .

With Cable Networks, Publishing, Filmed Entertainment, and Cable all posting record normalized operating results, Time Warner reported normalized

EBITA of $1.381 billion for 2000's second quarter versus $1.237 billion for the same period a year ago.  On an actual basis, Time Warner reported EBITA of $1.295 billion on revenues of $7.080 billion for 2000's second quarter, compared to EBITA of $2.014 billion on revenues of $6.531 billion for the same period a year ago.

*        *        *

Commenting on the company's performance, Time Warner's Chairman and CEO Gerald M. Levin said, ". . . During the quarter . . . we announced the management team and organization for AOL Time Warner . . . . *We are already working very well together* . . . ."

124.    On 7/18/00, after Time Warner issued its 2ndQ 00 results, it held a conference call for

analysts, money managers and institutional investors, including large Time Warner shareholders.

During the call, Levin stated:

LEVIN: . . . [L]et me talk about AOL Time Warner and describe the financial engine *. . . the growth rates are substantial.  The message is essentially the same, it's a strong sustainable growth.  It will be a large cap growth stock with sustainable growth.  Now I feel more comfortable going over these metrics with you because last week we had a joint Board meeting in Atlanta . . . and all the businesses went through a long-term plan just as we do every year at Time Warner.  So, that's all the businesses, including AOL, so now we have a long-term plan that supports the following financial engine.  For the first year of this new company, the year 2001, we again look for revenues north of $40 billion.  We anticipate revenue growth in the 12 to 15% range annually.  EBITDA for this first full year of 2001 should be north of $11 billion.  When you include up to $1 billion of synergies, that would give us a year '01 EBITDA growth rate in the range of 30%, thereafter we see it in the range of about 25%.  We're even more comfortable with these numbers having done this long-range plan.  The other metric is free cash flow, isn't that what it's all about.  And, we see that growing at 50% a year for this plan period. . . .  [B]ased on our plan, we are comfortably expecting that cash EPS can grow in the range of 25 to 30% annually. . . .*  [I]n my view or our view, we believe a premium multiple should attach to the growth rate, you know, however you compute your multiples or your discounted cash flows, we think a premium is warranted primarily because the *growth that I'm describing, we believe more strongly today than ever, is sustainable growth*.

125.    On 7/19/00, Salomon Smith Barney issued a report on Time Warner, which was

reviewed and approved by Levin, Parsons or Ripp.  It stated:

At Time Warner's quarterly meeting, Chairman and CEO Jerry Levin provided a positive strategic outlook for the company.  As underscored by its second quarter 2000 results . . ., *momentum continues to persist in nearly all of Time Warner's business units. . . .  The meeting focused on advertising with Steve Heyer, TBS*

*Entertainment's President and COO giving a presentation on the upfront marketplace in cable advertising.*

*Advertising Market Remains Robust*

Time Warner's solid results were aided by the robust advertising market . . . . *Specifically, advertising revenues within . . . Cable Networks increased about 18% . . . .*

\*       \*       \*

Financial Targets Laid Out for TWX/AOL

*Time Warner/America Online will be a dominant media and entertainment company producing revenue and EBITDA of over $40 billion and $11 billion, respectively in 2001. We expect 12%-15% revenue growth from Time Warner/ America Online in 2001 and, after factoring in $1 billion in synergies, 2001 EBITDA growth could reach 30%. Longer term EBITDA growth should moderate to 25%.*

\*       \*       \*

Outlook and valuation

Overall . . . we remain optimistic about the growth opportunities from the America Online/Time Warner merger. . . .

. . . [W]e arrive at a price target of $115 for AOL Time Warner.

126.     On 7/20/00, AOL was to report its results for the period ended 6/30/00. Investors and Time Warner shareholders were intensely focused on this report as concerns had surfaced that the advertising market was softening and thus investors were anxious to see if AOL's business was continuing to achieve strong subscriber growth in the U.S. and internationally, as well as very rapid, profitable growth overall, and especially in its e-commerce advertising business. AOL did not disappoint, as it again reported ***better-than-expected results across the board*** via a release reporting its 4thQ 00 and F00 results for the period ending 6/30/00. The release stated:

*Fourth Quarter Income, Fully Taxed and Excluding One-Time Events, Up 115% to $334 Million, or $0.13 per Share, on Consolidated Revenues of $1.9 Billion*

*FY2000 Net Income Soars to $1 Billion on Consolidated Revenues of $6.9 Billion*

- 90 -

***Fourth Quarter Advertising, Commerce & Other Revenues Rise 95% to $609
Million – Totaling Nearly $2.0 Billion for Full Year; Advertising & Commerce
Backlog Doubles to $3.0 Billion***

***New US and International Records in AOL Membership Growth – Totaling
992,000 in Fourth Quarter and 5.6 Million in Full Year***

. . . America Online, Inc. today reported record results for its fiscal fourth
quarter and full fiscal year ended June 30, 2000 – achieving new highs for
consolidated revenues, advertising, commerce and other revenues, operating income,
EBITDA and AOL membership growth.

The quarter's consolidated revenues climbed 39% to $1.9 billion from $1.4
billion in last year's June quarter. Net income for the quarter, fully taxed and
excluding one-time items, more than doubled to $334 million, or $0.13 per diluted
share, up from $155 million, or $0.06 per diluted share, on the same basis last
year. . . .

Advertising, commerce and other revenues improved 95% to $609 million in
the latest quarter, for a total of nearly $2.0 billion for the full year. ***Additionally, the
Company's advertising and commerce backlog – made up of contractually
committed revenues to be recognized at scheduled future dates – doubled over the
year to $3 billion at June 30, 2000, with growth of $300 million in the last three
months alone.***

\*      \*      \*

Net income for the full year, fully taxed and excluding one-time items, rose to
$1.0 billion, or $0.40 per diluted share, on consolidated revenues of $6.9 billion.
That compares to a fiscal 1999 net income of $391 million, or $0.17 per diluted
share, on consolidated revenues of $4.8 billion.

\*      \*      \*

***The AOL service set subscriber growth records for the fourth quarter of
992,000 net new members and for the full year of 5.6 million – totaling 23.2
million total members worldwide at June 30. . . .***

***Record Performance Drives Growing Momentum***

Steve Case, Chairman and Chief Executive Officer, said: "***This has been a
record-breaking year for America Online, and we finished on a strong note with
this quarter's performance. We added an all-time high of 5.6 million AOL
members this year, bringing membership to more than 23 million worldwide. Just
four years after becoming the only Internet company with $1 billion in annual
revenues, we are now posting $1 billion in annual profits.***"

Mr. Case added: "***We are more excited than ever about the enormous
potential of AOL Time Warner. . . .***"

Bob Pittman, President and Chief Operating Officer, said: "*These record results reflect our success in executing business plans . . . . We posted record subscriber growth, both in the US and major international markets, with member retention reaching an all-time high. And we are continuing to drive up our advertising and e-commerce revenues through an increasing number of partnerships with leading brands and retailers.*"

127.    On 7/20/00, AOL held a conference call for analysts, money managers and investors:

CASE:   . . . *This quarter we again achieved records in membership growth, advertising and commerce and profitability*. . . . [W]e added a record 992,000 net new AOL members for the fourth quarter and an all-time high of 5.6 million for the entire year. . . . [W]e achieved new highs for advertising, commerce and other revenues, with $609 million for the quarter and $2 billion for the full year and we start the new year with a backlog of $3 billion. . . . *These record results made clear that our business has never been stronger [and] our growth opportunities have never been better* . . . .

PITTMAN:   . . . [L]et's focus on advertising and commerce, our fastest growing revenue stream because I know that it's been on the minds of a lot of you. . . . *[W]e reached all time highs in advertising, commerce and other revenue for the fourth quarter and for the full year and continued to build our backlog at a record pace, on top of our tremendous third quarter performance. To put this in perspective, we are getting more advertising commerce dollars than any single U.S. advertising vehicle except for the top four national broadcast networks. As we have long predicted, advertisers and marketers are starting to concentrate their buys with industry leaders. Because we are the industry leader in both reach and time spent online, we benefited from this consolidation. . . . Key to generating this ad commerce revenue is our success at expanding our audience reach. . . . [A]nd I'm happy to report . . . we set another record for AOL membership growth this quarter with strong gains both in the U.S. and abroad and retention stands at an all-time high*. For the full year we added more than 5.6 million net new members. . . . AOL International had a record year. . . . *[O]ur accelerating momentum overseas is underscored by the fact that fourth quarter subscriber growth more than tripled over last year*. . . .

KELLY:   . . . *The quarter's financial results certainly cap an exceptional year for AOL. Once again, underscoring its strength and sustainability of our business model. For the year and for the quarter, we reached a number of new records including ones for revenue, operating income, EBITDA, net income, earnings per share and free cash flow. . . .* Let's quickly touch the highlights for the quarter. . . . During the quarter we added 992,000 subscribers to the AOL service bringing worldwide membership to 23.2 million. . . . Advertising, commerce and other revenues is $609 million, including $503 million in advertising and commerce revenues, $59 million in the merchandise revenues and $47 million in other revenues. In aggregate, these remain the fastest growing component of our revenue streams and now represent 32% of total revenues versus just 23% a year ago. . . . During the quarter we signed 33 multi-year deals in excess of a million dollars and our backlog now stands at $3 billion versus $2.7 billion last quarter for 11% sequential increase

and double last year's total. *Let me put that backlog number in perspective. The $3 billion in committed future business gives us terrific visibility on future revenues and reflects our partners' confidence in AOL's ability to get results. One interesting statistic, our backlog at the end of fiscal year 2000 is equal to our total revenues reported in fiscal 1998. As we have shown our ability to deliver, for our advertising and commerce partners, we've attracted more of the traditional blue chip names. Today, these are the types of companies that account for the vast majority of our backlog. Even so, we actively monitor and manage the backlog and we continue to have a very high confidence level in it.*

128.   On 7/21/00, *The Wall Street Journal* reported on AOL's 6/30/00 results as released on

7/20/00:

America Online Inc. *exceeded Wall Street expectations for its fiscal fourth-quarter earnings as advertising and electronic-commerce revenue nearly tripled, defying jitters about the impact of failures at dot-com companies on online advertising spending.*

*             *             *

*AOL did have huge success expanding revenue from advertising and electronic-commerce transactions processed over its service. That figure almost doubled to $609 million from $313 million. . . . [A]dvertising and e-commerce sales are a closely watched gauge of the company's profitability.*

*The solid results in that category helped reinforce the belief among some Wall Street analysts that the largest Internet players have limited exposure to the growing raft of failures among dot-com companies. . . .*

AOL executives echoed those comments, saying AOL had only "modest" exposure to such advertisers. *The company has made a concerted effort to partner with large old-line corporations eager to build a Web presence by getting in front of AOL subscribers, the largest audience on the Internet. . . .* Mr. Case said "*the vast majority of our [promotional] agreements are with companies that have been around for decades.*"

129.   On 7/21/00, Salomon Smith Barney issued a report on AOL, which was reviewed and

approved by Case, Pittman or Kelly, stating:

- After a better-than-expected F4Q2000 earnings result – $0.13/share reported vs. our $0.11/share estimate – we are raising our F2001 estimate for AOL from $0.55 to $0.60/share.

- AOL's subscriber growth and profit margin engines continued to roll in F4Q 2000, and we now expect F2001 operating profitability to be 25%-26% of revenue, versus 23% previously.

*             *             *

- 93 -

- As the investment focus shifts to AOL's merger with Time Warner, we believe the combined company's stock will offer multiple expansion potential from a free cash flow multiple of 50x today *on 50% annual FCF growth in 2001-03E*.

                          *      *      *

Summary and Investment Opinion

AOL reported a strong F4Q 2000, highlighted by record June quarter subscriber growth, a sharp uptick in the company's already-strong profitability, and two cents of earnings upside relative to our expectations for the quarter. . . . *[O]perating margin upside in F4Q 2000, point to higher earnings and cash flow for the company in the coming year than we have previously estimated*.

On the advertising and e-commerce front, AOL exceeded our revenue estimate in F4Q 2000 by 4%, with ad/e-commerce/other revenue climbing 95% year-over-year and 7% sequentially in the period.

                          *      *      *

On the merger front, we believe that AOL and Time Warner are already architecting operating and financial *plans that will enable the company to hit the ground at full speed after all regulatory approvals have been received and the merger closed*.

                          *      *      *

*[W]e expect that a combined AOL Time Warner will become a free cash flow dynamo and one of the cheapest places to buy strong free cash flow growth*. AOL's performance this quarter with respect to cash flow demonstrates that point: AOL achieved free cash flow of $344 million this quarter, 22% higher on a sequential basis and 365% higher when compared with the same period last year. EBITDA for F4Q00 was $572 million, 88% higher than the EBITDA of $304 million in F4Q99. Cash earnings for F4Q00 of $393 million grew 23% on a sequential basis and 92% compared with the same period last year. On a per share basis, F4Q00 cash earnings came in at $0.16 per share, which translates to 23% growth on a sequential basis and double the cash earnings per share number for the same period a year ago. *Clearly, AOL by itself is already becoming a cash flow powerhouse, and we believe the merger with Time Warner will only add to this strength. We emphasize cash flow and free cash flow because we believe these measures are most directly tied to shareholder value creation and represent the fundamental drivers of investment*.

130.    By mid-00, AOL's insiders anticipated that the AOL/Time Warner Merger would close later in 00 or in early 01. They knew that upon the close of the Merger, all their then *unvested* AOL stock options would be converted into options to purchase AOLTW shares and *immediately accelerate and vest*. Thus, knowing that they would shortly get millions of new *vested* AOLTW

stock options if, as and when the Merger closed, but fearing that their ongoing falsifications of AOL's results could be exposed at any time causing AOL stock to collapse and prevent the Merger, during 7/00-8/00, while AOL stock was still artificially inflated, top AOL insiders exercised millions of their existing and already vested AOL stock options and then immediately sold off some 2.2 million shares of AOL stock at as high as $58 per share, pocketing more than $125 million in illicit insider trading proceeds.  This insider selling is shown below:

|  | SHARES SOLD BETWEEN |  |
| --- | --- | --- |
| INSIDER | 07/14/00–08/30/00 | PROCEEDS |
| James Barksdale | 700,000 | $38,095,100 |
| Case | 1,000,000 | $56,367,000 |
| Kelly | 70,000 | $3,999,800 |
| Novack | 96,634 | $5,412,772 |
| Pittman | 394,745 | $21,833,346 |
| TOTALS: | 2,261,379 | $125,708,018 |

131.    As *Stealing Time* noted:

"The bubble had clearly burst, but senior management was under enormous pressure to hit the [financial] numbers and close the Time Warner transaction, which would diversify the revenue base and lower the risk profile of the company," Patti concluded.[5]

*          *          *

But the company wasn't concerned only about the merger.  Officials were concerned about their own financial well-being.  The wealth of numerous AOL executives was tied directly to the company's stock price.  Through options, Case and others had already achieved phenomenal riches.  The merger only raised the stakes – and cranked up the pressure.  Under the deal terms, most of the stock options of AOL employees vested one year after the deal closed.  If they wanted to cash in, they could not afford a misstep.

"It's emblematic of the big stock-option grant," said a former AOL official.  "The fact that everyone has options creates an almost perverse incentive to prop up the stock at almost any cost."

---

[5]    Referring to James Patti – former senior manager in Business Affairs.  The book talks about his firing which he attributes to his expressing his concerns about the legitimacy of the BA Specials.

132.    In late 9/00, AOL issued its 00 Annual Report to Shareholders.  AOL's 00 Annual

Report to Shareholders – for the year ended 6/30/00 – contained a letter signed by Case and Pittman,

which stated:

> In July, ***we reported new record results for our 2000 fiscal year ended June 30 –
> achieving new highs for consolidated revenues, advertising, commerce and other
> revenues, operating income, EBITDA and AOL membership growth***.  Our fiscal
> 2000 highlights include:
>
> •    Consolidated revenues reached nearly $6.9 billion, a 43% increase over the
>     previous fiscal year.
>
> •    ***The AOL service set a subscriber growth record for the full year of 5.6
>     million – totaling 23.2 million total members worldwide at June 30. . . .
>     [T]he Company's international joint ventures completed their most
>     successful year ever – setting a subscriber growth record for the fiscal year
>     with 1.4 million net new members for a total of 4.6 million.***
>
> •    ***Advertising, commerce and other revenues grew to a total of nearly $2
>     billion for the full year.  Additionally, the Company's advertising and
>     commerce backlog doubled over the year to $3 billion.***
>
> *      *      *
>
> ***All of this serves to underscore the strength of the foundation on which
> AOL Time Warner will be built.***
>
> *      *      *
>
> ***[W]e have discovered even more potential for AOL and Time Warner to
> thrive in this new age of business.  Together, we're going to achieve what neither
> of us could separately . . . .***

133.    In late 9/00, AOL also filed its Form 10-K for the year ended 6/30/00 with the SEC

(later incorporated by reference in the Stock Option Registration Statements) signed by all of AOL's

then directors and its CFO that stated:

> The following table and discussion highlights the revenues of the Company
> for the years ended June 30, 2000, 1999 and 1998.

|  | Year ended June 30, | | | | | |
|  | 2000 | | 1999 | | 1998 | |
|  | (Dollars in millions) | | | | | |
| **Revenues:** | | | | | | |
| Subscription services | $4,400 | 63.9% | $3,321 | 69.1% | $2,183 | 70.1% |
| ***Advertising, commerce and other*** | ***$1,986*** | ***28.8%*** | ***$1,027*** | ***21.4%*** | ***$566*** | ***18.2%*** |

- 96 -

| | | | | | | |
|---|---|---|---|---|---|---|
| Enterprise solutions | $500 | 7.3% | $456 | 9.5% | $365 | 11.7% |
| Total revenues: | $6,886 | 100% | $4,804 | 100% | $3,114 | 100% |

\*      \*      \*

Advertising, Commerce and Other Revenues

*An important objective of the Company's business strategy is a continued emphasis on growing the advertising, commerce and other revenues. . . .  During fiscal 2000, leveraging its large, active and growing user base, the Company continued to build on its industry-leading advertising and commerce through a series of major alliances with leading brands and retailers. . . .  Contributing to future growth in advertising, commerce and other revenues is the Company's backlog, made up of contractually committed revenues to be recognized in future periods. . . .  The backlog balances as of June 30, 2000, 1999 and 1998 were $3,017 million, $1,519 million and $511 million, respectively. . . .*

The following table summarizes the material components of advertising, commerce and other revenues for the years ended June 30, 2000, 1999 and 1998.

| | Year ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2000 | | 1999 | | 1998 | |
| | (Dollars in millions) | | | | | |
| *Advertising and electronic commerce fees* | *$1,600* | *80.6%* | *$772* | *75.2%* | *$363* | *64.1%* |
| *Merchandise* | *$211* | *10.6%* | *$132* | *12.8%* | *$103* | *18.2%* |
| *Other* | *$175* | *8.8%* | *$123* | *12.0%* | *$100* | *17.7%* |
| *Total advertising, commerce and other revenues:* | *$1,986* | *100%* | *$1,027* | *100%* | *$566* | *100%* |

Advertising, commerce and other revenues increased by 93%, from $1,027 million in fiscal 1999 to $1,986 million in fiscal 2000. . . .

Advertising, commerce and other revenues increased by 81%, from $566 million in fiscal 1998 to $1,027 million in fiscal 1999. . . .  Advertising and electronic commerce fees increased by 113%, from $363 million in fiscal 1998 to $772 million in fiscal 1999.

The AOL F00 10-K also contained AOL's historic financial results (certified by Ernst & Young):

| | Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2000 | 1999 | 1998 | 1997 | 1996 |
| | (Amounts in millions, except per share data) | | | | |
| Statement of Operations Data: | | | | | |
| Subscription services | $4,400 | $3,321 | $2,183 | $1,478 | $1,024 |
| *Advertising, commerce and other* | *$1,986* | *$1,027* | *$566* | *$330* | *$125* |
| Enterprise solutions | $500 | $456 | $365 | $411 | $188 |

| | | | | | |
|---|---|---|---|---|---|
| Total revenues | $6,886 | $4,804 | $3,114 | $2,219 | $1,337 |
| Income (loss) from operations | $1,389 | $450 | $(126) | $(176) | $(175) |
| Net income (loss) | $1,232 | $754 | $(80) | $(176) | $(203) |
| Net income (loss) per share-diluted | $0.48 | $0.30 | $(0.04) | $(0.10) | $(0.13) |

\*      \*      \*

| | Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2000 | 1999 | 1998 | 1997 | 1996 |
| | | | (Amounts in millions) | | |
| Other Selected Data: | | | | | |
| Net cash provided by operating activities | $1,808 | $1,119 | $428 | $124 | $2 |
| Earnings before Interest, Taxes, Depreciation and Amortization (EBITDA, as adjusted /2/ | $1,788 | $858 | $259 | $19 | $(107) |

/2/    EBITDA is defined as net income adjusted to exclude (1) provision/(benefit) for income taxes, (2) interest income and expense, (3) depreciation and amortization and (4) special charges and gains on investments. The Company considers EBITDA an important indicator of the operational strength and performance of its business including the ability to provide cash flows to service debt and fund capital expenditures. EBITDA, however, should not be considered an alternative to operating or net income as an indicator of the performance of the Company, or as an alternative to cash flows from operating activities as a measure of liquidity, in each case determined in accordance with generally accepted accounting principles ("GAAP").

(Footnote omitted.)

134.    As 00 unfolded and AOL and Time Warner continued to work on closing their Merger, the dot-com implosion accelerated and many analysts continued to fear a general slowdown in advertising spending – a combination of events some thought would hurt AOL's e-commerce advertising, Time Warner's cable TV advertising and AOLTW's growth and success after the Merger closed. On 10/16-17/00, AOL's and Time Warner's stocks plummeted from $53.54 to $48 and from $80 to $65.40, respectively, on concerns that advertising spending was slowing down and that this would hurt both companies and, of course, AOLTW. But, on 10/18/00, AOL and Time Warner reported strong financial results – in AOL's case including an 80% increase in e-commerce

advertising revenues and a $3 billion e-commerce advertising backlog. When reporting their results for their quarters ended 9/30/00, AOL and Time Warner went to extraordinary lengths to assure investors all was well with their businesses and on track for the Merger – which would achieve all the economies, synergies and growth forecast. The releases, conference calls and interviews of 10/18-19/00 are set forth below.

135.    On 10/18/00, Time Warner issued a release reporting its 3rdQ 00 results, headlined and stating:

> ### *Time Warner Businesses Report Record Third Quarter Operating Results*
>
> − *Normalized EBITDA Grows 13% for Third Quarter*
>
> − *Cable Networks, Publishing and Cable Post Operating Record Third Quarters*
>
> − *Normalized EPS is $0.07 for Third Quarter*
>
> Time Warner Inc. today reported record operating results for the third quarter of 2000. Operating income before amortization of intangible assets (EBITA) grew 13% over the comparable 1999 quarter . . . .
>
> With Cable Networks, Publishing and Cable achieving record third quarters, Time Warner reported normalized EBITA of $1.273 billion for the third quarter of 2000 versus $1.128 billion for the same period a year ago.
>
> \*       \*       \*
>
> Time Warner's Chairman and CEO Gerald M. Levin said: "Our third-quarter and year-to-date operating results keep us right on track for another record-breaking year. *Third-quarter operating results were fueled by 17% growth in advertising and provide exceptional momentum for our pending merger with America Online. The merger will have a profound impact on our businesses across the board, substantially driving our growth, profitability and free cash flow potential*."
>
> Levin continued ". . . *We are confident that AOL Time Warner will be able to deliver quickly on the promise of the merger . . . .*"

136.    On 10/18/00, Time Warner held a conference call for analysts, money managers, institutional investors and large Time Warner shareholders:

> LEVIN: . . . *[T]he post-merger planning, the integration is actually going, and I have some experience over several transactions, better than anything I've ever experienced. . . . I'm even more confident today . . . about our ability to meet our*

*financial targets . . . . [W]hat I've been doing during this period is really working to eliminate what you might call the execution risk. . . . I don't see it. . . . Now, finally, there's been a lot of swirl around the advertising market particularly related to the so-called dot-com shakeout.  Let me make this perfectly clear.  I don't buy it.  I don't get it and I don't buy it.  Time Warner's advertising growth is precisely on plan and with AOL, we are really uniquely positioned to tap into all parts of the marketing budgets and we have premium position which I'll get into. . . .*  AOL Time Warner will be the preeminent large cap, high-growth, blue-chip company with diversified multiple revenue streams . . . .  I don't see any other company that could build so fast off of such a large base.  Even with the tyranny of large numbers.  And, most importantly is the management team. . . .  [W]e're going to hit the ground running with the following kind of financial metrics that go from top to bottom.  The first is we expect the year 2001 will be on a calendar year basis.  Revenues will be $40 billion plus.  Our revenue growth for the overall company will be 12% to 15% annually.  EBITDA . . . will be $11 billion plus.  The growth rate the first year, 2001, will be about 30% because frankly we're going to take advantage of a lot of going [sic] in cost and revenue synergies.  Thereafter, we're looking at about 25% a year.  I also believe that our job is free cash after all is said and done . . . [and] we see that growing at 50% a year. . . .  I believe that this company with this kind of profile is entitled to . . . what I would characterize as a premium multiple. . . .  *Advertising growth and across all of our businesses, it's 17%.  That number is on plan and is in line with our expectations for the year. . . .*  But it's the fastest growing revenue stream and *I've said before that for AOL Time Warner on a percentage basis, advertising e-commerce will be the fastest growing part of the company and obviously putting AOL together with Time Warner will be an accelerator on this. . . .*

PITTMAN: . . . I want to . . . tell you how well our transition process is going.  But before that, let me say a few words about what America Online brings to AOL Time Warner. . . .  *[W]e added 10 million net new AOL members over the past two years bring today's total to nearly 25 million around the world. . . . And our continuing ability to achieve record breaking advertising and commerce revenues demonstrates how effectively we can monetize that expanding subscriber base* and that usage . . . .  [W]e not only have tremendous management strength in each of the individual businesses but we have tremendous management strength managing the cross-company opportunities of this new venture. . . .  *When we look at the future of AOL Time Warner's advertising and e-commerce, we see enormous potential.  Let me also say that there seems to be some concern about the current advertising market.  For this company, I don't see it and I don't buy it . . . we are benefiting from current advertising trends of consolidation in the Internet space, it's actually good for us*.

137.    On 10/18/00, AOL also issued a release reporting its 1stQ 01 results – for the three months ended 9/30/00.  The press release stated:

*First-Quarter Earnings Per share, Fully Taxed and Excluding One-Time Items, Soars 100% to $0.14*

***Consolidated Revenues Rise 34% to $2.0 Billion; Advertising, Commerce and Other Revenues Jump 80% to $649 Million***

***AOL Membership Grows More Than 1.4 Million, Setting First-Quarter Record***

. . . America Online today reported results for its fiscal first quarter ended September 30, 2000 – reaching **new highs** for consolidated revenues, advertising, commerce and other revenues, operating income, EBITDA and first-quarter AOL membership growth.

The quarter's net income, fully taxed and excluding one-time items, totaled $350 million, or $0.14 per diluted share, up from $182 million, or $0.07 per diluted share, on the same basis last year. The Company reported net income of $345 million, or $0.13 per diluted share, up from $181 million, or $0.07 per diluted share, in fiscal 2000's first quarter. . . .

The quarter's consolidated revenues climbed 34% to $2.0 billion from $1.5 billion in last year's first quarter. Advertising, commerce and other revenues reached a record $649 million, climbing 80% over fiscal 2000's corresponding quarter.

***With a record 1.4 million net new subscribers for the quarter, the AOL service totaled more than 24.6 million members worldwide on September 30.***

\*         \*         \*

Steve Case, America Online's Chairman and Chief Executive Officer, said: "***. . . Our record-breaking results underscore that we are continuing to build our interactive businesses at a rapid pace, both in the US and around the globe. . . .***

Mr. Case added: "***AOL Time Warner will be a one-of-a-kind company . . . . [W]e're confident that we have the right assets, strategies, experience and vision to take full advantage of the tremendous opportunities before us. . . . [W]e will hit the ground running.***"

Bob Pittman, America Online's President and Chief Operating Officer, said: "This record-breaking quarter reflects the great momentum behind our world-class brands and focused business strategies. Clearly, our diversified, multiple-revenue-stream business model sets us apart from the industry, and this will be further enhanced by our merger with Time Warner."

Mr. Pittman added: "***Our distinctive strategy of focusing on large strategic marketing agreements with major mainstream companies is paying off in the continuing strength of our advertising and commerce revenues, which will substantially benefit from the merger.***

\*         \*         \*

• Advertising and Commerce Backlog: ***The consolidated backlog of advertising and commerce revenues grew to more than $3.0 billion at September 30, 2000, from $2.0 billion a year earlier***.

- 101 -

\*        \*        \*

The Company's international operations and joint ventures extended their strong momentum with groundbreaking initiatives in Europe . . . .

In Europe, AOL . . . added more than 290,000 net new members, a record for the first quarter, bringing the total served to more than 3.9 million members.

138.    On 10/18/00, AOL held a conference call for analysts, money managers, institutional

investors and large AOL and Time Warner shareholders:

CASE: . . . [I]n light of the recent market volatility I wanted to address a few issues right up front. . . .  *[O]ur post-merger planning for integrating AOL and Time Warner is going exceedingly well . . . .  We feel terrific about the way the new company is coming together and we are convinced that we'll meet the financial targets we have set. . . .*  [A]s you can see from our results as well as those announced earlier today by Time Warner, *most of our businesses are building great momentum as we head into the merger.  Together we will be able to achieve more for shareholders than either company could do on its own. . . .*  [F]inally, there's been a lot of swirl about the advertising market.  Particularly about the so-called dot-com shakeout.  *I want to separate the swirl from reality.  AOL's advertising growth is right on target. . . .  Time Warner is on target as well. . . .  In fact, the current advertising  environment benefits us because it will drive a flight to quality. . . . [W]e are very confident about the future both in the near-term and over the longer term. . . .  Our results, once again, demonstrate the power of our multiple brand, multiple revenue stream business model which clearly sets us apart from the Internet industry. . . .  [A]dvertising, commerce and other revenues climbed to a record $649 million . . . .  [O]ur worldwide membership increased by 1.4 million new subscribers, setting a first quarter record. . . .*

PITTMAN:  . . . [T]his quarter's success has clearly underscored the fundamental value of our consumer business model.  Our company has built multiple revenue streams . . . [and] unmatched world-class brands . . . that together have driven our high growth and built powerful momentum behind our business strategies.  That is what makes us unique today.  And our merger with Time Warner will extend this unmatched leadership.  *Growing our combined businesses faster than either of us could have done it alone. . . .  [W]e achieved record subscriber growth for this quarter*. . . .  *Internationally, we had a banner quarter.  Continuing the acceleration of our worldwide growth momentum* . . . .  *[A]s I said this morning at Time Warner's earnings meetings about the concerns with the advertising market for this company, I don't see it and I don't buy it.  Business looks great to us and once we become AOL Time Warner, we anticipate even more advertising and commerce opportunities. . . .  And the foundation for driving this advertising commerce business is our tremendous subscriber base . . . [with] AOL at the heart of it*. . . .

KELLY: . . . *The quarter's record results underscore the strength of our multiple revenue stream business model.  It is unique in the industry and will further be*

- 102 -

*enhanced with our merger with Time Warner. . . . Now I want to separate the swirl from reality on advertising and e-commerce. Our advertising commerce and other revenues grew by 80% or $289 million to $649 million and now represents fully 33% of total revenues compared to only 24% from a year ago. . . . Our backlog of committed advertising and commerce revenues was more than $3 billion as of September 30. Up slightly from last quarter and up over a billion dollars from a year ago. As in the past, we are extremely confident about the quality and composition of our backlog. . . . We review our backlog carefully each quarter. And I'm here to tell you that it's in very good shape. So, based on our reported revenue numbers and our backlog numbers and based on what we're seeing in our business today and looking forward, AOL's advertising commerce business is very healthy. And I can't say that strongly enough. . . .*

QUESTION: . . . [C]ould you give a little more detail about the backlog number . . . why [was it] essentially flat? . . . [A]s you look forward either AOL standalone or for the combined company, can you give us some sense of how you see advertising growing over the next couple of years?

PITTMAN: . . . *What happened this quarter is we shortened the term, total term within the backlog ... and the reason we did that is because we're doing more and more deals with mainstream companies . . . so, I think it's very positive. . . . [T]he outlook is very strong and obviously once we merge with Time Warner, I think you'll find that even stronger.*

KELLY: . . . *[L]et me just add to that . . . as it relates to overall quality, I would say that the backlog, again, has never been better.*

\*       \*       \*

KELLY: And I just want to say that one more time. I felt so good saying it the first time, I just want to repeat it. . . . *[T]he pro formas for AOL and Time Warner when you really look at the numbers, they are quite fantastic in terms of what we delivered this quarter. Without a doubt we talk about a company in the first nine months to generate $26.3 billion already growing at 12%. The advertising revenues of $6 billion for the nine months, 36% increase and that's just 23% of our total revenue base and . . . strong subscription growth are growing at 14% to almost $11 billion. I just had to say them again, those are powerful numbers, strong across the board. So, pro forma of this company is in very good shape even before you can start to consider all the ramifications and increases we're going to see because of the synergy . . . .*

\*       \*       \*

QUESTION: Could you give me some breakdown on your advertising revenues from the dot-com companies and the traditional advertisers? You had been mentioning that . . . revenue based from traditional advertisers will be growing. . . .

PITTMAN: . . . I think [what] you're really asking is with some of the businesses that didn't have a business model not doing well, meaning they're either going to go

out of business or can't afford to buy advertising anymore, how does that affect us? . . . We have never been keen on taking money from people that we think are going to give it to us one time and not have it later on. We have been very suspect of people if we can't figure out their business model on a piece of paper. *And, so I think we actually have been selective in the process and I think although a year ago you might have thought we were crazy for turning down some of that money, I think today the strategy and the soundness of that strategy is very apparent and we're in great shape and if you asking what's our outlook, I think it's never been better*.

139.    On 10/18/00, Case was interviewed on CNN and stated:

CASE:    *The future is terrific, both for AOL and soon for AOL-Time Warner. We're seeing very robust growth in advertising and e-commerce. . . . And there's a flight to quality, and thankfully, AOL is the leader in the Internet sector. So more and more companies are working with us*.

*            *            *

QUESTION:    *Now what about the ad backlog? . . .*

CASE:    *It's, right now, it's about $3 billion as a backlog. So it's really quite significant. And, again, I think, as a function of this trend – this irreversible trend . . . advertisers need to be on the Internet more and the company they generally turn to is AOL*.

*            *            *

QUESTION:    Everybody has been hurt by the crash in dot-com advertising – you have not been?

CASE:    *Well, maybe we're a little bit different than everybody else. We've always felt that we were, maybe, a cut above. I don't say that arrogantly, but we have been doing this for over 15 years and we've kind of emerged as the blue-chip. And we have a little different business model – different approach. I think we benefit from that.*

        *One thing we do with advertising commerce, we try to partner with the leaders – the leading companies that have been around for decades and the new companies that are well capitalized. I think that helps shield us from some of the risks that, maybe, other companies have suffered from*.

QUESTION:    Subscriber growth. You added 1.4 million in the latest quarter. What about the next quarter?

CASE:    *More. We're seeing very strong growth. . . . So there's very dramatic growth. We think that will continue both in the United States . . . and even more true outside of the United States . . . . So the trend there is very significant*.

140.    On 10/18/00, Levin was interviewed on CNNfn and stated:

QUESTION: . . . We're seeing a lot of investor fears over potential of an advertising slowdown . . . we saw both stocks drop on those fears.  Are those fears founded?

LEVIN: . . .  *No, not really, today when we announced our earnings, we said . . . [w]e don't see any slowdown.  As a matter of fact, we feel very comfortable about the year.  And I also said going into the new year, when we'll have AOL-Time Warner, that advertising will be the fastest-growing part of the company on a percentage basis. . . .  [T]here's always a flight to quality.  So I just don't see it.  I don't see it's affecting us. . . .  So I'm very bullish on advertising.*

141.    On 10/19/00, *The Wall Street Journal* reported:

Mr. Levin also insisted that worries about the advertising climate were "*spurious*," responding to concerns that have hit media and Internet stocks in recent days and caused Time Warner stock to fall almost 16% Tuesday.

"*I was reassured*," coming out of an analyst meeting yesterday morning, said Merrill Lynch & Co. analyst Jessica Reif Cohen, saying Time Warner's operating results were "on target."

142.    On 10/19/00, the *Los Angeles Times* reported:

**Time Warner Profit Beats Forecast, Helps Stock Recover From Plunge**

Time Warner Inc. reported **better-than-expected operating profit** for the third quarter, helping its stock recover from a sharp plunge the previous day.

*        *        *

"Time Warner's quarter looked impressive, **but more importantly comments from [CEO Gerald] Levin during the conference call were extremely bullish,**" said Fred Moran, analyst at Jeffries & Co.

*        *        *

Advertising, which grew 17% in the third quarter, was one of the drivers for Time Warner's earnings growth despite concerns that a slowdown in ad spending will cut into Internet media companies' growth. **Levin said he was comfortable with future ad and subscription growth rates**.

"**That's not even an issue for us,**" he said on a conference call with analysts. "**AOL-Time Warner advertising will be the fastest growing part of the company.**"

143.    On 10/19/00, Salomon Smith Barney issued a report on Time Warner, which was reviewed and approved by Levin, Parsons or Ripp, and stated:

- Time Warner hosted an upbeat quarterly analyst meeting that underscored the company's premier position and diversified business model that allows it to stand out among the media landscape. . . .

- 105 -

- ***Advertising appears solid at Time Warner whose pristine assets and global brands and content allow it to still attract a disproportionate share of the advertising dollar.***

- ***With the merger on track to close later this fall, we think AOL Time Warner is uniquely positioned and poised to see accelerated growth.***

<div align="center">*        *        *</div>

Opinion

In what was probably Time Warner's final quarterly analyst meeting as a stand-alone company, Chairman and CEO Gerald Levin highlighted the company's record third quarter results and the company's unique position. . . . ***Advertising revenues have been a key concern in the market. Time Warner saw advertising revenues climb 17% in the quarter and fully expects this to continue in the fourth quarter with solid momentum on tap for 2001. Levin attributes this to Time Warner's premium position in the market and the flight to quality that typically results from any secular rotation of advertising dollars.***

<div align="center">*        *        *</div>

With the conclusion of the merger, AOL Time Warner will be poised to blend its businesses more fully. To ensure a smooth integration process, the companies announced the new management slate in early May and just this week finalized the financial team. ***This deep bench of talented managers should put AOL Time Warner on strong footing.***

Advertising Revenues Strengthen at the Top

. . . ***Cable Networks saw advertising revenues rise 14% in the quarter to yield a year-to-date 18% increase, while Cable Systems is faring even better with a 24% year-to-date increase in ad revenues.***

<div align="center">*        *        *</div>

Merger Remains on Track, ***All Financial Targets Reaffirmed***

Richard Parsons, President of Time Warner and future Co-Chief Operating Officer of AOL Time Warner, delivered an update on the status of the merger saying that all basic tenets of the original agreement and merger goals remain on target. ***Citing the similar business models and corporate cultures of AOL and Time Warner, Parsons conveyed the positive energy surrounding all of the operating teams organizing the combination.*** . . .

AOL Time Warner expects a 30% EBITDA growth in 2001 due to certain synergies, to be followed by 25% growth thereafter on a range of 12%-15% annual revenue growth. Growth in free cash flow is estimated to surge roughly 50% per year. We feel these targets are achievable, especially in light of the fact that pro-forma AOL Time Warner revenue grew by 12%, and EBITDA grew 24% before the raw power of the combination has played out.

144.    These reassurances, representations and forecasts worked.  By early 11/00, AOL's stock recovered and was up to $58.50 per share and Time Warner's stock had recovered to $87 per share.  The Merger, by which Morgan Stanley, Salomon Smith Barney and the AOL and Time Warner insiders would cash in on to the tune of more than $900 million, remained on track.

145.    On 11/9/00, AOL filed its Report on Form 10-Q for the quarter ended 9/30/00, which reported the quarterly financial results as previously amended and released on 10/18/00, which was incorporated by reference in the Stock Option Registration Statements, and also stated:

Consolidated Results of Operations

Revenues

The following table and discussion highlights the revenues of the Company for the three months ended September 30, 2000 and 1999:

|  | Three Months Ended September 30, | | | |
|  | 2000 | | 1999 | |
|  | (Dollars in millions) | | | |
| Revenues: | | | | |
| Subscription services | $1,206 | 61.1% | $995 | 67.4% |
| **Advertising, commerce and other** | **$649** | **32.9%** | **$360** | **24.4%** |
| Enterprise solutions | $120 | 6.0% | $122 | 8.2% |
| Total revenues | $1,975 | 100% | $1,477 | 100% |

*        *        *

Subscription Services Revenues

*        *        *

At September 30, 2000, the Company **had approximately 24.6 million AOL service subscribers, including 20.3 million in the United States**.

*        *        *

Advertising, Commerce and Other Revenues

The following table summarizes the material components of advertising, commerce and other revenues for the three months ended September 30, 2000 and 1999:

|                                        | Three Months Ended September 30, | | | |
| -------------------------------------- | ---------- | ------- | --------- | ------- |
|                                        | 2000       |         | 1999      |         |
|                                        | (Dollars in millions) | | | |
| *Advertising and electronic commerce fees* | *$534* | *82.3%* | *$274* | *76.1%* |
| Merchandise                            | $61        | 9.4%    | $47       | 13.1%   |
| Other                                  | $54        | 8.3%    | $39       | 10.8%   |
| Total Advertising, commerce and other revenues | $649 | 100%    | $360      | 100%    |

Advertising and electronic commerce fees increased by 95%, from $274 million in the three months ended September 30, 1999 to $534 million in the three months ended September 30, 2000. . . .  At September 30, 2000, the Company's advertising and commerce **backlog, representing the contract value of advertising and commerce agreements signed, less revenues already recognized from these agreements, was approximately $3 billion**, up approximately $1 billion from September 30, 1999.

\*     \*     \*

For the three months ended September 30, 2000, EBITDA increased from $337 million to $599 million or 78% over the same period a year ago.  This increase is mainly due to the significant increase in income before taxes (excluding special charges) from $299 million during the three months ended September 30, 1999 to $573 million during the three months ended September 30, 2000.

146.    On 11/28/00, Case appeared at the CS First Boston Technology Group Annual

Conference in Scottsdale, Arizona and stated:

CASE:  . . .  **[E]verything really is on track . . . we're continuing to grow our business at AOL. . . .  So, the fact that we've done so well . . . in executing that strategy over the past year . . . bodes very well as we . . . move into this next year**.

\*     \*     \*

QUESTION:  And what is the current environment for you in the online advertising space . . . has it become more challenging recently?

CASE:  **It's going great for us**.

\*     \*     \*

QUESTION:  How . . . are you doing on the subscriber acquisition side . . .?

CASE:  **It's going quite well**.

147.    On 12/12/00, Salomon Smith Barney issued a report on AOL, which was reviewed and approved by Case, Pittman or Kelly, stating:

> AOL today announced that it has passed the 26 million member milestone for its AOL service. This achievement is particularly impressive given that it only took 48 days to add an additional 1 million members (averaging to 20,833 members a day) since October 24, 2000 when the 25 million member milestone was achieved. Looking back we note that an average of 20,833 new members per day over the past 48 days is the fastest membership pace that the company has historically achieved. *This growth is particularly noteworthy given the current slow down in PC sales*.

148.    On January 2, 2001, AOL issued a release, stating:

> *AOL Breaks Single-Day Membership Growth Record, Adding 70,000-Plus Subscribers Worldwide on Christmas Day*
>
> *New AOL Membership Records Underscore Internet's Accelerating Growth and AOL's Brand Leadership*
>
> \*      \*      \*
>
> Bob Pittman, America Online's President and Chief Operating Officer, said: "*These new AOL membership records highlight the Internet's accelerating growth. And our subscriber momentum is putting AOL in its strongest position ever, as we move into . . . our merger with Time Warner*".

149.    On 1/11/01, AOLTW issued a release announcing the completion, *i.e.*, closing, of the Merger of AOL and Time Warner.  The release stated:

> Jerry Levin, Chief Executive Officer of AOL Time Warner, said:  "AOL Time Warner's scale, scope and reach will enable us to capitalize on the digital revolution that is shaping global media, entertainment and communications on behalf of consumers worldwide. *With today's closing, all our planning and preparations over the past year start to pay off.  We are hitting the ground running with a clear road map for creating value for our . . . shareholders* . . . and employees.  Our unprecedented range of businesses will enable AOL Time Warner to launch new platforms for growth . . . .

150.    In an interview with the financial press on 1/11/01, Levin stated:

> "*We feel even more confident today, given the amount of time we have had to work on our business plan . . . [w]e are reaffirming our guidance.*"

151.    On 1/11/01, Salomon Smith Barney issued a report on AOLTW based on conversations with Levin, stating:

- In a heartfelt presentation, Gerald Levin, Chairman & CEO of TWX and soon to be CEO of AOL TWX, gave a run down of critical questions on investors' minds. . . . **Levin expressed comfort with financial expectations in 2001. He proclaimed the AOL service as the crown jewel given its rich and stable subscription model, which he feels represents the heart of AOL and TWX. . . . Finally, Levin has no intention of (ever) leaving AOL TWX, as he makes his mark on the world**.

152.    On 1/12/01, Levin and Pittman were interviewed on CNBC and stated:

QUESTION:  This deal was . . . announced about a year ago. . . . [W]hat has changed in the interim?  Does your outlook of where you are going, is it still what you thought a year ago or has the world changed and now you've changed?

LEVIN:  **Well, no, actually the year has been very helpful to us because we've been able to . . . do all the integration and do everything that we need to do.  And while there has been some macroeconomic change, in fact, that works in our favor because, in fact, you know, when you have the number one position in so many different areas, you have a lot of levers that you can pull on from a revenue point of view and of course when you put two companies together, there are a number of cost opportunities**.

PITTMAN:  . . . **[I]n this integration process that . . . we've actually found more opportunities that none of us could see in the beginning because the people working on it, closest to it, have gotten involved in it and are finding those.**

LEVIN:  . . . **I am more confident today than I was on January 10th in 2000 because we've literally been working together. . . .  I've never quite seen that in a deal like this**.

*        *        *

QUESTION:  . . . Most media companies are telling us [advertising] is very challenging right now.  What are you seeing?

*        *        *

PITTMAN:  . . . [W]hen you find that slowing down, **it doesn't slow down for everybody**.  What happens is a company says I need to cut back, doesn't cut back across-the-board . . . what they do is [they] tend to consolidate with the big players who can deliver them the most.  **The good news is this company is in that position. So we actually find during these periods it's a period of consolidation in the traditional media business and on the AOL side, which is driving a lot of this growth for us** . . . .

QUESTION:  . . . [G]iven what I am hearing here on the advertising front, are you going to be able to make that billion dollars of synergies you have been talking about for some time?

PITTMAN:  **Well, we've actually enrolled the billion dollars of synergy into our bottom line EBITDA.  We said it's $11 billion dollars and yes, we are committed.**

- 110 -

153.    On 1/12/01, Levin and Pittman were interviewed on CNNfn and stated:

QUESTION: . . . Since this deal was announced . . . *[a]dvertising has slowed down. The economy is slowing. You have some pretty ambitious financial goals that you mapped out to Wall Street. Will you have to bring those down a little bit? . . .*

PITTMAN: *No, I think we fully expect to do our $11 billion. We're on it*. . . . [T]hey're not cutting everybody back, they're cutting the tertiary and secondary buys out. They tend to consolidate into their big players . . . . *So in that way, we're unaffected by that*. . . . *So we feel very good about it* . . . .

*        *        *

LEVIN: . . . I've spent a lot of time . . . with investors at several conferences. . . . *We've reinforced the metrics that we've given. And that is revenues are going to be north of $40 billion, growing at 12 to 15 percent a year. And EBITDA is going to be at the $11 billion level, growing at 25 to 30 percent. And so the company is being positioned as a global, large cap growth stock. . . . But we've now put to bed our business plan and our budget for the new year. And we're reconfirming the guidance we've given to the Street. . . . We also reinforced the numbers for AOL . . . .*

*        *        *

PITTMAN: . . . *The AOL business, as you know, has been going great guns, had its best year internationally in the last 12 months . . . . So I feel very strongly about that.*

154.    On 1/12/01, Levin and Pittman were interviewed by *Bloomberg* and stated:

QUESTION: . . . Well, some investors are concerned that AOL Time Warner might have trouble meeting its growth forecasts that were set a year ago when the deal was first announced, given the slowing economy and a drop off in Internet advertising. So are you, are you going to make the numbers that you set back in January of 2000?

LEVIN: Well, we've actually this past week, we've spent a lot of time talking to investors. And, just coincidentally today, we're sending our budget to our Board and *we feel even more confident today, given the amount of time we've had to work on our business plan, as well as the synergies and integration that Bob Pittman and Dick Parsons had worked on so that we are reaffirming the guidance that we have given the Street. And we see this being a $40 billion revenue company with EBITDA of $11 billion*.

PITTMAN: And I think we've got, in a company like this, so many diverse businesses, so many diverse revenue streams and again, when you hear about [a] slowing economy, you hear people talking about [how] they are going out to try and build diverse revenue streams. We've already got 'em. They're already doing well. So again, I think a company like ours does very well in times like this.

LEVIN:  *[Y]ou should look at AOL Time Warner as a global large capitalization growth stock . . . it really has no peer.*

155.    On 1/13/01, *The New York Times* reported:

**AOL Time Warner Sticks to Its Aggressive Goals**

. . . [T]he leaders of . . . AOL Time Warner *said yesterday that they were sticking to the aggressive financial goals promised to investors.*

\*        \*        \*

*[I]ts executives maintain a positive view, in sharp contrast to the stream of warnings in recent weeks by companies in the old and new economies of shortfalls in sales and profits.*

\*        \*        \*

Levin . . . said that whatever the ups and downs in the advertising market . . . AOL Time Warner rested on a very stable base of 130 million subscriptions to its magazines, online services, cable systems and HBO movie channels.  *These, he said, are unlikely to be hurt in any economic downturn*.

\*        \*        \*

*The executives said that the America Online Internet services was not seeing any slowdown in its advertising revenue, despite the sharp drop in online advertising at other companies. . . .*

"*AOL is in a totally different zone than a dot-com advertising vehicle,*" Levin said.

\*        \*        \*

"*This is a one-of-a-kind, very profitable, global large-capitalization growth stock . . . that deserves a premium valuation,*" he said.

156.    On 1/13/01, the *Los Angeles Times* reported:

**AOL Time Warner Forges Ahead**

**Media:  After firms' merger deal closes, Co-COOs Richard Parsons and Robert Pittman discuss plans and expectations**

\*        \*        \*

[QUESTION:]  Is the slowing economy going to hurt your ad revenue?

PITTMAN:  In the advertising world, you hear people say there's a slowdown.  *But it's not across the board*.  When [buyers] cut back, they don't cut back on their

primary ad buys, which provide a big reach.  Turner Networks, WB and the Time magazine group all fit into that category.

<p style="text-align:center">*       *       *</p>

[QUESTION:]  There are a lot of strong personalities now leading the company. How are you all getting along?

PITTMAN:  *We're getting along very well.  If you've got strong people, they all get along.*

157.    On 1/16/01, AOLTW issued a release headlined and stating:

*AOL Membership Surpasses 27-Million Milestone . . .*

. . . AOL Time Warner Inc. today announced that the worldwide membership of its flagship AOL service has surpassed the 27-million milestone. . . . Bob Pittman, Co-Chief Operating Officer at AOL Time Warner, said: "*We are extremely pleased that AOL is experiencing such record-breaking membership growth, both in the US and internationally*."

158.    Because upon the closing of the Merger, all the previously unvested stock options of the AOL and Time Warner executives in their respective compensation agreements and plans had converted into AOLTW stock options *and* immediately accelerated and vested, the AOLTW top insiders were now positioned to immediately cash in, which several of them intended to do by quickly selling off millions of their own shares while using over a billion dollars of AOLTW's cash to repurchase millions and millions of its "*under-valued*" shares on the market – to manipulate upward and inflate the price of the stock while they bailed out.  This also required that the insiders keep the stock price inflated by continuing to tell investors the Merger was a success and AOLTW was achieving the huge revenue, EBITDA and cash flow growth forecast – and was not being hurt by the dot-com implosion or any advertising slowdown.  So, post-merger, while using over a billion dollars of AOLTW money to repurchase shares on the open market, AOLTW insiders repeatedly stressed the success of the Merger and the strength of AOLTW's business.

159.    Just a few days after the Merger closed, on 1/18/01, AOLTW issued a release regarding the repurchase of AOLTW shares on the open market, which stated:

<p style="text-align:center">- 113 -</p>

***AOL Time Warner Launches $5 Billion Share Repurchase Program***

\*     \*     \*

***Actions Underscore Board's Belief in Underlying Value of Company and its Business Opportunities***

At its first meeting here today, the Board of Directors of AOL Time Warner announced it has approved a series of measures reflecting its belief in the underlying value of the Company and its potential business opportunities moving forward. These include a program to repurchase up to $5 billion of the Company's common stock in the open market . . . .

\*     \*     \*

Commenting on the stock buy-back program, Gerald M. Levin, chief executive officer of AOL Time Warner, said: "***. . . Thanks to the strong growth prospects for our Company, we're able not only to continue to invest in our world-class businesses, but to use a portion of our growing financial capacity to buy back stock at a time when we believe our shares are undervalued.***"

160.    Analysts reacted very positively to this stock buy-back announcement, accepting

AOLTW's assertion that its stock was undervalued.  On 1/19/01, *Bloomberg* reported:

"Yesterday's announcement of the stock buyback bodes well, more than what any analysts can say," said ING Barings analyst Youssef Squali, who rates shares of AOL Time Warner "strong buy."  "***It's AOL voting with its cash and to say to the whole world, 'We think it's undervalued*.'**"

161.    On 1/26/01, Morgan Stanley issued a report on AOLTW written by Meeker, which

was reviewed and approved by Levin, Parsons, Pittman or Kelly.  It stated:

***In the wake of the closing of the AOL Time Warner merger on January 11, we place a Strong Buy rating on the new shares.***

\*     \*     \*

***AOL Time Warner has the ability to generate multiple annuity-like revenue streams from hundreds of millions of customers over many years.***

\*     \*     \*

Financially, we believe that even in a moderately slowing economy, there's a 90%+ probability that AOL Time Warner meets its $40 billion (up 16% Y/Y) and $11 billion (up 27% Y/Y) revenue and EBITDA targets that it has set for 2001.  In an even more difficult economic environment, we believe that the EBITDA target is especially attainable owing to management's commitment to attain these goals,

paired with powerful growth and cost savings potential. *We have long been believers that investors should put their money with the best management teams*.

\*     \*     \*

*Our Growth Forecast. We estimate that the company will have a 2000-2005 compound average revenue growth rate of 15%. In addition, we expect the 2000-2005 EBITDA and cash EPS compound average growth rates to be approximately 25-27%.*

What we find truly compelling about AOL Time Warner is that its revenue and EBITDA growth is 50% greater than traditional media companies. *The legacy AOL businesses are the real growth engines behind this company, providing an estimated 55-60% of the incremental 2000-2005 revenue growth and 65% of the incremental EBITDA growth*.

162.    On 1/29/01, Salomon Smith Barney issued a report on AOLTW, which was reviewed

and approved by Levin, Parsons, Pittman or Kelly, and stated:

*AOL: The Company AND the Stock Hitting the Ground Running*

•     AOL Time Warner's new financial reporting format is clean and detailed.

\*     \*     \*

*An upcoming analyst meeting/earnings report on January 31 . . . should . . . raise confidence about management's ability to reach its financial targets. We look to this event as a confidence building exercise . . . .*

\*     \*     \*

We believe outlook for the AOL division is likely to be a highlight. *AOL's membership engine is purring, even at top speeds. Recent membership growth rates have been at record levels, and we expect the company to be confident about membership growth in 2001 – another 5 million new members is the starting target.*

163.    On 1/31/01, AOLTW was to hold a huge investor meeting in New York City to brief

analysts, institutional investors, money managers and large AOLTW shareholders about the status of

the Merger and the new Company's business and prospects. So intense was interest in this

conference that it was to be the largest investor conference in the history of any public company. On

1/30/01, at a dinner for analysts and large AOLTW shareholders held the night before the 1/31/01

meeting, Case spoke, stating:

- 115 -

You'll hear a lot tomorrow from [our] *exceptional management team*, about our plans for the future, and particularly . . . for the next year. We've talked about our goal of having revenue in 2001 of at least $40 billion, EBITDA of at least $11 billion. Some have said, "In this slowing economy, that seems like those are hard numbers to hit. Don't you want to back-pedal a little bit?" *The answer is "No, we're not going to back-pedal. We do believe we can achieve those numbers*."

> *The reason for our confidence is that we have . . . an exceptional management team in place.*

<p style="text-align:center">*     *     *</p>

Our goal is to become the most . . . valuable company in the world. *We will achieve it  . . . by making the numbers . . . .*

> *I hope you'll leave with a renewed confidence that we are going to be able to meet our short-term objectives. But I hope you will also leave with a tremendous confidence that we'll be able to achieve the greatness that we are aspiring to achieve because of the quality of this team, because of how well this new management is functioning as a team . . . .*

> *I expect we will see a "flight to quality" – to the companies that have exceptional management teams. . . .*

> *. . . [W]e have an enormous opportunity here . . . not just to achieve our results this year – which we will achieve – but also to achieve our goal of being the most valuable . . . company in the world. . . .  [W]e already have a world-class management team . . . .*

164.   On 1/31/01, in advance of the AOLTW investor conference in New York City, AOLTW reported the AOL, Time Warner and AOLTW results for the period ended 12/31/00 via a release headlined and stating:

> *America Online Reports December Quarter; Net Income Climbed 67% to $365 Million, or $0.15 Per Share, Fully Taxed and Excluding One-Time Events*

> *Advertising, Commerce & Other Revenues Rose 65% to Record $741 Million Worldwide AOL Membership Added All-Time Record 2.1 Million in Quarter*

> *AOL Time Warner Reports Pro Forma Full-Year Revenues Increased 11% to $36.2 Billion and Adjusted EBITDA Rose 19% to $8.4 Billion*

<p style="text-align:center">*     *     *</p>

America Online, Inc. Results

<p style="text-align:center">- 116 -</p>

*In the December quarter, America Online reported all-time records in revenues, advertising, commerce and other revenues, operating income, EBITDA and AOL membership growth.*

\*        \*        \*

America Online's December quarter revenues climbed 27% to nearly $2.1 billion from $1.6 billion in the year-ago quarter.  *Advertising, commerce and other revenues reached a record $741 million, climbing 65% over last year's corresponding quarter*.

*The flagship AOL service posted record quarterly and full-year growth.  In the December quarter, AOL gained 2.1 million new subscribers – including new highs of more than 1.2 million in the US and nearly 850,000 internationally.  For the year, AOL added 6.2 million new members.  At year's end, AOL totaled 26.7 million subscribers. . . .*

AOL operating highlights from the quarter include:

\*        \*        \*

−        *Advertising & Commerce Revenues:  Revenues from advertising and commerce climbed to $686 million, increasing 71% over last year's corresponding quarter.*

\*        \*        \*

AOL Time Warner Inc. Pro Forma Results

Driven by strong performances at America Online, Cable, Publishing and Networks, AOL Time Warner's pro forma 2000 revenues rose 11% to $36.2 billion, and adjusted EBITDA increased 19% to $8.4 billion.  That compares to 1999's $32.5 billion in revenues and $7.0 billion in adjusted EBITDA.  AOL Time Warner's 2000 adjusted diluted cash earnings per common share climbed 32% to $0.94, compared to $0.71 in 1999. . . .

For the December quarter, AOL Time Warner's revenues rose 8% to $10.2 billion, and adjusted EBITDA increased 14% to $2.4 billion.  That compares to $9.5 billion in revenues and $2.1 billion in adjusted EBITDA in last year's corresponding quarter. . . .  [A]dvertising and commerce revenues increased 14% to $2.6 billion, compared to the year-ago quarter's $2.3 billion.

\*        \*        \*

**Strong Business Momentum for AOL Time Warner in 2001**

\*        \*        \*

Jerry Levin, AOL Time Warner's Chief Executive Officer, said: "*These record results underscore the strong momentum that AOL Time Warner's businesses bring into the merged company.  AOL Time Warner's current*

*businesses are generating substantial growth . . . . [W]e have created a one-of-a-kind company positioned for sustainable high growth.*"

\*　　\*　　\*

Bob Pittman, AOL Time Warner's Co-Chief Operating Officer, said: "***We are seeing exciting momentum in our subscription and advertising/commerce businesses across the Company.***

165.　On 1/31/01, AOLTW issued another release  in connection with its huge analyst/

investor conference, headlined and stating:

***AOL Time Warner Reiterates Full-Year 2001 Guidance At First Investors Meeting***

***Company Expects to Report More Than $40 Billion in Revenues, $11 Billion in EBITDA, Cash EPS Growth of 25% to 30% in First Year of Operation***

***Cites Strong Financial Capacity to Support Growth in 2001 and Beyond***

***AOL Time Warner Inc. told investors and financial analysts to5day5 that the Company expects to meet its previously announced guidance for 2001 of more than $40 billion in revenues and $11 billion in EBITDA, as well as forecasting cash earnings per share growth of 25% to 30% for the full year.***

***At its first Investors Day, AOL Time Warner told the financial community that the Company's revenue growth for full-year 2001 is expected to be in the  12% to 15% range. . . .  [A]nd advertising and commerce revenues [are] expected to increase 18% to 22% for the full year. . . . (EBITDA) is expected to grow more than 30% from the prior year to $11 billion.  AOL Time Warner expects free cash flow, which on a pro forma basis was $920 million in 2000, to more than double in 2001, and grow at a 50% compound annual growth rate over the next several years.***

\*　　\*　　\*

J. Michael Kelly, AOL Time Warner's Chief Financial Officer, said: "***Strong growth in subscription and advertising revenues will drive the Company's performance . . . .  AOL Time Warner has all the financial strength necessary to back our vision for the future.***"

166.　On 1/31/01, AOLTW issued another release headlined and stating:

***AOL Membership Outside the US Surpasses 5 Million Member Milestone***

\*　　\*　　\*

America Online, Inc. . . . announced today that growth in its AOL-branded services has driven its AOL membership ***outside the United States past the five***

*million member mark*. . . . Michael Lynton, President of AOL International, stated: "*. . . We have had our best growth year ever in Europe* . . . ."

167.    On 1/31/01, AOLTW held the largest analyst/investor conference in history in New

York City to present information about AOLTW to the investment community.

LEVIN: . . . [W]e originally thought that the birthing period for this new company would be the standard nine months . . . it turned out to be one year and a day . . . . *[I]t was actually very helpful because we really put in place the company during that period and got through an awful lot that, you know, otherwise you might have had to wait on. So actually, I'm kind of pleased. The way I look at the company, frankly, is as a global, large cap growth company with growth metrics that are really quite astonishing with a very healthy balance sheet and actually it's kind of a blue-chip powerhouse* . . . . *I mean it truly is a one-of-a-kind company* . . . . *You know, we're saying we hit the ground running. That's not just a euphemism because that's basically what happened now*. . . . *I'm very comfortable with the fact that we've not only reaffirmed the guidance given a long time ago but* . . . *we're paying real attention now to top line across the company, revenue growth, EBITDA*. . . . *Let me declare, affirmatively, that AOL is the crown jewel. I say that without qualification*. . . . *You look at advertising, direct marketing, e-commerce, why? It's enormous*. . . . *This s a golden franchise that can be leveraged throughout Time Warner*. . . .

KELLY: . . . *I'd like to say right up front though, a little over a year ago we were on this very stage and we gave guidance of 40 billion plus in revenue in year one, 12-15% percent growth, EBITDA of 11 billion dollars for about a 30% growth rate*. . . . *The guidance that we gave over a year ago, right here, the day we announced the merger, remains unchanged as we get into the fiscal year*. . . . We need to step back and put this in perspective to realize the size and breadth and scale of AOL Time Warner. It is unlike any other company. . . . *Advertising and commerce is the fastest growing component of our revenue stream*. . . .

PITTMAN: . . . America Online put up a record-breaking quarter. *Tremendous subscriber and advertising commerce growth*. . . . *[T]he AOL brand achieved a record worldwide addition of 2.1 million* . . . . *Internationally AOL* . . . *surpassed the 5 million member milestone* . . . . *[O]n advertising and commerce* . . . *we're very excited about the progress we've made* . . . . *As a matter of fact, on the AOL side, most of the big deals are done at the CEO, COO level*.

168.    On 1/31/01, Levin and Pittman were interviewed on CNNfn and stated:

QUESTION: . . . AOL Time Warner reporting earnings . . . a penny better than Wall Street expectations. . . . A solid performance. And we are pleased to welcome Gerry Levin, CEO of AOL Time Warner and Bob Pittman, chief operating officer of AOL Time Warner.

\*        \*        \*

LEVIN: . . . *[W]e really hit the ground running . . . . You'll see AOL Time Warner is really up and running. . . .*

\*      \*      \*

QUESTION:  It's a really weak advertising environment right now.  You have people talking about the fact that they think this could persist into the first half of the year.  *Tell us about what the current economic environment could mean for your numbers going forward*. . . .

LEVIN:  . . . *Well, AOL had just a record quarter, both in terms of subscriptions and what we're calling advertising . . . . So we're very optimistic.  And you'll see that in our guidance today.*

PITTMAN:  *[W]e actually do very well in this environment. . . .*  And any time . . . there's any sort of economic downturn . . . *we do extraordinarily well in those environments*.

\*      \*      \*

LEVIN:  . . . *Going forward, you will see that, for the year 2000, on a pro forma basis, the combined company had revenues of $36 billion and EBITDA of about $8.4 billion. . . . And we're pretty much sticking with very significant growth rates for calendar year 2001, where we think you'll see those top line numbers going up 12 to 15 percent and EBITDA up 30 percent.*

169.  On 1/31/01 and 2/1/01, Salomon Smith Barney issued reports on AOLTW.  The 1/31/01 report stated:

*AOL:  AOL Time Warner; Live from Analyst Day*

\*      \*      \*

- . . . AOL Time Warner management laid out a bullish near- and long-term outlook for the company, despite variable advertising trends and certain division-specific issues. . . .  Although the stock has rebounded nicely since Jan. 1, we believe the uniqueness and richness of AOL Time Warner's businesses and growth prospects offer further upside in an uncertain environment.  *We rate the shares a Buy . . . and have a $115 per share price target grounded in the company's dynamic free cash flow model.*

\*      \*      \*

The morning focused on financial targets for 1Q and full year 2001, *which suggest a sharp acceleration in revenue and EBITDA growth as the year unfolds.*

\*      \*      \*

*Throughout presentations, the management team is showing itself to be tightly integrated, comfortable and confident about the new company's outlook.*

Weekly inter-division management meetings are now routine, with regular tracking and assessment of tangible operating metrics – this laser focus on operations should provide another layer of predictability and help raise confidence about successful execution. *It is pretty clear that the year long wait to close the merger was actually a positive, allowing the company to forge ahead with more vigor and determination right out of the gates.*

\*        \*        \*

- . . . AOL was held up as the "crown jewel" and operational core of the new company, with every content and distribution unit being tied into and enhanced by the interactive giant. *The company also expects to add 6mm+ new AOL members in 2001, in line with or slightly better than 2000's record growth*.

The 2/1/01 report stated:

*AOL:  The Transformation Begins:  Analyst Meeting Review*

- AOL Time Warner's analyst day showcased management depth . . . while highlighting near-term and long-term revenue growth drivers made possible by the merger.

\*        \*        \*

- The twin engines of the near-term are AOL and cable . . . .

\*        \*        \*

AOL Time Warner's 4Q 2000 results, 2001 outlook commentary and a day-long set of management presentations *depicted a financially strong growth company, with a deep and experienced management team that is committed to delivering results. . . .*

*The company stood by earlier revenue and EBITDA guidance for 2001 . . . .*

\*        \*        \*

*Cable Television – Entering a Golden Era*

Cable television operations account for more of AOL Time Warner's current EBITDA than any other division – roughly 34% of total EBITDA in 2000.  During 2000, cable was the second biggest source of EBITDA growth in AOL Time Warner's pro forma results, accounting for 27% of the year's cash flow growth. *Looking ahead, AOL Time Warner sees its cable systems entering a halcyon period in which new products and services should drive double-digit revenue growth and consistently strong EBITDA gains in the division*.

\*        \*        \*

- 121 -

In cable systems revenues rose 13% to $1.6 billion and EBITDA grew 16% to $767 million aided by strong growth in the number of digital service subscribers. ***Advertising and commerce revenues rose 20% to $160 million*** . . . .

### *AOL – Steaming Along, Looking to Add 6mm Members in 2001*

AOL is currently just behind cable in terms of EBITDA contributions for AOL Time Warner – at 28% of the total in 2000 – however, ***AOL is likely to become the company's single largest cash flow source within the next 12 months*** . . . .

170.    On 2/1/01, Morgan Stanley issued a report on AOLTW, written by Meeker, which

reported on AOLTW's 1/31/01 investor conference:

AOL Time Warner had its inaugural investor day . . . .  The investor day was preceded by a dinner with investors and analysts . . . .

\*          \*          \*

Of all the things that AOL Time Warner highlighted over the course of the night and day, we believe that the most interesting and important metric is the guidance it gave for at least $2 billion of free cash flow in 2001.  In 1999, free cash flow was $2.4 billion, and then dropped to $920 million in 2000 because of aggressive cable systems capital expenditures.  ***We believe that free cash flow in 2001 will actually be $2.5-4.0 billion. . . .  Free cash flow is very important to the company's growth story*** . . . .

1Q01 and 2001 Guidance

During the investor meeting, the company gave guidance for the full year 2001 as well as 1Q01.  The company expects total revenue growth for 2001 to be 12-15%, with subscription revenues growing 12-14%, content revenues improving 6-8%, and advertising and commerce revenues increasing 18-22%.  EBITDA for the full-year is expected to grow at least 30% to $11+ billion.  ***The company also expects free cash flow at least double in 2001 from a base of $920 million in 2000 and at a 50% CAGR over the next several years***.

\*          \*          \*

Mr. Pittman reiterated the company's belief ***that it is well positioned in an advertising slowdown market as advertisers and marketers are more likely to curtail their ad spend with second-tier properties than with AOL Time Warner*** . . . .

Mr. Kelly made several important points . . . .  ***We . . . agree with Mr. Kelly's view that AOL Time Warner has an unmatched business model, with multiple revenue streams and a leverageable infrastructure that should drive substantial increases in free cash flow and profitability.  Finally, the company is committed to delivering on its financial targets.***

171.    On 2/1/01, The Wall Street Journal reported:

- 122 -

> *[F]or the first time, the company also didn't report how much advertising was in the pipeline for its America Online unit, a number that had, in previous years, served as an industry bellweather. Mr. Kelly says that the measure is no longer "meaningful" in the combined company because advertising will be being sold across different divisions.*

<p style="text-align:center">*    *    *</p>

> *The America Online unit's advertising revenue, one of the most closely watched indicators of performance, exceeded Wall Street's expectations. Ad revenue grew 65% to $741 million . . . .*

172.    Realizing that these representations and forecasts were false, due to the host of intensifying negative factors that were hurting AOLTW's business and would crush its stock when they ultimately could no longer be concealed, as soon as the Merger closed, AOLTW's top executives took steps to protect themselves from the impending collapse of AOLTW stock. Because the Merger was now closed, **all of their previously unvested stock options had immediately accelerated and vested**. Thus, they were in a position to bail out of AOLTW. And bail out they did. Beginning on 2/2/01, only days after the Merger closed and **one day** after they caused AOLTW to begin to spend over $1 billion of its cash to repurchase millions of shares of its "under-valued" stock on the open market – to manipulate and artificially inflate the stock – these **same** executives began to unload millions of shares of their own AOLTW stock at what they knew were artificially inflated prices, to benefit from that stock price inflation and shield themselves from the stock collapse they knew was coming. **Between 2/2/01 and 6/14/01, while these AOLTW top insiders caused AOLTW to spend $1.3 billion in AOLTW's corporate funds to repurchase some 30.2 million shares of AOLTW stock on the open market, these same AOLTW insiders exercised millions of AOLTW stock options and unloaded 8.9 million shares of their own AOLTW stock for some $440 million in insider trading proceeds**!

173.    On 3/8/01, the AOL unit of AOLTW issued a release headlined:

**AOL Membership Surpasses 28 Million . . .**

174.    On 4/16/01, AOLTW issued a release stating:

<p style="text-align:center">- 123 -</p>

> ***America Online . . . today announced that the worldwide membership . . . has surpassed 29 million.***

175. On 4/16/01, Salomon Smith Barney issued a report on AOLTW, stating:

> AOL: Nearing Thirty, but Nowhere Near Over the Hill
>
> Summary
>
> - AOL has reached the 29mm member mark much sooner than expected . . . .
>
> * * *
>
> - Part of AOL's recent success in adding subs despite a slowing economy is that it has simply gotten smarter about adding new subs by continuing to expand/refine its strategy and adding several marketing programs with OEMs and leading retail outlets, incl. Sears, Target, Office Depot and Circuit City.
>
> * * *
>
> The fact that AOL continues to increase members at a solid pace given the overall slow-down in PC sales as well as the continued economic slow-down ***bodes well for the business***.

176. Following the 1/01 closing of the Merger, continuing concern over the impact of the dot-com collapse and an advertising slowdown on AOLTW's business persisted, hurting AOLTW's stock, driving it down to as low as $33 in early 4/01, right as the massive AOLTW insider bailout was underway. In mid-4/01, in the midst of continuing concerns over the advertising market and their insider bailout, AOLTW was to report its 1stQ 01 results – ***its critical first quarter as a newly merged enterprise – which would be intensely focused on by analysts and investors for any sign that the Merger was having problems or that AOLTW's business was faltering, due to an advertising slowdown or otherwise***. AOLTW insiders knew it was absolutely indispensable that AOLTW report very positive results to boost investor confidence and make their representations of the success of the Merger – and their forecasts of strong future growth – credible and to keep AOLTW stock inflated while they continued to unload their shares.

177.    AOLTW did not disappoint, as it *reported better-than-expected results across the board*. On 4/18/01, AOLTW issued a release reporting its 1stQ 01 results – its first quarter as a new public company.  The release was headlined and stated:

> *AOL Time Warner First Quarter EBITDA Climbs 20% to $2.1 Billion and Cash EPS Rises 21% to $0.23 On Total Revenues of $9.1 Billion*
>
> *Free Cash Flow Increases Over 400% to $651 Million*
>
> *Time Warner Cable Digital Subscriptions Grow 213% Year-Over-Year to 3.3 Million;*
>
> *AOL Service Adds Over 2 Million New Members in the Quarter*
>
> *AOL Advertising and Commerce Revenue Climb 37% to $721 Million*
>
> AOL Time Warner Inc. today reported results for its first quarter ended March 31, 2001, posting *strong gains in total revenues, EBITDA, cash earnings per share, and Free Cash Flow over pro forma results from last year's comparable quarter.*
>
> *         *         *
>
> Revenue growth was driven by a . . . 10% increase in advertising and commerce revenues to $2.1 billion . . . .
>
> *         *         *
>
> −    Advertising and Commerce:  Strong growth in advertising and commerce revenues were led by year-over-year increases of 37% at America Online and 17% at Time Warner Cable.
>
> *         *         *
>
> *Strong Quarter Builds Foundation for Future Growth*
>
> Jerry Levin,  Chief Executive Officer, said:  *"We couldn't be more pleased with AOL Time Warner's performance in our first quarter as a new Company. Our results met or exceeded all key operating and financial targets.   This outstanding quarter underscores the unique promise of AOL Time Warner, and the ability of our management team to collaborate in a focused, disciplined way. And this is just the beginning.*

"*Our businesses are working together as one, unified organization to deliver shareholder value over the near- and long-term.*"[6]

---

[6]    The statements that AOLTW would have or had an excellent or outstanding management team that was working together effectively to integrate AOL's and Time Warner's separate operations to achieve the proposed Merger synergies and economies were false. The executives for the two companies hated each other, were constantly fighting with each other and attempting to aggrandize their own positions in the combined Company. As *The New York Times* reported on 1/19/03:

> But all the happy talk about a new common ground leaves a bitter taste among those who are no longer part of the effort.
>
> "They hated us and did everything they could to make sure that we got no cooperation and made no progress, including Logan," said a former senior AOL executive. "It reminds me of the child who killed his mother and father and then threw himself on the mercy of the court as an orphan."

Even Morgan Stanley has admitted after the fact (in 12/02):

> Perspective on the nearly two years since the close of the merger of AOL and Time Warner:
>
> In our view, the biggest disappointments post the combination of AOL and Time Warner [is] 1) AOL's lack of innovation and execution; 2) AOL Time Warner's inability to forecast changes in its business model; and 3) *the inability of the AOL and Time Warner divisions to work together. On the last point, we believe the company suffered from the antithesis of a post-merger honeymoon – the management team seemed too focused on revenue and EBITDA targets at the expense of running the business and, simply, the people refused to work together. Something had to break, and break it did*.

*The Daily Deal* reported (12/21/02):

> Steve Case thought he was buying Time Warner, and one day he woke up to find the Warner guys in charge. . . . Now, however, the Warner guys face an extremely old, very daunting problem that is largely of their own making . . . . *AOL Time Warner consists of a number of . . . companies that don't take to each other, don't like each other and treat each other as competitors*.

On 7/7/02, *The New York Times* reported:

> *Morale among executives of the former Time Warner has plummeted steadily since the merger was announced at the start of 2000. Many had chafed at what they considered the initially condescending attitude among executives of the former America Online toward the stodgy world of old media, and they especially*

\*        \*        \*

For the first quarter, *America Online reported records in revenues, advertising and commerce revenues*, and EBITDA, *as well as strong AOL membership growth*. . . . Advertising and commerce reached a record $721 million, climbing 37% over last year's March quarter and 5% ahead of the December quarter of 2000. EBITDA improved 35% to $684 million.

178.    On 4/18/01, AOLTW held a conference call after reporting its 1stQ 01 results:

LEVIN: . . . I am quite pleased with our company's performance because I think we made an excellent start in delivering results on each of our key targets. *What this indicates is that this management group is very focused on using all of our resources and our brands to the greatest advantage. . . . What this enables us to do and I'll say it very clearly is to generate sustained and consistent growth . . . . We actually use [sic] the year and a day that it took us to close the transaction. It was quite meaningful that period because we got a lot done, a lot in place so that we can come out-of-the-box strongly*. . . . Again, this reflects our improved *profitability of our businesses where we've streamlined our operations* . . . . [F]ree cash flow rose more than 400 percent to $651 million. . . . [T]his underscores . . . the cash generating capability of our businesses . . . . *So given these results let me state with the renewed conviction, that we are on track for our full year targets of $40 billion in revenues, $11 billion in EBITDA* . . . .

\*        \*        \*

Now we turn to advertising and commerce. In this market it is a very impressive performance. Revenues over all are up 10 percent. Obviously AOL led the charge with a 37 percent increase. . . . *So when you step back the strength of AOL Time Warner is highlighted by our ability to deliver double-digit ad commerce revenue growth over all. . . . This is a large cap growth company* . . . .

\*        \*        \*

PITTMAN:  . . . *We couldn't be more pleased with the performance of our subscription and advertising commerce businesses this quarter. . . .*

KELLY: . . . *I think we are very pleased clearly with the results that we have been able to post today. . . .* AOL membership now tops 29 million. *So the strong growth in AOL membership continues. . . .* For those of you who might be sitting there asking yourself well what about the advertising marketplace? What will the impact be on this overall? Let me be direct, we are realists in understanding where the advertising marketplace is. We've planned for the effects of this downturn, the slowdown in the advertising markets . . . . But I would also like to stress here that we

*resented the cost cuts imposed to make the combined company's aggressive earnings goals*.

- 127 -

had very strong performance in the advertising marketplace both at AOL with a 37 percent increase and at the cable operations still a 17 percent increase. So the core operations still have strong growth . . . . I want to close with that we are committed to delivering the metrics that we set out for ourselves. We are looking at $40 billion plus in revenue for the year. We are looking at EBITDA of $11 billion. And we're looking at free cash flow increasing more than 200 percent from a year ago.

179.    On 4/18/01, CNN reported:

[W]e just got off a very long conference call with Gerry Levin, the co-chief operating officers. We've been reporting the numbers through the morning. ***As you know, the company not only met its targets, it exceeded them on most fronts. And the stock is up quite strongly this morning. . . .***

    ***. . . Gerry Levin . . . said the company remains on-track for . . . the full year, $40 billion in revenues, $11 billion in EBITDA.***

\*    \*    \*

The company said that it expects the second half will be stronger. ***There were also comments on the call that the ad revenue atmosphere seems to be improving. . . .***

But the comments from everybody, Bob Pittman, Dick Parsons, Gerry Levin, ***is that we promised you that the consolidation of these two companies would produce 12 to 15 percent more cash flow. We're delivering it even in this environment.***

180.    On 4/18/01, Salomon Smith Barney issued a report on AOLTW, stating:

***AOL: Building a Solid Foundation***

\*    \*    \*

- . . . AOL Time Warner reported a better than expected first quarter . . . .

\*    \*    \*

- Management reaffirmed full year expectations and set a positive tone for 2001. Maintain Buy recommendations.

\*    \*    \*

***Overall, the first quarter was stronger than expected.***

\*    \*    \*

***AOL's ad/e-commerce revenue was $721 million, representing 5% sequential growth and 37% year-over-year growth***. In comparison, Yahoo!'s ad/e-commerce revenue was down 28% year-to-year in the same quarters. . . . Additionally, AOL's EBITDA margin rose 430 basis points year-over-year and 52

basis points sequentially to 32.2%, 87 basis points higher than we expected. *The strong margin performance at AOL comes from sustainable sources, in our view, including growth in ad/e-commerce sales* . . . .

\*        \*        \*

Outlook and Valuation – *A Great Defensive Play in an Uncertain Market*

AOL Time Warner have [sic] risen 36% from its recent January 2, 2001 low of $32.39, outpacing the market by 43%. . . .

As made evident by the first quarter performance, we continue to think that AOL Time Warner has the right mix of content and distribution assets . . . . *[W]ith the company's ability to surpass expectations in the first quarter's tough environment, we feel confident that the company should be able to meet projected financial targets in the short-term and in the long-term.*

181.    On 4/19/01, the *Los Angeles Times* reported:

AOL Time Warner Inc. *delivered surprisingly solid earnings Wednesday to a wary Wall Street, putting to rest – for now – doubts about the media and entertainment giant's ability to hit its financial targets amid the advertising slowdown.*

*Fueled by double-digit growth at its Internet and cable businesses* . . . *first-quarter revenue rose 9% to $9.1 billion.*

\*        \*        \*

"*They've done a great job in restoring confidence in their business model and their growth targets,*" said Andrea Rice, an analyst at Deutsche Bank.

\*        \*        \*

*For months, AOL executives have told investors that the company was on track to meet its aggressive 2001 financial targets, even as other companies faltered.*

\*        \*        \*

*AOL Time Warner's chief executive, Gerald Levin, reiterated those targets Wednesday and said his company is not as vulnerable as others to the ad slowdown.*

"*Our company rides above the normal market dynamics,*" Levin said. . . .

\*        \*        \*

> *Advertising and e-commerce revenue – a trouble spot at many Internet companies – rose 10% during the quarter, thanks largely to increases at the flagship AOL Internet service and the Time Warner cable business.*

182.    AOLTW stock soared higher in anticipation of and on these very strong results, representations, assurances and forecasts. The stock, which traded as low as $33.70 on 4/4/01 went to $50 on 4/18/01. The stock continued to soar higher during the rest of 4/01 and 5/01, while the AOLTW insiders continued to bail out, selling millions of their shares while manipulating the market price higher through a combination of false statements and the use of $1.3 billion of AOLTW's cash to repurchase millions of its shares on the open market.

183.    During late 4/01 and early 5/01, the large stock selling by AOLTW insiders attracted the notice of some in the investment community due to required SEC filings disclosing these sales. When analysts and members of the media questioned those sales as inconsistent with the AOLTW buy-back of its "***undervalued stock***," AOLTW spokespersons, Jim Whitney and Ed Adler, lied, falsely telling them that the sales were prompted by a "***change in AOL's compensation structure***," by a need to raise money for executives' "***charitable giving***" and "***philanthropic activities***," as "***part of their long-term personal financial planning***," and that the buy-back program "***has nothing to do with the individual selling by executives***." These, of course, were lies, as the selling was part of a coordinated insider bail-out by insiders who knew the stock was inflated because they were making false statements, concealing adverse information and using corporate funds to manipulate the stock higher while they sold. In fact, the buy-back was designed and intended to support the stock sales by the executives which were a bail-out by them to pocket millions before the truth about the failure of the Merger and problems with AOLTW became public and the stock collapsed.

184.    On 4/27/01, Salomon Smith Barney issued a report on AOLTW, stating:

- . . . The company has raised the curtain on the first act of a major integration story. With each move orchestrated with great precision, ***we expect the year to at least meet expectations***.

- ***Near term, the twin engines are AOL and cable . . . .***

- ***AOL's story remains compelling and the company has gotten off to a strong start.***

185.    On 5/2/01, Salomon Smith Barney issued a report on AOLTW, stating:

**AOL:  Well-Positioned for Times Good and Bad**

<div align="center">*        *        *</div>

- ***Based on recent management updates, AOL Time Warner is on track to meet its targets for the year ($40 billion revenue, $11 billion EBITDA).***

<div align="center">*        *        *</div>

An area of obvious interest is the advertising market where AOL Time Warner made the point that tough economic times breed defensive spending and reversion to "core" ad vehicles like those that AOL Time Warner provides. ***In our judgment, solid first quarter results did much to chase away skepticism and we expect this to lift even further as the year unfolds and the company delivers***.

186.    On 5/17/01, Levin spoke at the AOLTW Annual Meeting of Shareholders, stating:

Last year, on this same stage, I said our intention was to come out fast from the starting gate as a single entity focused on executing one strategy. ***Although the regulatory process delayed our start, there was a silver lining.  During that time, our board and management became thoroughly acquainted.  The degree of cooperation and consultation was extraordinary*** . . . .

Under CFO Mike Kelly, we formed a high-powered financial group that has done a remarkable job of designing a set of metrics for a company in a category all its own. . . .  [W]e worked closely with each division to set performance targets. ***As a result, we're comfortable with our 2001 year-end targets of revenues of $40 billion and EBITDA of $11 billion.  They're grounded in the operating strengths of AOL Time Warner and its demonstrated potential***.

***Key to our performance is AOL. . . .  [O]ur crown jewel. . . .  AOL is a transforming catalyst that immeasurably strengthens all our businesses.***

<div align="center">*        *        *</div>

***AOL's 2000 performance was truly outstanding.  Subscriptions grew by 30%, from 20.5 to 26.7 million. . . .  [A]nd the possibilities for accelerating this growth are dramatic.***

***In the first quarter of 2001 – our first as a combined company – the momentum stayed strong.***

187.    On 5/17/01, Salomon Smith Barney issued a report on AOLTW, stating:

AOL:  ***Management Affirmed 2001 Targets at Shareholder Meeting***

<div align="center">- 131 -</div>

- At its shareholder meeting, ***AOL Time Warner affirmed that it is comfortable with 2001 financial targets . . . .  AOL, the fast growing subscription service, is the catalyst that strengthens all businesses . . . .***

188.    AOLTW stock continued to advance, moving on to its post-merger high of $58.51 on 5/22/01 as the AOLTW insider bail-out continued, with the market price of AOLTW stock artificially inflated and manipulated upward by the ongoing huge stock buy-back and the false representations, assurances and forecasts being made by AOLTW, its insiders and its bankers.

189.    On 6/19/01, it was reported in the press that defendant Keller, Senior Vice President for Business Affairs at AOL, and at least one other AOL Business Affairs management employee, had been suspended due to an investigation of AOL's e-commerce deals with PurchasePro.com, a company that had twice recently been forced to restate its financial results.  However, AOLTW quickly denied any negative implications.  On 6/19/01, *The New York Times* reported:

> Jim Whitney, a spokesman for America Online, declined to comment on reports of Mr. Keller's suspension.  But he said, "***All revenue related to Purchase Pro has been accounted for appropriately and accurately by AOL.***"

190.    Levin quickly moved to support AOLTW's stock price and counter any negative impact of the Keller revelations.  On 6/20/01, CNBC reported:

> ***Shares of AOL Time Warner posted a strong gain today on word from CEO Gerald Levin that advertising revenues are finally stabilizing.***  In an interview at the Cannes International Advertising Festival, ***Levin said the world's largest Internet and media company is on track to meet its targets for the year.***

While AOLTW executives would continue to misrepresent the true state of AOLTW's business and prospects for many more months to cover up the truly disastrous nature and results of the sale of Time Warner to AOL, after the revelations that Keller and another AOL Business Affairs e-commerce dealmaker had been ousted, AOLTW stock began a decline from which it would not recover.

191.    On 6/25/01, AOL issued a release headlined and stating:

***Worldwide AOL membership Surpasses Landmark 30 Million Milestone . . . AOL Subscription Base Doubles in Just 2-1/2 Years***

192.    On 6/28/01, Salomon Smith Barney issued a report on AOLTW, stating:

AOL:    *Reaches 30MM Member Mark . . .*

                    \*        \*        \*

- *AOL once again announced a faster-than-expected addition of its next million members, reaching 30mm members worldwide . . . .*

- *AOL's ability to deliver better-than-expected strong membership growth* should help to lessen investors' fear . . . .

                    \*        \*        \*

The fact that AOL continues to increase members at a solid pace despite a looming price increase, continued slow-down in PC sales, as well as the continued economic slow-down bodes well for AOL's access business . . . .

193.    On 7/5/01, Morgan Stanley issued a report on AOLTW, stating:

AOL Time Warner has shown the ability to generate solid internal growth in weak economic conditions, *as demonstrated by first-quarter results*. . . .

- *Reiterate Strong Buy . . .*

Even with a moderate degradation to the current economic outlook, we still see a 90% probability that AOL Time Warner will meet the $40 billion revenue and $11 billion EBITDA targets that it has set for 2001.  *Long term, we remain convinced that AOL Time Warner's ability to tap into numerous, large business opportunities is nearly unprecedented*.

                    \*        \*        \*

We are maintaining our Strong Buy-V rating on AOL Time Warner shares. . . .  *We believe that the first quarter of 2001 represented a first step for the company in proving to analysts and investors that AOL Time Warner is truly the premier company in both the Internet: New Media/eCommerce sector and the Media & Entertainment sector.*

*The foundation of our investment thesis is that the company has shown the ability to sustain internal growth rates which are approximately double those of its peer groups.  The first quarter's results demonstrated this capability.  In our view, in each succeeding quarter as the company achieves 25%+ year-over-year EBITDA growth, the argument for sustainability should be strengthened.*

194.    By mid-7/01, investors and Time Warner shareholders were intensely focused on AOLTW's 2ndQ 01 results to see if AOLTW's business was continuing to achieve strong subscriber growth in the U.S. and internationally, as well as very rapid, profitable growth overall and especially

in its e-commerce advertising business.  AOLTW did not disappoint, as it again reported better-than-expected results across the board.  On 7/18/01, AOLTW issued a release reporting its 2ndQ 01 results.  The release stated:

> **AOL Time Warner Reports Record Second Quarter EBITDA of $2.5 Billion, Up 20%; Cash EPS Up 28% to 32 Cents on Increased EBITDA Margin of 28%**
>
> **Free Cash Flow Grows 55% to $519 Million**
>
> **Total Revenues of $9.2 Billion Led by 10% Growth in Subscription Revenues; Company Surpasses 135 Million Subscriptions**
>
> AOL Time Warner Inc. today reported results for its second quarter ended June 30, 2001, posting records in total revenues, EBITDA and cash earnings per common share.
>
> – Total revenues rose 3% to $9.2 billion, up from $8.9 billion . . . .  Advertising and commerce revenues grew 1% to $2.3 billion, **with America Online and Time Warner Cable posting strong increases of 26% and 19% respectively**. . . .
>
> – EBITDA increased 20% to $2.5 billion; cash EPS climbed 28% to $0.32; and Free Cash Flow climbed 55% to $519 million, excluding merger-related costs.  These compare to pro forma EBITDA of $2.1 billion, cash EPS of $0.25 and Free Cash Flow of $334 million in last year's corresponding quarter.  The EBITDA margin expanded to 28% from 24%.
>
> – AOL Time Warner's total subscriptions grew to more than 135 million, an increase of 17.9 million over the past year.  The flagship AOL service added 1.3 million new members worldwide – a June quarter record – for a total of 30.1 million members at June 30. . . .
>
> Chief Executive Officer Jerry Levin said:  "**We couldn't be more proud of what we accomplished this quarter.  We achieved outstanding bottom-line results, dramatic improvement in profit margins and a huge increase in Free Cash Flow.  Our record results are further proof that we are delivering on the promise of the AOL Time Warner merger.**"
>
> . . . "**In just six months, we've made great progress integrating the Company. . . .  We've just begun to tap the enormous potential.**"
>
> \*     \*     \*
>
> For the second quarter, America Online reported records in total revenues, EBITDA and AOL membership growth.  Revenues climbed to a record $2.1 billion, up 13% from $1.9 billion in the year-ago quarter.  **Advertising and commerce revenues reached $706 million, climbing 26% over last year's June quarter** . . . .
>
> \*     \*     \*

*AOL services in Europe and Latin America continued their strong growth in the quarter – with the AOL services in Europe exceeding 4.8 million members . . . .*

195.     On 7/18/01, AOLTW held a conference call for investors, money managers, analysts and AOLTW shareholders during which Levin and Kelly stated:

LEVIN:  . . . I could not be more pleased with what we have accomplished . . . . So, for the quarter we have achieved clearly outstanding bottom-line results, and really impressive when you look at our profit margin and a substantial increase in cash flow . . . .   Our key metrics, we delivered record EBITDA of $2.5 billion . . . obviously above consensus.  Free cash flow . . . was up 55 percent to $519 million.  *So, in six months, we have . . . achieved tremendous gains and profitability . . . . This is . . . proof positive that we are delivering on the merger, even on an accelerated basis, where there is obviously a difficult business climate.  I think we are benefiting from this very disciplined way that we are running the company. . . . I believe we are . . . the premier growth company, a safe and secure place for people to put their money if they want to see the kind of large cap growth stock that AOL-Time Warner represents*. . . .

KELLY:  . . . [W]e are very pleased with our overall operating and financial performance as well as our strong competitive positions.  *Results are a clear reflection that we are executing on the promise of the merger and we are executing well*. . . .  Now let's look and really get involved in looking at the advertising and commerce numbers. . . .  *[A]t AOL commerce revenues grew 26 percent to $706 million.  Cable delivered strong growth of 19 percent and advertising growth of $142 million*. . . .  *With that perspective we are looking at the $40 billion in revenue as being the top of our range and we are still looking at targeting the $11 billion of EBITDA.  We have made and are making great strides in driving efficiencies in this organization and expanding our EBITDA margins*.

196.     On 7/23/01, *Fortune* magazine published an article about AOL's accounting for online advertising transactions, stating:

*Do AOL's Ads Add Up?*

*Despite an ad slump, the online service reported great sales.  Some critics question the numbers.*

The advertising market, as media executives across the country are painfully aware, has been in free fall.  But if there's an ad depression going on, somebody forgot to tell the AOL division of AOL Time Warner.  While rivals watch ad dollars shrivel, AOL thrives. . . .  AOL's ad revenues would be lower were it not for what critics consider some controversial sales tactics and accounting games.  These fall into two broad categories:  so-called ads-for-equity deals, a barter transaction that was all the rage during the Web boom, and deals in which AOL invests in a dot-com that in turn pays AOL for advertising and marketing services.

According to *Fortune*, **an AOLTW publication**:

> *Accounting for the deals in this manner is perfectly legal.  In fact, it's mandated by GAAP rules. . . .  Kelly says AOL is not trying to inflate revenues through these deals. . . .  Kelly says nothing is funky about AOL's figures*.

This was a lie.  The accounting for AOLTW advertising revenues was false and fraudulent and violated GAAP.

197.    On 8/2/01, CNNfn interviewed Levin and he stated: "On advertising, I think we have hit bottom . . . .  [B]ut I think we'll see that turnaround."

198.    On 8/27/01, Pittman was interviewed on CNBC and stated:

QUESTION:  Mr. Pittman, let me go back to the advertising market . . . .  It is said to be quite frustrating at the moment.  Can you give us a glimpse inside Time Warner and tell us what the advertising climate is like for you?

PITTMAN:  Well, I think we, you know, see the general market trend out there, which I think Gerry Levin talked [about] this summer has – *has stabilized; we've not yet seen an upturn.  But I think from our standpoint, clearly this trend toward consolidation is beneficial to us*.  And if you look at the performance of AOL Time Warner actually even in the last couple of quarters vs. other companies that sell advertising, you do see the advantage we have in terms of having it all in one house. . . .  *So when advertising goes down a little bit, it benefits another side of our business.  So we have actually a little balancing effect within our company that I think other media companies probably don't quite enjoy*.

*            *            *

QUESTION:  Now let me ask you a little bit about the stock price having come down noticeably in recent months.  Some analysts on Wall Street, some money managers are worried that AOL Time Warner will not meet profit expectations in the current quarter or in the quarter coming.  Can you shed a little light on whether or not you're going to have to warn – anytime soon?

PITTMAN:  *You know, we've made no change in our guidance whatsoever.*

199.    On 9/24/01, AOLTW cut back its revenue, EBITDA and cash flow forecasts by 50%-70%, basically admitting that the first year results of the Merger were going to be far worse than promised and forecast.  While AOLTW stock fell on these unexpected revelations, AOLTW stock continued to trade at artificially inflated levels as AOLTW continued to refuse to make full, complete and accurate disclosure of the state of its business, its true prospects and the prior financial

and accounting wrongdoing at AOL and Time Warner. For instance, on 9/24/01, Case said publicly:

"*[O]ur unique mix of assets give [sic] us confidence that we can generate strong earnings growth next year and into the future*."

200.    On 10/17/01, AOLTW issued a release reporting its 3rdQ 01 results, which stated:

**AOL Time Warner Reports Third Quarter EBITDA Up 20% to $2.5 Billion**

**Free Cash Flow Grows to $1.3 Billion**

**Total Revenues Increase to $9.3 Billion**

**Subscription Revenues Climb 13% with**

**Total Subscriptions Surpassing 137 Million**

**Filmed Entertainment's EBITDA Up 43% to $307 Million**

AOL Time Warner Inc. today reported results for its third quarter ended September 30, 2001.

Total revenues rose 6% to $9.3 billion, up from $8.8 billion on a pro forma basis in last year's corresponding quarter . . . . Advertising and commerce revenues declined 5% to $1.9 billion.

EBITDA increased 20% to $2.5 billion and cash EPS rose 43% to $0.30, excluding merger-related costs and certain one-time items. These compare to pro forma EBITDA of $2.1 billion and cash EPS of $0.21 in last year's third quarter.

\*        \*        \*

America Online

America Online revenues climbed to $2.2 billion, up 13% from $1.9 billion in the year-ago quarter, benefiting primarily from continued strong subscriber growth in the US. Subscription revenues of $1.4 billion were up 14% from last year's third quarter.

America Online's advertising and commerce revenues of $624 million were 5% higher than a year ago – driven by a 7% increase in advertising, *including contract settlements and inter-company revenues*, partially offset by a 10% decline in commerce revenues. EBITDA improved 22% to $742 million.

\*        \*        \*

Cable

*Time Warner Cable's revenues climbed 17% year-over-year to $1.8 billion.* Subscription revenues grew 15% to $1.6 billion, and *advertising and commerce revenue rose 41% to $175 million, due partly to increased advertising sold in conjunction with the launch of new channels.*

201.    In 11/01, Kelly, AOLTW's CFO (and the prior CFO of AOL), was *relieved of his accounting responsibilities*.  Levin pretended this was a promotion for Kelly ("*a super CFO*"), when, in fact, Kelly was demoted for participating in the gross falsification of AOL's financial reports prior to the Merger and AOLTW's financial reports subsequent to the Merger.  Then, in early 12/01, Levin, AOLTW's Chairman/CEO – just 61 years old and who had told investors he had "*no intention of (ever) leaving*" AOLTW, as he made his mark on the world – suddenly retired, stating he wanted "*more 'poetry' in his life*," a move that "*stunned*" investors and that the media termed a "*shocker*."  AOLTW stock declined sharply from $36 to $31 over the next few days.  In 1/02, just after Levin left, AOLTW again slashed its revenue, EBITDA and cash flow forecasts, this time for *both* 01 and 02, now projecting single digit revenue growth in 02 with advertising revenue to show no growth.

202.    In early 4/02, defendant Schuler was ousted as the head of AOLTW's AOL unit.  In 4/02 or early 5/02, AOLTW's top insiders learned that as a result of the Keller suspension, speculation over the legitimacy of AOL's e-commerce deals, AOLTW's CFO's demotion and Levin's sudden, startling departure, members of the financial press were now intensely investigating the Company – especially the activities of AOL's e-commerce advertising business.  Knowing that this would likely ultimately lead to the exposure of AOL's prior phony accounting practices and further crush AOLTW's stock, in mid-02, several AOLTW top insiders unloaded even more of their AOLTW shares, selling off another 11.2 million shares for $205.2 million between 5/10/02 and 7/15/02, continuing to sell as they learned that *The Washington Post* was preparing to publish a major exposé on AOL's e-commerce advertising accounting practices, which would expose widespread irregularities and Pittman's role in them.

203.    However, AOLTW officials continued to pepper the market with false representations and assurances and AOLTW stock continued to trade at artificially inflated levels.  On 5/16/02, AOLTW held its 02 Annual Shareholders Meeting during which the Company's top officials stated as follows:

> CASE: . . . [L]et's look at some facts.  When we announced the merger a little over two years ago, AOL had 20 million members.  Today AOL has 34 million members.  No subscription service in the world has experienced this kind of growth over the past two years. . . .  Despite some first year setbacks, this company, your company, is getting its house in order and will be able to deliver on the premise and the promise of the merger. . . .  Even with the current challenges we now face, I am confident that when all is said and done, people will look back on Jerry's leadership and his decision to merge AOL and Time Warner and recognize that it was a seminal moment in the development of this great company and the history of our industry. . . .

> PARSONS: . . . Each of our divisions contains an amazing collection of dedicated, committed people and each is headed by an extraordinary executive.  [As] the parts of our company come into sync and the combination of our assets fuels our growth, their faith in our future and your faith in our future will be more than justified.  That is not a prediction, that's a promise.

204.    On 7/18/02, *The Washington Post* published an extensive investigative exposé laying out Pittman's role in falsifying AOL's financial reports.  *The Washington Post* exposé reported:

> In October 2000, a critical question confronted America Online Inc. as it sought to cinch the largest merger in U.S. history:  Was it feeling the effects of an industry-wide slowdown in advertising?

> ***AOL's president at the time, Robert W. Pittman, offered a resounding answer: "I don't see it, and I don't buy it," he told Wall Street stock analysts and the media.***

> Other AOL officials were less optimistic. . . .  ***[I]nternal company projections raised caution about one sector: dot-coms.  Failures were accelerating among those Internet start-ups, which represented a significant amount of the company's ad business.***

> About two weeks before Pittman's declaration on Oct. 18, he and other executives were told in a meeting at Dulles headquarters that AOL faced the risk of losing more than $140 million in ad revenue the following year.

> [T]he internal warning came when investors were highly alert to any weakness in online advertising.  Just a week before Pittman's public statements, for example, shares of AOL's key competitor, Yahoo Inc., plunged 21 percent after the

company reported strong ad growth but acknowledged that the pace could not be sustained. . . .

In such an atmosphere, and with its takeover of Time Warner Inc. imminent, AOL sought to maintain its breakneck growth in advertising and commerce revenue. . . . AOL boosted revenue through a series of unconventional deals from 2000 to 2002, before and after the merger, according to a *Washington Post* review of hundreds of pages of confidential AOL documents and interviews with current and former company officials and their business partners.

AOL converted legal disputes into ad deals. It negotiated a shift in revenue from one division to another, bolstering its online business. It sold ads on behalf of online auction giant eBay Inc., booking the sale of eBay's ads as AOL's own revenue. AOL bartered ads for computer equipment in a deal with Sun Microsystems Inc. AOL counted stock rights as ad and commerce revenue in a deal with a Las Vegas firm called PurchasePro.com Inc.

AOL also found ways to turn the dot-com collapse to its advantage, renegotiating long-term ad contracts it risked losing into short-term gains that boosted its quarterly revenue.

\*      \*      \*

Without the unconventional deals, AOL would have fallen short of analysts' estimates of the company's growth in ad revenue (which is reported in a category that also includes revenue from commerce) in three quarters in 2000 and 2001.

Collectively, the deals helped AOL beat Wall Street analysts' expectations for earnings per share – a critical profit yardstick for investors  – by a penny per share in two quarters in 2000. At the time, investors punished companies whose earnings were off by even a cent.

Alec Klein, *Unconventional Transactions Boosted Sales; Amid Big Merger, Company Resisted Dot-Com Collapse*, Wash. Post, 7/18/02, at A01. The next day – 7/19/02 – former AOL President and then AOLTW Co-COO Pittman was kicked out of the Company.

205.    In late 7/02 and early 8/02, AOLTW confirmed it was the subject of SEC/DOJ civil and criminal investigations regarding its e-commerce advertising deals, including those with WorldCom, Sun Microsystems, Qwest, Oxygen Media, PurchasePro, DirectTV and Homestore.com, as well as AOLTW's forecasts of strong financial growth before and after the Merger, while insiders were bailing out, unloading hundreds of millions of dollars worth of their AOL and AOLTW shares at inflated prices. On 7/25/02, AOLTW stock hit its post-merger low of just $8.60 per share. "***This***

*is the end of a fiasco*," said one analyst.  But it wasn't.  On 8/9/02, AOLTW publicly admitted for the first time that AOL had previously improperly recorded millions of dollars of e-commerce advertising revenues.  And on 8/14/02, it was revealed that defendant Colburn, the senior AOL executive in charge of e-commerce advertising, had been kicked out of the Company.  On 9/18/02, AOLTW was named as a defendant in the *Homestore.com* securities class action suit based on very detailed allegations that it had participated in a scheme to inflate Homestore.com's, and its own, advertising revenues via a series of specified phony transactions, amounting to many millions of dollars.  Several Homestore.com executives have now pleaded guilty to criminal securities fraud charges arising from these transactions with AOLTW.  AOLTW then restated several prior quarters of its financial results to eliminate almost $200 million in improperly recognized e-commerce advertising revenue – much of which was recognized and reported prior to the Merger.  AOLTW then admitted to improperly accelerating the recognition of hundreds of millions of dollars of cable TV payments as advertising revenues.  Finally, after repeatedly denying it would do so (*i.e.*, on 8/23/02, AOLTW's CFO said "*it's absolutely premature and inappropriate to do an impairment charge at this time*"), in early 03, AOLTW took a gigantic goodwill write-off ($45 billion) related to AOL's over-valued assets, *resulting in AOLTW suffering a loss of approximately $100 billion for 02 – the largest annual corporate loss of all time*!  At the same time, Case, the Chairman of AOLTW, was forced out of the Company.  On 3/28/03, AOLTW filed its 02 Form 10-K in which it disclosed that the SEC had informed the Company that its accounting for $400 million in advertising from a deal with Bertelsmann AG was improper.  AOLTW restated its results again to eliminate the $400 million from its advertising revenues and consolidate the losses from AOL Europe in 00-01.  AOLTW stock now trades at just $17-$18 per share.

## AOL'S AND AOLTW'S FALSE AND
## MISLEADING FINANCIAL STATEMENTS

206.     During 99-02, AOL falsely reported its results through revenue recognition

manipulations with many of its customers which inflated its advertising and commerce revenues.

The Company also failed to record losses for impairment on long-term assets on a timely basis.

Ultimately, AOL has admitted that its results for 00-02 had to be restated to properly account for

some $600 million in advertising revenue which in fact had been reciprocal transactions.  AOLTW

also inflated its cable TV advertising revenues by classifying cable license fees as advertising.  The

Company has subsequently recorded huge charges to belatedly account for impaired assets.

207.     AOL, and then the AOL unit of AOLTW, reported the following financial results and

subscriber metrics for 99-02:

|  | 3/31/99 | 6/30/99 | 9/30/99 | 12/31/99 |
|---|---|---|---|---|
| AOL Advertising & Commerce Revenues | $210M | $233M | $350M | $437M |
| EBITDA – AOL | $259M | $343M | $386M | $453M |
| EPS | $0.17 | $0.07 | $0.07 | $0.10 |
| Backlog of Ad Rev | $1.3B | $1.5B | $2.0B | $2.4B |
| AOL Subscribers | 16.9M | 17.6M | 18.7M | 20.5M |
|  | **3/31/00** | **6/30/00** | **9/30/00** | **12/31/00** |
| AOL Advertising & Commerce Revenues | $557M | $609M | $649M | $741M |
| EBITDA – AOL | $492M | $572M | $599M | $652M |
| EPS | $0.17 | $0.13 | $0.13 | $0.01 |
| Backlog of Ad Rev | $2.7B | $3.0B | $3.0B | N/R |
| Subscribers | 22.2M | 23.2M | 24.6M | 26.7M |
|  | **3/31/01** | **6/30/01** | **9/30/01** | **12/31/01** |
| Ad & Commerce Rev – AOLTW | $2.05B | $2.28B | $1.93B | $2.22B |
| AOL Ad & Commerce Rev | $721M | $706M | $624M | $637M |
| EBITDA –AOLTW | $2.1B | $2.5B | $2.5B | $2.8B |
| EBITDA – AOL unit | $684M | $801M | $742M | $718M |
| EPS | ($0.31) | ($0.17) | ($0.22) | $(0.41) |
| Backlog of Ad Rev | N/R | N/R | N/R | N/R |

| AOL Subscribers | 28.8M | 30.1M | 31.3M | 33.2M |
|---|---|---|---|---|
| | **3/31/02** | **6/30/02** | **9/30/02** | **12/31/02** |
| Ad & Commerce Rev – AOLTW | $1.83B | $2.07B | $1.7B | $2.2B |
| Ad & Commerce Rev – AOL | $497M | $409M | $324M | $388M |
| EBITDA – AOLTW | $2.1B | $2.5B | $2.2B | $2.8B |
| EBITDA – AOL unit | $433M | $473M | $432M | $474M |
| EPS | ($12.25) | $0.09 | $0.01 | ($10.04) |
| Backlog of Ad Rev | N/R | N/R | N/R | $555M |
| AOL Subscribers | 34.6M | 35.1M | 35.3M | 35.2M |

208.    These results were included in press releases and SEC filings, including Form 10-Qs and Form 10-Ks.  The 99-00 results were included or incorporated into the Merger Registration Statement and the Stock Option Registration Statements.  These filings represented that the accompanying financial statements included all adjustments necessary for a fair presentation of AOL's results.  Later, AOLTW, as a combined company, continued to report inflated results due to the manipulations described below.  The Company continued to represent in SEC filings that the financial statements were a fair presentation of its results.

209.    These representations were false and misleading when made as AOL's financial statements were not a fair presentation of AOL's results and were presented in violation of GAAP and SEC rules.

210.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

211.    During 99-02, AOL misstated its earnings due to its improper accounting for numerous reciprocal transactions with customers who were purportedly purchasing advertising from AOL, but, in reality, had entered into transactions with AOL only because AOL was buying products or services from these companies.  AOL has subsequently admitted that its results, as originally reported, were overstated by some $600 million due to improperly reported revenues.  In fact, AOLTW engaged in other manipulative transactions totaling hundreds of millions of dollars which were not included in the restatement.  The Company also failed to record losses for impaired assets on a timely basis.

**AOL'S and AOLTW's Manipulative Reciprocal Revenue Transactions**

212.    GAAP, as described by FASB Statement of Concepts No. 2, requires that financial statements reflect the true substance of transactions and represent what they purport to represent.

213.    Moreover, GAAP, as set forth in Emerging Issues Task Force ("EITF") 99-17, requires that revenue under barter transactions for Internet advertising should only be recognized on a basis of fair value.  EITF 99-17 states in part:

> 4.    The Task Force reached a consensus that revenue and expense should be recognized at fair value from an advertising barter transaction only if the fair value of the advertising surrendered in the transaction is determinable based on the entity's own historical practice of receiving cash, marketable securities, or other consideration that is readily convertible to a known amount of cash for similar advertising from buyers unrelated to the counterparty in the barter transaction.  An exchange between the parties to a barter transaction of offsetting monetary consideration, such as a swap of checks for equal amounts, does not evidence the fair value of the transaction.  If the fair value of the advertising surrendered in the barter transaction is not determinable within the limits of the Issue, the barter transaction should be recorded based on the carrying amount of the advertising surrendered, which likely will be zero.

> *    *    *

> 8.    Entities should disclose the amount of revenue and expense recognized from advertising barter transactions for each income statement period presented.  In addition, if an entity engages in advertising barter transactions for which the fair value is not determinable within the limits of this Issue, information regarding the volume and type of advertising surrendered and received (such as the number of

equivalent pages, the number of minutes, or the overall percentage of advertising volume) should be disclosed for each income statement period presented.

214.    Contrary to GAAP, AOL recorded hundreds of millions, if not billions, of dollars of advertising revenues through reciprocal transactions which did not reflect the fair value of the advertising provided, but which were entered into solely to create a pretext for AOL to report revenue.  AOL engaged in these manipulative transactions with many entities.  These transactions included:

(a)    **_Homestore.com_**.  Homestore.com was an Internet-based provider of residential real estate listings, as well as related content on its Web site.  In 00-01, AOL engaged in at least 16 round trip transactions with Homestore.com in which Homestore.com would purchase services from various Internet companies which would in turn purchase advertising from AOL which would then purchase advertising from Homestore.com.  AOL did not really need the advertising on Homestore.com's site, but used these transactions to generate revenues.  These transactions were a sham.  Homestore.com and AOL entered into round trip transactions with GlobeXplorer, Inc. (4thQ 00 and 1stQ 01); WizShop.com, Inc. (4thQ 00 and 1stQ 01); PurchasePro.com, Inc. (1stQ 01); Classmates Online, Inc. (1stQ and 2ndQ 01); and Investor Plus (2ndQ 01).  Each of these companies had products which were of minimal value, but they were willing to enter into these transactions in return for the kickback.

(i)    The concept for the sham Homestore.com transactions was devised by defendant Keller, and approved by at least the person at AOLTW to whom he directly reported, defendant Colburn.  The sham deals were designed to work to the mutual benefit of Homestore.com and AOLTW so that they could both report bogus advertising revenue.  AOLTW held 3.9 million shares of Homestore.com stock, and therefore benefited twice from the sham deals when both it and Homestore.com reported artificially inflated advertising revenue.

(ii)        The Homestore.com deals had three phases.   In phase l, Homestore.com paid a third-party for services and products that Homestore.com did not need, and for which it in fact, overpaid.  In phase 2, Homestore.com required the third parties to purchase advertising from AOLTW with most or all of the money Homestore.com paid to the third parties.  In phase 3, AOLTW purchased advertising from Homestore.com in the same amount that the third-party paid to AOLTW for advertising.  Accordingly, AOLTW and Homestore.com were paying themselves for the advertising revenue they reported from these sham transactions.

(iii)        The Company improperly reported advertising revenue from these phony deals.   The transactions were shams agreed to with Homestore.com in order to report advertising revenue that neither party "earned" as required by FASB Statement of Concepts ("Concepts") No. 5.  In addition, the fraudulent transactions were not "representationally faithful" as required by Concepts No. 2.

(b)        *Veritas*.  Veritas Software entered into at least one agreement for $50 million with AOL in 9/00.  AOL agreed to buy $50 million in software from Veritas in exchange for Veritas agreeing to buy $20 million in advertising from AOL.  The $20 million effectively equaled Veritas's profit margin on the sale of software and was essentially a bribe to Veritas to buy advertising from AOL.  AOL overstated its advertising revenue by $20 million in violation of Accounting Principles Board Opinion ("APB") No. 29.  The Veritas deal came about after AOL's Business Affairs unit raised a "hue and cry" when it heard that AOL's network operations unit was planning to make a $30 million purchase from Veritas without getting something in return.  Veritas said it did not want to advertise on AOL and was not going to spend any money to do so.  Consequently, defendant Colburn and a Business Affairs Director, Jeffrey Tyeryar, instructed the AOL network operations unit to raise the contract amount to $50 million and structured a second deal in which Veritas would spend the extra $20 million it had received for its software on AOL advertising.  Business Affairs

wanted the $20 million from Veritas so that it could be booked as revenue before the end of the last quarter of calendar year 00, the last quarter before the Merger.

(i)     AOL used a second contract for the advertising component in an attempt to make it appear that the two contracts were unrelated.  AOL recorded $20 million in advertising revenue when, in fact, AOL was just getting back the $20 million it had overpaid for the Veritas equipment and software.  Veritas agreed to the contract only because it was anxious to book revenue from the AOL software sale before the end of 00.

(ii)     In 02, Veritas subsequently disclosed that, in connection with the SEC's investigation of AOL's accounting, the SEC had subpoenaed Veritas's records relating to transactions it entered into with AOL in 9/00.  On 1/17/03, Veritas announced that, as a result of the SEC's investigation, it was restating its financial results for fiscal years 00 and 01, eliminating $20 million in revenue previously booked as licensing and support fees paid by AOL.  Further, the Company announced that it would no longer record as an expense the $20 million it paid AOL for advertising.

(iii)     Later in 3/03, Veritas disclosed in its amended Form 10-K, that the restatement resulting from the AOL deal was based on a determination that the fair value of the goods and services purchased and sold in the deal could not be "reasonably determined."  In addition, Veritas disclosed that it was further restating its financials based on "two additional contemporaneous transactions involving software licenses and the purchase of on-line advertising services" to reflect additional reductions in revenue.  Veritas's auditor at the time of these transactions, defendant Ernst & Young, was replaced following the audit of the Company's year 00 financial statements.

(iv)        Veritas has restated its financial statements due to the improper accounting for this reciprocal transaction.  AOL's accounting was at least as egregious as Veritas's. *The Washington Post* described the Veritas/AOL transaction as follows:

> In some deals with Northern Virginia-based AOL, Veritas and other companies improperly inflated revenue by exchanging significant amounts of cash that were considerably above the actual value of products sold, sources familiar with the matter said.  "The fair value of the goods and services purchased and sold in the AOL transactions could not be reasonably determined," Veritas told the SEC [on 3/17/03].

(c)        ***Kinkos***.  In 00, AOL began investing in Kinkos, eventually owning 11.5% of Kinkos.  Kinkos in turn purchased advertising on AOL, effectively returning AOL's investment.  Yet AOL recognized the advertising as revenue in 01.  This was a return of investment and was not indicative of the strength of AOL's advertising.

(d)        ***Gateway***.  In 10/99, AOL entered into an agreement with Gateway, Inc. to cross-market each others' services.  When someone purchased a Gateway computer they would receive 12 months free AOL service.  Gateway was paid a fee for each AOL subscription and AOL was paid a fee for advertising services.  AOL also invested $800 million in Gateway.  As Gateway paid AOL for advertising, AOL then booked the amount as revenue, not offsetting the amount by the payments and its investment in Gateway.  Gateway has since restated its results to offset the $500 million in revenue it recorded from AOL in 00 and 01 by roughly the same amount it paid to AOL during the same time period, in violation of APB No. 29.

(i)        On 4/1/03, Gateway announced that it was restating its prior financial statements to reduce reported revenue from its agreement with AOL in response to accounting concerns raised by the SEC, which had been investigating Gateway.  As a 4/2/03 *Washington Post* article noted:

> In 2000 and 2001, Gateway's method of reporting its dealings with America Online artificially boosted revenue because it failed to deduct the payments it made to AOL from the revenue it received.  Because money was moving back and forth

between the companies, Gateway said it intends to restate its financial results by reducing its revenue, a change that will more appropriately reflect the net amount of cash it received.

"The revision is related to how the company accounted for bundled AOL Internet services, which it previously had reported on a gross basis," Gateway said in a statement.

\*    \*    \*

Gateway said the reduction of revenue on its books from restating deals with America Online would be about $340 million, or 3.5 percent of revenue, in 2000, and $130 million, or 2.2 percent of revenue, in 2001.

(ii)    AOL and AOL Time Warner's improper accounting for the Gateway Internet deal resulted in an overstatement of advertising revenue divided on a quarterly basis of approximately $85 million per quarter beginning at the latest in 1stQ 00 through the quarter ended 12/31/00, and $130 million for the quarter ended 3/31/01. AOL also misreported the round-trip/barter transaction involving the purchase of stock in a round-trip deal originally entered into with Gateway beginning in 10/99.

(iii)    AOL's intention in the transaction was not to invest in Gateway but to generate revenues. AOL invested approximately $800 million in Gateway, acquiring a 4.5% stake in the company in Gateway stock and warrants. In return, Gateway was to use the entire $800 million it received from AOL for advertising and other AOL services. The deal was, in fact, a round-trip/barter transaction in which AOL, through improper accounting, overstated advertising revenue.

(iv)    Similar to the Homestore.com transaction described above, AOL failed to use the underlying instrument (stock), as opposed to the money exchanged, as a basis for valuing the amount of advertising revenue to be recognized in the deal. In 12/01, AOL invested $200 million in a class of stock (50,000 shares of non-voting Series A convertible preferred stock) held only by AOL. The Gateway stock was thus restricted and would not convert until 02 and beyond depending on the trading prices on those dates. Consequently, proper valuation of the stock was

critical to AOL's recognition of advertising revenue in the Gateway deal. APB No. 29, *Accounting for Nonmonetary Transactions*, requires that a fair market value calculation be applied upon issuance of the stock and that the advertising revenue reported by AOL be consistent with the value. AOL did not do so, thus violating GAAP, as set forth in APB No. 29, which required that the transaction be valued at the fair value of the instruments exchanged. By failing to properly value the Gateway stock, AOL and AOLTW overstated advertising revenue by at least $3 million in 4thQ 01 and $18 million in 1stQ 02 and 2ndQ 02.

        (e)     ***Bertelsmann AG***.

        (i)     ***Goldman Sachs' 1% Solution***:  In reviewing the Merger, the European Commission ("EC") was concerned that it would harm competition in Europe's media market since AOL was a 50-50 partner with Bertelsmann AG in AOL Europe. In 10/00, the EC ordered Bertelsmann to give up control of AOL Europe. AOL was the logical buyer, but with the Merger only three months away, AOL did not want to own more than 50%, since going above half ownership would trigger the presumption of consolidation for majority-owned subsidiaries (under Accounting Research Bulletin ("ARB") No. 51), which would force AOL to consolidate the mounting losses of AOL Europe onto its books. To solve this problem, AOL resorted to a "share-parking" arrangement in which Goldman Sachs Group Inc., a Wall Street bank, agreed to step in and "purchase" 1% of AOL Europe – half a percent from each parent – for $215 million. This was not a true purchase as AOL Europe had secretly agreed to a "put" guaranteeing that Goldman could sell back the 1% on a specified date at a healthy profit. After the Merger, in 3/02, Goldman did just that, receiving $255 million for its 1% of AOL Europe – a $40 million (or 15%) profit. AOL's secret share-parking arrangement with Goldman was never disclosed and it allowed AOL to conceal at least $200 million in losses that it was required to recognize in 00. Of course, had AOL recognized

such a loss in 00, when it was required to do so, the Merger would not have been completed on the previously agreed upon terms.

(ii)      ***AOL's Purchase of AOL Europe***:  In 3/00, Bertelsmann and AOL entered an agreement giving Bertelsmann the right to "put" its interest in AOL Europe to AOL, at a specified price, in either cash or stock at AOL's option.  As part of a negotiation in 3/01, Bertelsmann sought to have the payment in cash.  AOL agreed to pay in cash provided Bertelsmann increased its advertising from AOL.  The put price was not changed, but Bertelsmann had to purchase an additional $400 million in advertising from AOL.  These revenues were essentially reciprocal transactions which had more to do with AOL's agreement to pay cash than with its advertising services and should have been recognized as a reduction in the price of the interest in AOL Europe, rather than as revenues.  AOL's 02 Form 10-K stated the following with respect to these advertising revenues:

> These two Bertelsmann transactions are collectively the largest multi-element advertising transactions entered into by America Online during the period under review.

> Although the advertisements purchased by Bertelsmann in these transactions were in fact run, the SEC staff has expressed to the Company its preliminary view that at least some portion of the revenue recognized by the Company for that advertising should have been treated as a reduction in the purchase price paid by the Company to Bertelsmann rather than as advertising revenue.

> *      *      *

> It is not yet possible to predict the outcome of these investigations, but it is possible that further restatement of the Company's financial statements may be necessary.

Later, the Company admitted that is accounting for AOL Europe had indeed been wrong and restated its results to reflect the error.  The Company's 11/3/04 earnings release stated:

> The Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") continue to conduct investigations into accounting and disclosure practices of the Company.  These investigations have focused on transactions principally involving the Company's America Online segment that were entered into after July 1, 1999, including advertising arrangements, the methods used by the

America Online segment to report its subscriber numbers and the accounting related to America Online's interest in AOL Europe prior to January 2002.

\* \* \*

In connection with its continuing review of these issues related to AOL Europe, including discussions with the staff of the SEC, the Company has determined that the financial results of AOL Europe should have been consolidated, beginning in March 2000, upon execution of the Put/Call Agreement given the governance rights surrendered by Bertelsmann. Accordingly, for this reason, the Company's consolidated financial results for the years ended December 31, 2000 and 2001 will be restated.

The restatement of AOL's 00 results reduced operating income by $306 million.

(f)    **Sun Microsystems**. AOL bartered advertising with Sun in exchange for $500 million in equipment. Sun purportedly purchased $350 million in advertising from AOL in exchange for the equipment transaction. AOL recognized the advertising revenue beginning in 99 and continued to recognize it into at least 01. This equipment deal was essentially an installment sale as AOL purchased equipment in 99 and then sold advertising over a three-year period. The fact that this was a manipulative transaction is shown by the fact that AOL did not receive the customary discount for the size of order it made from Sun, which was readily available to any Sun commercial customer. This was so that Sun would have enough profit to "buy" the advertising from AOL using AOL's own funds.

(i)    The Sun transaction was announced on 11/24/98. A subsequent 9/1/02 *New York Times* article entitled, "Ouster at AOL, but Where Does Trail End?" reported that AOL agreed to buy $500 million in computer equipment from Sun at list price, even though companies like AOL typically buy at a discount of more than 30%. For its part, Sun agreed to pay AOL $350 million for advertising services. Sun also agreed to pay AOL more than $310 million per year as part of a three-year partnership called "Iplanet," which payments AOL treated as recurring revenue. Through this partnership, AOL was in effect recovering some of its own expenditures in order to artificially increase its own advertising revenue and overstate income as a result. Furthermore, AOL

and Sun would not have entered into the transaction without the reciprocal purchases. Pursuant to GAAP, including APB No. 29, revenue resulting from the deal should have been reported net of the overpayment rather than on a gross basis.

(ii)    At a minimum, AOL's overpayment for Sun's computer equipment, based on the equipment's fair market value, should have been recorded as a reduction of AOL's advertising revenue resulting from the round-trip transaction. Instead, AOL recorded the transaction based on an inflated list purchase price for the computer equipment, resulting in at least a 30%, or $150 million, overstatement of advertising revenue from 98 to 4thQ 01.

(g)    ***Oxygen Media***. In 4/01, Oxygen and AOL entered into a three-year agreement in which AOL invested $30-$50 million in Oxygen and agreed to carry the network on Time Warner Cable Systems. Oxygen simultaneously agreed to spend $100 million advertising on AOLTW properties. AOLTW recognized this revenue from 2ndQ 01 to 2ndQ 02. As *Agence France Presse* reported:

US regulators are investigating a pact between AOL Time Warner and Oxygen Media over suspected double-booking of revenue by AOL, the Wall Street Journal said Monday.

The Securities and Exchange Commission (SEC) was probing a complicated deal signed in April last year, under which the women-centered Oxygen cable channel was carried on Time Warner Cable's networks, it said. . . .

It quoted people familiar with the situation as saying AOL was suspected of engineering the deal in such a way that the advertising revenue was booked both at America Online and at Time Warner Cable.

*        *        *

It could raise new questions about the hundreds of millions of dollars in advertising sales made between divisions of AOL Time Warner that had boosted divisional results since the merger of America Online and Time Warner at the beginning of 2001, it said.

(i)    On August 26, 2002, *The Wall Street Journal* described the nature of this transaction. The article entitled, "Officials Probe AOL's Actions With Partners," reported that:

For America Online, investing in companies that then advertised on the Internet service was about as crucial to its growth as taking in oxygen. Literally.

Last year, AOL invested $30 million to $50 million in Oxygen Media Inc. and arranged for the women-focused cable channel to be carried on parent AOL Time Warner Inc.'s cable systems. At the time, Oxygen agreed to buy about $100 million in ads that mostly ran on America Online – a hefty amount for a start-up medial company.

The Oxygen trades were one of the many complex deals that were a way of life at the America Online unit – and many other technology companies – during the boom years. At AOL, these deals sometimes included an investment. Other times, AOL squeezed its suppliers for advertising revenue. Either way, the deals weren't much of a secret – AOL was proud of its ingenuity in crafting the arrangements and expected AOL partner companies to buy ads on AOL.

"If we're one of their big customers, we expect them to be one of our big customers," Robert Pittman, the since-departed chief operating officer, said in an interview last year.

(ii)    The Oxygen deal was unusual for not including a launch fee to AOL (commonly paid in the cable industry). Instead of paying the AOLTW launch fee, which could have been as much as $100 million, Oxygen was required to purchase advertising, principally from the Company's AOL division. To compensate Time Warner's cable division for not receiving revenue from Oxygen in the form of a launch fee, the AOL division bought advertising on Time Warner cable. According to a *Wall Street Journal* report on 10/7/02 entitled, "SEC Probes AOL-Oxygen Pact for Double-Booking of Revenue," defendant Pace, AOLTW's Chief Financial Officer, told a group of investors that the SEC inquiries into AOL's accounting included AOL's involvement with other AOLTW divisions and singled out the Oxygen deal as an example. By failing to properly account for its round-trip deal with Oxygen, AOLTW overstated AOL advertising revenue by at least $100 million from 2ndQ 01 to 2ndQ 02.

(h)    ***Hughes***. In 6/99, AOL made an investment in Hughes, a General Motors ("GM") equity security, of more than $1.5 billion. In return, Hughes became one of AOL's largest customers for advertising. Despite the fact that the money for advertising services was coming from AOL's investee, AOL recognized the money as revenue. This revenue was in substance a return of

- 154 -

investment and not legitimate advertising revenue. The overstated value of stock received resulted in artificially inflated advertising revenue by nearly $50 million beginning in 99 and continuing through 01.

        (i)        The 6/99 Hughes transaction expanded upon a prior agreement from 5/99 to jointly develop a combination set-top box that would make DirecTV and AOL TV available to customers. Under the expanded alliance, AOL invested $1.5 billion in GM Series H 6.25% automatically Convertible Preferred Stock. GM immediately invested the $1.5 billion received from AOL in the stock of its subsidiary, Hughes. In return, Hughes committed to increase its sales and marketing expenditures to AOL over the next three years by approximately $1.5 billion.

        (ii)        In fact, the bartered services (online advertising) were overstated in violation of GAAP, particularly APB No. 29, since AOL did not properly value the barter instrument (stock) exchanged for them. More specifically, while AOL entered into the round-trip/barter deal under the guise of making an investment, the underlying instrument, not the money to be exchanged, should have been the basis for valuing the advertising.

        (iii)        Despite the amounts of money swapped (*i.e.*, $1.5 billion from AOL for GM Series H preferred stock in exchange for Hughes' commitment to purchase $1.5 billion in advertising from AOL), the underlying round-trip/barter deal was essentially an exchange of GM Series H preferred stock for AOL advertising services. AOL's recognition of advertising revenue at the full purported value of the stock violated GAAP. Since the stock was not publicly traded, but was a class of stock created only for AOL and was not yet convertible three years later, the value of the stock at the time of the transaction was not $1.5 billion, and thus the associated AOL advertising services recorded based on that inflated amount over the period of the deal was improper. Though the preferred stock tracked Hughes' common stock (GM Series H common stock), the stock's nonconvertibility status meant the security would have to be discounted. AOL's and AOLTW's

advertising revenue was overstated by approximately $16 million for the quarter ended 6/99, by $48 million in the quarters ended 9/20/99, 12/31/99 and 3/31/00.

(iv)    In its 01 Form 10-K filed on 3/25/02, AOLTW recorded a charge of "approximately $270 million to reflect an other-than-temporary decline in the carrying value of AOL Time Warner's investment in Hughes Electronics Corp."  In its 9/30/02 Form 10-Q, the Company reported:

> Included in the noncash pretax charges for three and nine month periods ended September 30, 2002 are charges related to the writedown of AOL Time Warner's investments in . . . Hughes Electronics Corp. ("Hughes") of $505 million for both the three and nine-month periods . . . .

(v)    Then, in 1/03, AOLTW sold its 8.4% stake (80 million shares) in Hughes for approximately $800 million, some $700 million less then the amount AOL had originally recorded.  According to Hughes' 3/3/03 Form 8-K, Hughes and AOL have entered into an agreement terminating their entire strategic alliance.  Under the termination, Hughes was released from its commitment to spend $1 billion in additional development and promotion efforts to support the companies' joint services.

(i)    *Qwest*.  In 7/01, Qwest and AOLTW entered into a reciprocal transaction in which Qwest purchased advertising on AOL in exchange for AOL agreeing to purchase several services from Qwest, including digital subscriber lines and network capacity.  In a related round-trip transaction, AOL agreed to buy network capacity in Europe from KPNQwest, a Qwest affiliate, in return for which Qwest agreed to purchase AOL advertising.

(i)    AOLTW violated GAAP by failing to account for the transaction based on the fair market value of the underlying instruments, either the network services or the advertising services, whichever was more reasonably and readily determinable.  Thus, the reciprocal transactions were used by AOL as a vehicle to improperly recognize millions of dollars of advertising revenue in violation of APB No. 29.

(ii)      On 8/23/02, *The New York Times* reported that another of the three deals being examined by AOL Time Warner in connection with the Company's initial report of $49 million in improperly reported revenue was the swap deal between the Company and Qwest.

(iii)      Numerous swap transactions were done between Qwest and AOL that were made at vastly inflated values.  In the 7/01 transaction, for instance, the capacity AOL was buying was not worth the notional price AOL paid,  but AOL entered into the agreement to generate the advertising revenue.

(j)      **WorldCom**.  Beginning in 98, WorldCom Inc. ("WorldCom") and AOL entered into a "multi-year, multi-million dollar agreement" pursuant to which AOL paid at least $900 million dollars a year to WorldCom to carry the bulk of its Internet traffic, and AOL became WorldCom's largest customer.  In 7/01, WorldCom and AOLTW struck a massive round-trip/barter deal in which WorldCom agreed to buy more $200 million in advertising from AOLTW in exchange for AOLTW keeping its network traffic on WorldCom's network.  While not disclosed in the press releases announcing the deal, AOLTW also agreed to buy Internet capacity from UUNet, a unit of WorldCom, to expand AOLTW's online network.  The reciprocal transactions were used by AOLTW as a vehicle to improperly recognize advertising revenue of at least tens of millions of dollars.

(i)      As *The Wall Street Journal* subsequently report in an 8/23/02 article entitled, "Questionable AOL Revenue Has WorldCom Link," there was a close relationship between the two companies (Case was on WorldCom's Board of Directors and AOL was WorldCom's largest customer) and, according to the SEC's investigation of AOLTW, a substantial portion of the $49 million of overstated advertising revenue initially reported by the Company involved WorldCom:

> The money stemmed from the particularly close relationship America Online and WorldCom developed during the past few years, in which AOL became WorldCom's biggest customer, paying the telecommunications firm at least $900 million a year to carry the bulk of its Internet traffic.  Most recently, in July 2001, the

two companies struck a massive deal in which WorldCom agreed to buy more than $200 million in advertising across AOL properties in exchange for AOL continuing to keep its network traffic on WorldCom's network.

People close to the situation said the latest deal was negotiated in part by David Colburn, a top AOL deal maker who was ousted two weeks ago, and Scott Sullivan, WorldCom's former chief financial officer, who has been charged with securities fraud after the company, now in bankruptcy-court proceedings, found a total of $7.2 billion in improper accounting.

(ii)    AOL Time Warner subsequently admitted improperly recorded $49 million in revenue occurred from 12/31/00 to 3/31/02.

(k)    *Compaq*.  In 01, AOL entered into a barter transaction with Compaq pursuant to which Compaq agreed to purchase advertising in exchange for AOL agreeing to purchase millions of dollars in equipment.

(l)    *Foundry Networks*.  In a similar transaction, Foundry Networks agreed to purchase advertising from AOL only because AOL agreed to buy equipment from Foundry.

(m)    *New Power Company*.  In 99, AOL entered into an advertising agreement with New Power Company.  A key part of the agreement was that AOL could not promote offers of electricity or natural gas for any other providers to residential customers.  Thus, New Power was not so much buying advertising as preventing AOL from promoting competitors.  The agreement provided AOL the right to receive 258,060 shares of New Power stock for every 100,000 customers that signed up with New Power through AOL.  After the Merger with Time Warner, AOLTW restructured the agreement to require New Power to advertise on Time Warner Cable.  AOL recognized some $18.7 million in revenue through this contract, which ended in 11/01 due to the lack of marketing leads generated by AOL.

(n)    *Nortel Networks*.  The Nortel deal was another advertising for equipment swap under which AOL purchased equipment not so much for the equipment as to inflate advertising revenues.  As *The New York Times* wrote on 10/14/02:

[A]t least $500 million of the AOL division's roughly $3 billion in advertising, marketing and other non-subscription revenue between June 2000 and July 2001 represented money received for something else – such as the sale of a business or the resolution of a legal dispute – and thus did not reflect sustainable demand for its services.

(o)    ***PurchasePro.com***.  More than $20 million of AOL's advertising revenue in 00 came from renegotiating the value of warrants to buy stock in another struggling business partner, PurchasePro.com.  As *The New York Times* reported on 8/12/02:

AOL formed its partnership with PurchasePro in March 2000.  It was another intricate two-way street: AOL first paid PurchasePro about $9 million and the two companies agreed to form a joint Web site that would share advertising and sales revenue.  PurchasePro paid AOL warrants to buy about 5.7 percent of PurchasePro stock, with certain future guarantees, so AOL was both paying and receiving money.  As usual, AOL recorded the value of the warrants as revenue and carried them on its books as investments.  PurchasePro even trained some AOL sales executives to sell its products and services, with AOL paying commissions to PurchasePro.

In January 2001, as America Online completed its acquisition of Time Warner, the two companies added another wrinkle.  PurchasePro agreed to buy an additional $5 million in advertisements in AOL Time Warner magazines and television networks.  And as part of that agreement, PurchasePro agreed to promote AOL in its advertisements.

By May, the two companies' joint venture had announced deals with Travelocity.com, another company in which AOL held a stake, and the jobs listing site Monster.com, as well as Homestore, among others.

The same month, PurchasePro's founder, Charles E. Johnson, announced plans to begin selling his 20 percent stake in the company, and by June he was forced to resign by the board amid accusations of improper accounting, a PurchasePro executive said.  One person involved in the subsequent S.E.C. inquiry said that at least a small part of the investigation involved revenue reported from PurchasePro's joint venture with AOL.

In September 2001, the companies finally ended their relationship.  AOL Time Warner put Eric Keller, an executive involved in negotiating the deal, on leave, and he later resigned.  AOL agreed to let PurchasePro drop a commitment to pay it $20 million in guarantees and also let PurchasePro keep $1.5 million in prepaid advertisements.

As the *Los Angeles Times* reported:

In one transaction, AOL reportedly paid $9.5 million for $30 million in PurchasePro stock warrants, then booked the $20.5-million difference as advertising and commerce revenue.

On 2/5/03, The Wall Street Journal reported:

> In an indication that federal authorities are expanding their criminal investigation of AOL Time Warner Inc.'s America Online unit, the Federal Bureau of Investigation has sought to question several former PurchasePro.com Inc. officers in the past few weeks.
>
> The FBI has contacted the former PurchasePro executives to schedule interviews but hasn't told them the nature of its inquiry. People familiar with the situation said the Department of Justice and the Securities and Exchange Commission are focusing on America Online and some of its former executives, including Eric Keller and David Colburn.
>
> These people said the investigation, which was launched last summer, is continuing and prosecutors are expected to decide whether to bring charges later this year. Simultaneously, federal prosecutors in Los Angeles are probing America Online's relationship with Homestore Inc. Several former Homestore officials have pleaded guilty to fraud and are cooperating with prosecutors.
>
> AOL declined to comment.

(p)    ***MovieFone***. In 99, AOL purchased MovieFone, Inc. MovieFone had a pre-existing arbitration award of $22.8 million plus interest from Wembley PLC. AOL decided not to try to collect the money but instead, in 9/00, offered Wembley a chance to buy advertising for $23.8 million, some $3 million less than the award plus interest. Then, even before Wembley had agreed to the offer, in order to make 3rdQ 00 numbers, AOL lifted artwork from Wembley's 24 dogs.com Web site and put it on AOL's site so as to book the revenue.

(q)    ***TicketMaster***. AOL also converted a $13 million legal dispute with TicketMaster into revenue in the 3rdQ 00.

(r)    ***The Golf Channel***. In 6/01, the Golf Channel agreed to pay AOLTW $200 million for advertising over five years in order to have its programming shown on Time Warner Cable. The AOL online advertising unit needed revenue and demanded a piece of the deal. According to *Stealing Time*:

> ***Can we recognize some of those carriage fees?*** the AOL official asked. It was a polite way of asking if Time Warner Cable would divert some of the $200 million to AOl in the form of ad revenue.

*Let me think about it*, the Time Warner Cable official responded.

Although both worked for the same parent company, they still viewed each other as representing two separate businesses with financial interests that did not necessarily coincide. "It's an internal negotiation over the balance sheet," an AOL official said.

The negotiation worked its way up the company chain of command, and, in the end, the two sides found a mutually agreeable solution. AOL agreed to promote Time Warner Cable on-line and through telemarketing to help drive new cable subscribers. In return, Time Warner told the Golf Channel to spend about $15 million of the total transaction cost to purchase advertising from AOL's on-line unit. The Golf Channel had few options if it wanted to be carried on Time Warner Cable. The sports channel confirmed that it agreed to buy the on-line ads because it wanted the cable deal. "We told them where and when" the ads ran, said an AOL official familiar with the deal. "They didn't have a choice."

The Golf Channel would not have agreed to spend money on online advertising in the absence of the *requirement* that it do so as part of a larger advertising "package," thus AOLTW overstated AOL's advertising revenue by $15 million for the quarter ended 9/30/01.

(s)     *eBay*.  AOL also manipulated its advertising revenue through advertising it sold on behalf of eBay in 00-01, which AOL recorded as its own revenue.  AOL served as an advertising broker for eBay selling ads.

(i)     However, AOL did not simply record the customary commission of an ad rep.  AOL counted all of the eBay revenue as if it were AOL's own.  In this way, AOL booked $80 million in 00 and 01 and $15 million in the 1stQ 02, the gross amounts from selling eBay's ads, as revenues.  With this accounting, AOL was able to report a larger amount of advertising  and commerce revenue.

(ii)     According to Alec Klein's book *Stealing Time*:

In the summer of 2001, AOL deal makers boarded the company jet for the San Jose, California, headquarters of [eBay] . . . and returned a day later with a transaction that would help AOL meet is financial targets.  AOL revised a deal in which it agreed to serve as an ad broker, selling eBay's on-line ad space, according to AOL's confidential executive summary of the deal.  But AOL did not simply take the customary ad rep's commission.  Instead, AOL counted all of the eBay advertising revenue as if it were AOL's own.  "AOL recognizes all revenue generated from eBay inventory sales on a topline basis."  AOL said in its internal documents.  In this way,

- 161 -

AOL booked $80 million in revenue in 2000 and 2001, the gross amounts from
selling eBay's ads. The gross sales didn't change AOL's net income, because AOL
counted the payments it forwarded to eBay – minus its brokers' fee – as an expense
elsewhere on its books. But with this accounting, AOL was able to report a larger
amount of ad and commerce revenue.

(iii)        Under GAAP, it was inappropriate for AOL to book eBay's ad sales as

AOL's own ad revenue because AOL assumed no financial risk in the transaction. *See* EITF 99-19;

SEC Staff Accounting Bulletin ("SAB") No. 101. AOL carried no risk of financial penalty if it did

not sell eBay's ads. SAB No. 101 states in part:

In assessing whether revenue should be reported gross with separate display of cost
of sales to arrive at gross profit or on a net basis, the [SEC] staff considers whether
the registrant:

1.        acts as principal in the transaction,

2.        takes title to the products,

3.        has risks and rewards of ownership, such as the risk of loss for
collection, delivery, or returns, and

4.        acts as an agent or broker (including performing services, in
substance, as an agent or broker) with compensation on a commission
or fee basis.

If the company performs as an agent or broker without assuming the risks and
rewards of ownership of the goods, sales should be reported on a net basis.

(iv)        GAAP, specifically EITF 99-19, requires that revenue earned by an

agent (as opposed to the principal) should be reported in its net amount, meaning the commission

earned by AOL, rather than eBay's total advertising revenue. As reported in the 7/18/02 *Washington*

*Post*, however, AOL "sold ads on behalf of online auction giant eBay, Inc., booking the sale of

eBay's ads as AOL's own revenue. . . . AOL did not buy eBay's advertising inventory. . . . AOL

carried no financial penalty if it did not sell eBay's ads . . . . AOL would not explain how it shared

that risk." All of these terms and conditions indicate that AOL operated as an agent, not principal.

Commenting on the deal in the *Washington Post*, "Michael Sutton, the SEC's chief accountant from

1994 to 1998, said, 'This sounds more like an agency relationship than a principal relationship.' An agent should book a commission, he said, not the gross sale, as AOL did."

        (v)      AOL also improperly billed eBay due to the Company's double counting of impressions. Impressions are made when a Web user clicks on a link which takes the user to a page where the advertisement is located. AOL's counting tool was not working properly and was double counting impressions for eBay such that it overbilled eBay. AOL eventually had to cut a check and send it to eBay as a refund when the double counting was discovered.

        (t)      ***Monster.com***. AOL improperly accounted for another "in kind" advertising deal entered into with Monster.com in late 99, used by AOL to overstate advertising revenue by over $29 million through 02. The transaction was essentially an exchanging of advertising by AOL and Monster.com.

        (i)      Because AOL exchanged or swapped its advertising services for the Monster.com advertising, AOL should have recognized the advertising revenue in accordance with the requirements set forth in APB No. 29. APB No. 29, ¶18, states that the fair market value of the asset (advertising services) should be used to value of the transaction. AOL overstated its revenue by grossly inflating the value of advertising provided and received. The transaction was a sham and no revenue should have been reported. By failing to comply with APB No. 29 and EITF 99-17, AOL and AOLTW overstated advertising revenue by at least $29 million beginning in the quarter ended 12/31/99.

        (u)      ***Dr.Koop.com***. AOL also used termination fees to create revenue. One such termination fee improperly recorded as advertising revenue by AOL was a $9.6 million termination fee paid by Dr.Koop.com ("Dr.Koop") when it cancelled its contract with AOL. Dr.Koop had entered into an $89 million four-year deal with AOL in 7/99. In 4/00 the deal failed and the AOL-Dr.Koop agreement was amended. In exchange for 3.5 million shares of Dr.Koop common stock,

Dr.Koop was, in turn, relieved of any further cash payment obligations to AOL and all existing warrants were cancelled. The value of the shares given to AOL to terminate the deal was placed at approximately $9.6 million. AOL and AOLTW violated GAAP by improperly recording the fees (shares) as advertising revenue from ongoing operations, rather than gains. AOL and AOLTW violated Concept No. 5, which requires that revenue be earned through major ongoing operations. The termination or renegotiation fees did not result from the central operations of the Company. Consequently, AOL overstated advertising revenue by at least $9.6 million by failing to properly treat contract cancellation fees as gains. The improperly reported Dr.Koop advertising revenue was reported for the quarter ended 6/30/00.

**Improper Classification of Revenues from Reciprocal Transactions**

215.    AOL has also admitted that due to the way it classified revenues in 99 and 00, it was necessary when SAB No. 101 was released to restate its 99 and 00 revenues by $29 million and $161 million, respectively. Costs were likewise reduced by the same amounts. SAB No. 101 was not intended to change existing GAAP. The amended 01 Form 10-K stated:

> In the fourth quarter of 2000, the Company adopted Securities and Exchange Commission ("SEC") Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" ("SAB 101"). SAB 101 clarifies certain existing accounting principles for the timing of revenue recognition and the classification of revenues in financial statements. While the Company's existing revenue recognition policies were consistent with the provisions of SAB 101, the new rules resulted in changes as to how revenues from certain transactions are classified. As a result of applying the provisions of SAB 101, the Company's revenues and costs were reduced by an equal amount of $161 million for 2000 and $29 million for 1999.

**AOL's Falsification of Its Subscriber Metrics**

216.    During 99-02, AOL continually stressed the number of its subscribers. Note the following chart showing the reported growth in the number of subscribers to AOL:



In fact, the number of subscribers was materially overstated due to the following concealed factors:

(a)    As AOLTW later admitted in the 4thQ 02 earnings conference call on 1/29/03, the subscriber number included millions of free-trial customers who had not agreed to pay for AOL's service. These so-called "subscribers" constituted 10% of AOL's total subscribers.

(b)    Many of AOL's subscribers were not part of the Company's unlimited usage higher priced plan but were in lower priced plans. These subscribers also constituted some 10% of the total "subscriber" number disseminated by AOLTW.

(c)    AOL's aggressive selling techniques led to customer accounts being created which did not reflect subscribers using AOL's service. In 98, 99 and 00, AOL was forced to get more and more aggressive in counting customers. AOL's Member Services department would have 15 to 30 employees in a conference room with telephones and personal computers cold-calling people eight hours a day. They would say "AOL has created an account for you for six months. If

- 165 -

you choose to cancel after the end of the six months, please send an email." AOL would then count this person as a subscriber.

(d)    AOL would obtain credit cards for people based on information obtained from AOL partners. Using these credit cards, AOL would create accounts.

(e)    AOL employees were frequently instructed to "batch create" subscriber membership accounts for anticipated mass deals with big companies like Target, Wal-Mart, General Motors, Daimler Chrysler and Mercedes Benz. AOL would create and count the subscribers under these deals even before the deal had been closed. In one instance at the end of 6/01, an employee was instructed to batch create some 65,000 accounts for a supposed deal with Wal-Mart. Within six weeks of quarter end, AOL had canceled all of these accounts. Yet the accounts were included in membership numbers at quarter end.

(f)    When paying customers would request cancellation of service, AOL would offer them six free months of service and continue to count them as subscribers.

(g)    AOL also counted non-paying employee accounts as subscribers and even counted screen names as subscribers even though each account could have up to six screen names.

(h)    The number of AOL subscribers has continued to decline since 02:

| | |
|---|---|
| 3/31/03 | 34.4 million |
| 6/30/03 | 31.5 million |
| 9/30/03 | 31.0 million |
| 12/31/03 | 30.7 million |
| 3/31/04 | 30.4 million |
| 6/30/04 | 29.7 million |
| 9/30/04 | 29.0 million |
| 12/31/04 | 28.5 million |
| 3/31/05 | 28.0 million |
| 6/30/05 | 27.0 million |
| 12/3/05 | 26.2 million |

(i)    Much of this decline is the result of AOLTW removing non-paying customers from its subscriber numbers. For example, in the Company's 7/23/03 earnings release, the Company

- 166 -

attributed 45% of the quarterly sequential decline of 864,000 in members to the "identification and removal from the subscriber base of non-paying members, consisting principally of those with service violations and members failing to appropriately complete the registration and payment authorization process."

**Time Warner and AOLTW's Improper Classification of License Fees as Advertising**

217.    AOLTW's cable business also inflated the amount of advertising revenue the Company reported.  As such, the revenue did not represent what it purported to represent, in violation of GAAP, as described by FASB Statement of Concepts No. 2, ¶¶58-59.

218.    When Time Warner Cable added a new channel, the channel's owner would pay AOLTW (as it would any other cable operator) a fee to be on the air.  In turn, the cable operators begin paying the new channel a monthly license fee.  Most cable operators, including Comcast, Cox and Cablevision, simply treated the payments from new channels as an offset to the license fees which cable operators are required to pay to the new channel.  AOL, on the other hand, recorded the start-up payments from the new channels as advertising revenues.  This significantly inflated AOLTW's advertising revenues.  In 02, for example, the misclassification of new channel payments as advertising revenue inflated the Company's advertising by $230 million.  One publication, *Broadcasting and Cable*, characterized the practice as follows:

> Time Warner Cable has been artificially inflating its results with launch fees from cable networks.  Even though the $2 to $7-per-sub fees are funneled through as local ad spots on the systems, most operators credit them against programming expenses, spreading the deductions over the five- to 10-year life of the contract.

> Time Warner Cable, however, books the fees immediately as current advertising revenue, as if the spots had been sold to a local car dealer.

219.    The *New York Post* reported with respect to this manipulation that:

> Already reeling from investor mistrust stemming from accounting shenanigans at its AOL unit, the company also was forced to admit it may have misled investors about the performance of its cable business.

The company surprised analysts when it said it had been booking fees that new cable networks pay to Time Warner Cable as advertising revenue. In reality, those fees are payments for carriage and last only for several years.

Tom Wolzien, an analyst at Bernstein, described the practice as a "parallel to what happened at AOL" and "disingenuous"; he noted that cable rivals Cox and Comcast don't account for the fees as advertising.

220.    This misclassification was not disclosed until AOLTW announced, in 03, plans to spin off part of the cable unit as an initial public offering, a transaction that would require significantly more detailed disclosures of the cable TV operations than AOLTW had earlier provided.

**Time Warner Cable's Improper Acceleration of Advertising Fees**

221.    Time Warner Cable also inflated advertising revenue by improperly accelerating advertising revenue from intercompany transactions. AOLTW's other businesses (including Warner Brothers) were being charged advertising on the cable system which was manipulated and accelerated to increase AOLTW's reported advertising revenues.

**AOL's Manipulation of Its Backlog of Advertising Revenue**

222.    In order to cover up the truth about the deterioration in the growth of AOL's core online access business and the emerging problems in its e-commerce advertising business, AOL's executives engaged in contrivances and falsifications to inflate AOL's e-commerce advertising backlog revenues. AOL did this by entering into an increasing number of bogus e-commerce advertising deals where the transactions lacked economic substance, as described above, and AOL was providing the funds to its purported customers to purchase the advertising – via "barter" or "swap" or "round trip" deals. These bogus transactions not only improperly inflated AOL's e-commerce ad revenues, but also grossly distorted AOL's e-commerce ad backlog, because these deals were, in many instances, one-time structured deals, not really entered into in the ordinary course of business or reflective of true ongoing demand for AOL's e-commerce ads.

223.   Having engaged in these manipulations, defendants then made the false statements

about AOL's advertising backlog prior to the Merger, including the following:

(a)    3rdQ 00 conference call on 4/18/00:

PITTMAN:  . . . And another advertising commerce milestone, our consolidated
backlog grew by more than $300 million to more than $2.7 billion.

KELLY: . . . During the quarter we signed 37 multi-year deals in excess of a million
dollars to help bring backlog to a total of $2.7 billion, that's over $300 million from
last quarter.

*        *        *

KELLY:  . . . We account for backlog as firm contractual backlog that is almost
guaranteed revenue, if you will. . . .We don't see any significant risks in the backlog.

(b)    4thQ 00 conference call on 7/20/00:

PITTMAN:  . . . And, as Steve noted we reached all time highs in advertising
commerce and other revenue for the fourth quarter and for the full year and
continued to build our backlog at a record pace, on top of our tremendous third
quarter performance.

*        *        *

KELLY:  . . . Let me put that backlog number in perspective.  The $3 billion in
committed future business gives us terrific visibility on future revenues and reflects
our partners' confidence in AOL's ability to get results.  One interesting statistic, our
backlog at the end of fiscal year 2000 is equal to our total revenues reported in fiscal
1998.

*        *        *

PITTMAN: . . . I think it's interesting to note that the age of the backlog or how long
you think it will stay in backlog has not significantly increased recently.  What that
tells you is that we're doing bigger and bigger deals.

(c)    1stQ 01 conference call on 10/18/00:

KELLY:  . . . Our backlog of committed advertising and commerce revenues was
more than $3 billion as of September 30. . . .   As in the past, we are extremely
confident about the quality and composition of our backlog.  And we've said this
before but I believe it needs to be stressed.  We review our backlog carefully each
quarter.  And I'm here to tell you that it's in very good shape.

*        *        *

KELLY: And as it relates to overall quality, I would say that the backlog, again has never been better.

224.     In the quarter ended 12/31/00, AOLTW abruptly stopped reporting backlog. Then, on 1/29/03, in its 4thQ 02 conference call, AOL referred to what it termed "domestic prior period commitments" of only $555 million. Defendants' statements about the strength and growth of its backlog of advertising revenues was buttressed by the tremendous growth in AOL's reported advertising backlog:



225.     In fact, AOL's reported backlog was materially misstated due to the Company's inclusion of orders which were either not firm or were with customers who did not have the wherewithal to pay AOL. Virtually all of AOL's e-commerce backlog could be canceled at will by the customer without cost or any significant penalty. Moreover, increasing numbers of AOL's customers were canceling their ad commitments or threatening to cancel them unless AOL cut their rates to far less profitable levels. Yet AOL continued to include in its reported backlog hundreds of millions of dollars of deals it knew were very likely to be canceled or would not be honored. Moreover, much of this backlog was composed of reciprocal transactions under which the customers had agreed to purchase advertising only because AOL had agreed to make purchases from these customers, including the reciprocal transactions described above.

**AOL's Failure to Record Impairment on Long-Term Assets**

226.    AOL's earnings were also misstated due to the Company's failure to record losses for

impairment on a timely basis for long-term assets as required by GAAP.

227.    GAAP, as set forth in SFAS No. 121, requires that companies review long-lived

assets to determine if the assets are impaired.  SFAS No. 121, ¶¶5-6:

> 5.    The following are examples of events or changes in circumstances that indicate that the recoverability of the carrying amount of an asset should be assessed:
>
> a.    A significant decrease in the market value of an asset
>
> b.    A significant change in the extent or manner in which an asset is used or a significant physical change in an asset
>
> c.    A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator
>
> d.    An accumulation of costs significantly in excess of the amount originally expected to acquire or construct an asset
>
> e.    A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue.
>
> 6.    If the examples of events or changes in circumstances set forth in paragraph 5 are present or if other events or changes in circumstances indicate that the carrying amount of an asset that an entity expects to hold and use may not be recoverable, the entity shall estimate the future cash flows expected to result from the use of the asset and its eventual disposition.  Future cash flows are the future cash inflows expected to be generated by an asset less the future cash outflows expected to be necessary to obtain those inflows.  If the sum of the expected future cash flows (undiscounted and without interest charges) is less than the carrying amount of the asset, the entity shall recognize an impairment loss in accordance with this Statement.  Otherwise, an impairment loss shall not be recognized; however, a review of depreciation policies may be appropriate.

(Footnote omitted.)

228.    GAAP, as set forth in SFAS No. 115, requires that a loss be recorded for impairment

in investments when the impairment is other than temporary.  SFAS No. 115, ¶16, states in part:

16.    For individual securities classified as either available-for-sale or held-to-maturity, an  enterprise shall determine whether a decline in fair value below the amortized cost basis is other than temporary.  For example, if it is probable that the investor will be unable to collect all amounts due according to the contractual terms of a debt security not impaired at acquisition, an other-than-temporary impairment shall be considered to have occurred.  If the decline in fair value is judged to be other than temporary, the cost basis of the individual security shall be written down to fair value as a new cost basis and the amount of the write-down shall be included in earnings (that is, accounted for as a realized loss).

(Footnote omitted.)

229.    Moreover, GAAP, as described by FASB Statement of Concepts No. 5, ¶87, states that a loss should be recorded when the future economic benefits associated with the asset are diminished.

230.    During 00-01, several events and conditions arose which indicated that the value of several investments were impaired and that the impairment was other than temporary.  Nevertheless, AOL did not record sufficient and timely losses for the impairment of these long-term assets.  Ultimately, in the 1stQ 02, AOL recorded $54 billion in accounting charges, which were essentially goodwill write-offs, and in the 4thQ 02, it recorded $45 billion.  Much of these charges would have been unnecessary had AOL taken timely and adequate charges during 00 and 01, as required by GAAP.

231.    ***Hughes Investment***.  In 99, AOL invested $1.5 billion in the Hughes division of GM.  Hughes was AOL's largest single investment up to that time.  Hughes was the owner of a satellite broadcaster, Direct TV.  This investment did not perform up to expectations and it was increasingly apparent that the investment was not recoverable.  Even by mid-00, Direct TV was reducing earnings estimates due to high costs.  Yet, to show favorable earnings, AOL, and later AOLTW, failed to record the required impairment charge.  In the 1stQ 02, a write-down of Hughes was part of a $1.7 billion total write-down for impaired assets.  In the 3rdQ 02, AOL had to take a write-down of $505 million to reflect the impairment of its investment in Hughes.

232.    *Goodwill*.  AOL and Time Warner had existing goodwill of $33 billion pre-merger and the Merger created another $95 billion in goodwill.  The proforma financials included in the Merger Registration Statement included goodwill arising from the Merger; the value of the goodwill was based in large part on phony advertising revenue and was thus unsupportable and should not have been included even in the proforma documents.  AOLTW's Internet division plummeted in value soon after the Merger.  Despite the requirement to record charges against earnings any time it is evident that goodwill is impaired, AOLTW failed to record sufficient and timely charges for the impairment of goodwill.  This resulted in a $54 billion charge in the 1stQ 02 and a $33 billion charge in the 4thQ 02.  However, it was not only the Internet division which was carried at inflated value but also the Cable division, which was not worth the amount reported on AOLTW's balance sheet.  Ultimately, AOLTW recorded a $10 billion charge to reflect the impairment in Cable-related goodwill.  The music segment goodwill was also inflated due to the Company's failure to record at least $650 million in impairment charges.

**Premature Revenue Recognition on Advertising**

233.    To increase advertising, AOL would run advertising early, calling it "front loading" or "jackpotting."  Advertising representing millions of dollars in revenue was "frontloaded" or "jackpotted" at the end of quarters.  Advertisers were in the dark about this practice.

234.    A *Washington Post* article dated 7/19/02 said that interviews with former AOL employees revealed that the term "jackpotting" referred to gambling slot machines where, for example, three cherries in a row wins.  In AOL's case, jackpotting meant it would run the same ad three times on a single Web page, often on the bottom of the screen, where it was less visible.

235.    *Catalina Marketing Corporation*.  In 98, Catalina signed a $10 million two year contract to run supermarket advertising online with AOL.  Prior to the time AOL was obligated to

run ads for Catalina, AOL executives ran the ads prior to the end of the quarter so that AOL could

book the revenue.

236.    **Telefonica SA**.  According to a 7/19/02 article in *The Washington Post*, an example

of "jackpotting" included AOL's agreement to sell $15 million in online ads to Telefonica, SA,

("Telefonica") in late 00.  In order to book revenue from the Telefonica deal in the quarter ended

12/31/00, AOL ran the advertising prior to the quarter end.  The 7/19/02 *Washington Post* noted:

> But with so little time left, AOL had to place the ads in high-traffic areas of
> AOL, such as its welcome screen, the first Web page people see when they use the
> service.  More consumers saw ads on the welcome screen and AOL could get faster
> credit for running the promotions.
>
> AOL officials didn't care that the Telefonica link from AOL's English-
> language welcome screen took its users to a Spanish-language site, said AOL sources
> familiar with the deal.  Nor did it matter [to AOL] that Telefonica's computer servers
> couldn't handle all of the customer traffic from AOL, they said.
>
> AOL succeeded in running the Telefonica ads fast to book the revenue before
> Dec. 31, as accounting rules required.

237.    Under GAAP as set forth in Concepts No. 5, AOL had substantially accomplished

what it would be required to do in order to recognize revenue.  As a result, AOL's advertising

revenue was overstated by $15 million for the quarter ended 12/31/00.

238.    According to a 7/18/02 *Washington Post* article:

> In some instances, AOL said in its written response to The Post, it would
> renegotiate a struggling dot-com's ad deal to shorten the term of the contract.  The
> dot-com would pay AOL a fee for breaking the deal early, and that fee would be
> incorporated into the new, shorter-term ad deal, effectively creating a balloon
> payment.  AOL would count all of the revenue, including the fee for renegotiating a
> shorter-term deal, as ad revenue.

                              *       *       *

> From July 2000 through March 2001, AOL said, it booked $56 million from
> dot-com deals that were terminated or restructured, about 3 percent of its $2.1 billion
> in overall ad and commerce revenue during that time.  In each quarterly earnings
> report during the period, the terminated and restructured deals range from 1.5 to 4.4
> percent of AOL's advertising and commerce revenue.

**Restatement**

239.    Contrary to GAAP and SEC Rules, AOL improperly reported revenues from advertising transactions causing its reported earnings to be misstated. Ultimately, AOL admitted that its 3rdQ 00 through 2ndQ 02 results had been misstated. In its 10/23/02 3rdQ 02 earnings press release, AOLTW stated the following with respect to its prior results:

> Restatement of Prior Financial Information
>
> The company has been conducting an internal review of certain advertising and commerce transactions at the America Online division under the direction of the Company's Chief Financial Officer. In connection with this internal review, the financial results for the quarters ended September 30, 2000 through June 30, 2002 will be restated. The total impact of the adjustments will be to reduce the Company's consolidated advertising and commerce revenues by $190 million over these eight quarterly periods, with a corresponding reduction in EBITDA for the same time period of $97 million. For the America Online division, the impact of the adjustments will be to reduce advertising and commerce revenues by $168 million over these eight quarterly periods, with a corresponding reduction in EBITDA for that same time period of $97 million. The remaining $22 million represents a reduction in revenues from certain transactions related to the America Online division in which the advertising was delivered by other AOL Time Warner divisions.

240.    In its 02 Form 10-K, AOLTW acknowledged an additional $400 million in advertising revenue that would be restated due to the Company's improper accounting for the Bertelsmann deal.

241.    The fact that AOLTW is restating its financial statements for 00-02 is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material. Pursuant to GAAP, as set forth in APB No. 20, the type of restatement announced by AOLTW was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *See* APB No. 20, ¶14. Thus, GAAP

provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, a change in accounting principles used or to correct an error in previously issued financial statements. AOL's restatement is not due to a change in reporting entity or a change in accounting principles, but rather, to errors in previously issued financial statements. Thus, the restatement is an admission by AOL that its previously issued financial results and its public statements regarding those results were materially false and misleading. Moreover, as noted above, AOL engaged in additional transactions which it has not restated, totaling hundreds of millions of dollars.

242.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (Concept No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (Concept No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers

- 176 -

securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concept No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concept No. 1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (Concept No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (Concept No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concept No. 2, ¶¶95, 97).

243.    Further, the undisclosed adverse information concealed by defendants during 99-02 is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

244.    AOL, AOLTW and its top officers were intimately familiar with the importance of accurate financial reporting, due in part to frequent interactions with the SEC regarding prior accounting and reporting manipulations.  Prior to 99, AOL had engaged in other accounting improprieties, resulting in SEC investigations, and the restatement of previously reported financial results.  The SEC separately investigated other AOL accounting practices that took place during fiscal years 95-97.  This SEC investigation involved the Company's improper allocation of hundreds of millions of dollars of costs associated with obtaining new subscribers over a period of years rather than accounting for the costs as they were incurred.  This improper accounting had the effect of inflating AOL's earnings for F95-97.  This manipulation converted AOL's losses into reported profits.  In 97, the SEC conducted an investigation into AOL's accounting practices, specifically alleging that AOL had overstated advertising revenue in a transaction with Tel-Save Holdings, Inc.  AOL prematurely recorded $7 million in revenue of a $12 million contract.  The SEC found that AOL should have recorded the amount over the remaining term of the contract.  The Company had to restate its 3rdQ 97 earnings.  In response to the SEC action, defendant Case stated that AOL would adopt "new gold-standard accounting practices."  However, in 4thQ 98, the SEC again required AOL to restate the quarterly results.

245.    In 98, AOL attempted to immediately take write-offs for two acquisitions totaling $316 million to avoid a drag on future earnings.  In accordance with proper accounting standards, the SEC forced AOL to write off the acquisition over a period of six years.

246.    On 5/15/00, the SEC ordered AOL to "Cease and Desist" from further violations of the securities laws and required AOL to comply with accounting rules in the future.  As part of the SEC's action, AOL also paid a $3.5 million fine and restated its prior financial results for the reporting periods in question, again converting alleged profits to losses.  AOL agreed to abide by the SEC order, including compliance with the securities laws and applicable accounting standards.

247.    When the SEC disclosed the issuance of its Cease and Desist Order and $3.5 million fine against AOL in 5/00, then-SEC Enforcement Chief Richard H. Walker publicly stated that "[t]his case underscores the importance we attach to financial reporting and should serve as a warning to others not to stretch the rules through aggressive accounting."

## ERNST & YOUNG'S ROLE IN THE WRONGDOING

248.    AOL engaged defendant Ernst & Young to provide independent auditing and accounting services for AOL at all times relevant to this action. Ernst & Young audited and certified AOL's financial statements for the fiscal years ended 6/30/98, 99 and 00 and audited and certified AOLTW's 01 financial statements. Ernst & Young represented in AOL's fiscal 98, 99 and 00 10-Ks and AOLTW's 01 10-K that the financial statements for those years fairly presented their financial condition and results of operation in conformity with GAAP and had been audited by Ernst & Young in accordance with GAAS. In fact, Ernst & Young's reports were false and misleading as AOL's and AOLTW's financial statements were prepared in violation of GAAP, as described above, which Ernst & Young's auditors actually knew, absent a gross departure from GAAS in the audit of AOL's financials.

249.    AOL was a significant client for Ernst & Young's McClean, Virginia office prior to the Merger. Ernst & Young's New York office audited Time Warner's financial statements prior to the Merger. Later, Ernst & Young's New York office audited the combined AOLTW entity. Ernst & Young participated in the wrongdoing alleged herein in order to maintain its competitive position as to other large accounting firms by retaining AOL as a client, to protect the fees received from AOL and Time Warner and to maintain and increase its market share for auditing, accounting and consulting services to be performed for Internet and media companies. The Ernst & Young partners who were responsible for this account benefited financially as a result and had an interest in retaining AOLTW as an accounting and auditing client.

250.    Ernst & Young received audit and other fees of $1.3 million and $2.2 million, respectively, in 00 for its work on AOL.  Ernst & Young received audit and other fees of $10.6 million and $42.1 million, respectively, in 01, and $6.5 million and $41.6 million, respectively, in 02 for its work on AOLTW.  Thus, the non-audit fees were much more significant than the audit fees, impairing Ernst & Young's independence.

251.    As a result of the services rendered to AOL, Ernst & Young personnel were present at AOL's corporate headquarters frequently throughout the year and had continual access to and knowledge of AOL's private and confidential corporate financial and business information through conversations with AOL's employees and reviewing documents not publicly available.

252.    Ernst & Young's opinion on AOL's fiscal 00 year-end financial statements, dated 7/20/00, and included in the company's 00 10-K, contained the following representations:

REPORT OF INDEPENDENT AUDITORS

Board of Directors and Stockholders

America Online, Inc.

We have audited the accompanying consolidated balance sheets of America Online, Inc. as of June 30, 2000 and 1999, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for each of the three years in the period ended June 30, 2000.  These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of America Online, Inc. at June 30, 2000 and 1999, and the consolidated  results of its operations and its cash flows for each of the three years in the period ended June 30, 2000, in conformity with accounting principles generally accepted in the United States.

As discussed in Note 13, in 1998 the Company changed its method of accounting for income taxes.

/s/ ERNST & YOUNG LLP

McLean, Virginia

July 20, 2000

253.    Ernst & Young issued nearly identical audit reports on AOL's fiscal 98 and 99 financial statements included in the company's fiscal 98 and 99 Form 10-Ks.

254.    Ernst & Young represented on 1/28/02, as to AOLTW's 01 financial statements that:

REPORT OF INDEPENDENT AUDITORS

The Board of Directors

AOL Time Warner Inc.

We have audited the accompanying consolidated balance sheet of AOL Time Warner Inc. ("AOL Time Warner") as of December 31, 2001 and 2000, and the related consolidated statements of operations, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2001. Our audits also included the financial statement schedule and supplementary information listed in the index at Item 14 (a). These financial statements, schedule and supplementary information are the responsibility of AOL Time Warner's management. Our responsibility is to express an opinion on these financial statements, schedule and supplementary information based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of AOL Time Warner at December 31, 2001 and 2000, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2001, in conformity with accounting principles generally accepted in the United States. Also, in our opinion, the related financial statement schedule and supplementary information, when considered in relation to the basic financial statements taken as a whole, present fairly in all material respects the information set forth therein.

ERNST & YOUNG LLP

New York, New York

January 28, 2002

255.    These were not the only representations by Ernst & Young regarding AOL.  In 7/02, in a conference call after the *Washington Post* article, Parsons stated that Ernst & Young had confirmed in writing without qualification that the accounting for every transaction mentioned in the article complied with GAAP.

256.    Ernst & Young's representations were false and misleading when made because, as AOL's and AOLTW's independent certified public accountants, Ernst & Young conducted audit examinations which required it to obtain an understanding of AOL's and AOLTW's business operations, and financial, accounting and management control systems.  In the course of these audits and investigations, had it conducted a GAAS audit, Ernst & Young would have discovered that AOL's financial results for fiscal 98, 99 and 00, and AOLTW's results for 01 were overstated by material amounts, that AOL was engaging in a myriad of revenue recognition schemes involving the entities it recorded revenue from, the terms of sales, the timing of sales and the recoverability of other assets, including long-term investments and goodwill.  Ernst & Young actually knew AOL was engaging in reciprocal transactions and in transactions where customers purchased advertising from AOL only when AOL made an investment in the Company.  The Bertelsmann deal, which resulted in an additional $400 million in restated revenue, was AOL's largest reciprocal transaction and necessarily would have been scrutinized carefully by an auditor performing a GAAS audit.  AOLTW has indicated that Ernst & Young approved the accounting for the transaction.

257.    In fact, Ernst & Young's report was false and misleading since its audit failed to comply with GAAS and due to the fact that AOLTW's financial statements were not prepared in conformity with GAAP, which caused the report to be a violation of GAAS and SEC rules.  The SEC has stressed the importance of meaningful audits being performed by independent accountants:

Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting. An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest. The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital. ***Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised***.

*Relationships Between Registrants and Independent Accountants*, Accounting Series Release No. 2961, 1981 SEC LEXIS 858, at *8-*9 (8/20/81).

258. GAAS, at the time of Ernst & Young's audits in question, were approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), and related to the conduct of individual audit engagements. Statements on Auditing Standards ("SAS") were recognized by the AICPA as the interpretation of GAAS.

259. Ernst & Young's responsibility, as AOL's independent auditor, included determining "[s]ufficient competent evidential matter . . . to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." AU §§110, 150.

260. Ernst & Young's audit reports concerning AOL's fiscal 98, 99 and 00 financial statements and its audit report concerning AOLTW's 01 financial statements were false and misleading as those financial statements were not prepared in accordance with GAAP, as described above in the section entitled "AOL's and AOLTW's False and Misleading Financial Statements," nor had Ernst & Young conducted its audits in accordance with GAAS.

261. In certifying AOL's fiscal 98, 99 and 00 and AOLTW's 01 year-end financial statements, Ernst & Young represented that these financial statements complied with GAAP. This statement was false and misleading in that Ernst & Young knew or was deliberately reckless in

failing to discover after conducting its audits that the financial statements violated GAAP. In fact, Ernst & Young auditors knew or were deliberately reckless in not knowing that revenue AOL recognized had not been earned at the time recognized or was not derived from independent entities.

262.    In certifying AOL's fiscal 98, 99 and 00 and AOLTW's 01 year-end financial statements, Ernst & Young represented that its audits had been made in accordance with GAAS. This statement was false and misleading in that Ernst & Young knew or was reckless in failing to discover that its audits were not performed in accordance with GAAS in at least the following respects:

(a)    Ernst & Young violated the general standard that due professional care was to be exercised in the performance of the audit. An example of such violation is Ernst & Young's willingness to issue a "clean" opinion notwithstanding its knowledge that the financial information from which the financial statements were derived was false. Furthermore, Ernst & Young did not exercise due care in its attempt to obtain competent evidential matter and therefore did not obtain sufficient evidence to form the basis of the "clean" opinion issued.

(b)    Ernst & Young violated the general standard that in all matters relating to an engagement, an independence in mental attitude was to be maintained by the auditor. Ernst & Young not only audited AOL's and AOLTW's financial statements, but served as the internal auditor as well. Thus, when Ernst & Young performed a year-end audit it was essentially auditing its own work. Ernst & Young could not be independent in mental attitude because when it found problems in AOL's or AOLTW's books it would essentially be admitting that it failed as an internal auditor. Ernst & Young is belatedly phasing out of this role in 03.

(c)    Ernst & Young violated the first standard of fieldwork that required the auditor to properly plan the engagement. In fact, under AU §316, *Consideration of Fraud in a Financial Statement Audit*, Ernst & Young was required to consider and plan for factors that

indicated AOL may be dealing with entities that were not independent.  The risk factors under AU

§316.17 included:

- Significant, unusual, or highly complex transactions, especially those close to year end, that pose difficult "substance over form" questions.  AOL's reciprocal transactions posed many substance over form issues.  Moreover, many of the transactions were quarter-end or year-end events that were not deals done in the normal course of business.  The Bertelsmann transaction was highly suspicious in that AOL agreed to pay cash when it was not required, even though no change in the put price was made.  The agreement by Bertelsmann to buy $400 million in advertising was, in substance, compensation for AOL changing the terms.

- Overly complex organizational structure involving numerous or unusual legal entities, managerial lines of authority, or contractual arrangements without apparent business purpose.

- Unusually rapid growth or profitability, especially compared with that of other companies in the same industry.  Ernst & Young knew or recklessly disregarded that AOL's reported advertising and commerce revenues continued to improve even as others in the industry reported disappointing advertising revenues.

(d)     Ernst & Young violated the second standard of fieldwork that required the

auditor to make a proper study of existing internal controls, including accounting, financial and

managerial controls, to determine whether reliance on those controls was justified and, if such

controls are not reliable, to expand the nature and scope of audit procedures to be applied.  A federal

district court judge presiding in the *Homestore.com* matter held that Homestore.com's outside

auditor ignored "red flags" with respect to transactions involving AOL – "red flags" that also should

have alerted Ernst & Young to the fact that AOL's financial statements were misstated:

> Next, plaintiff details several accounting "red flags" (known as "risk factors" in the GAAS, AU §§316.16-316.17) that PWC was confronted with and to which it did not react or respond.  The most significant of these red flags was the fact that on numerous occasions, major transactions took place within the last few days of the quarter. . . .

> . . . First and foremost, one of the principal issues in the late 1990s was how to properly account for "barter-type" transactions.  In January 2000, at the beginning of the class period, the Financial Accounting Standards Board made effective "Emerging Issues Task Force ("EITF") Issue No. 99-17," entitled "Accounting for Advertising Barter Transactions."  FACC ¶545.  Such transactions could only be recorded if the fair value of the advertising surrendered in the transaction could be determined based on the company's own historical practices of receiving cash or

cash equivalents for similar advertising sold to unrelated entities. FACC ¶546. Similarly, EITF 99-19, also effective prior to the class period, dealt with recognition of gross revenues versus net. FACC ¶550-551. Many of Homestore's reciprocal "barter-type" transactions were alleged to have violated both of these rules.

*In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1044 (C.D. Cal. 2003).

(e)    Ernst & Young violated the third standard of fieldwork that required the auditor to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

(f)    Ernst & Young violated the third standard of reporting that states that informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report. Ernst & Young did not modify its audit opinion although AOL did not adequately disclose its relevant accounting practices relating to sales and non-monetary transactions.

(g)    Ernst & Young violated the fourth standard of reporting that required that when an opinion on the financial statements as a whole can not be expressed, the reasons therefore must be stated. In view of the aforementioned GAAS and GAAP violations, Ernst & Young should have stated that it could express no opinion as to the financial statements of AOL or should have issued an adverse opinion stating that AOL's fiscal 98, 99 and 00 and AOLTW's 01 financial statements were not presented fairly and in accordance with GAAP.

263.    In the course of issuing its unqualified audit opinion as to AOL's fiscal 98, 99 and 00 and AOLTW's 01 financial statements, Ernst & Young knew that it was required to adhere to all of the standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP. In issuing its unqualified opinions for AOL's financial results, Ernst & Young knew or was deliberately reckless in not knowing that its audits and reports

were not in compliance with GAAS and that AOL's financial results were not reported in accordance with GAAP.

## MORGAN STANLEY'S AND SALOMON SMITH BARNEY'S ROLES IN THE WRONGDOING

264.    Salomon Smith Barney and Morgan Stanley are large and prestigious investment banking houses which represent that they possess – and they are perceived to possess – enormous expertise in financial and accounting matters, including valuing companies in the context of corporate mergers and in analyzing the value of corporate enterprises from an investment standpoint.

265.    In corporate mergers where shareholder approval of the transaction is necessary, an opinion from a reputable, sophisticated and independent investment banking firm is indispensable to the completion of the transaction.   This is because it is necessary to have an opinion of an independent entity with financial expertise to provide the shareholders who are being asked to sell their company or to have their company enter into a merger with assurance that the terms offered them are "fair from a financial point of view" to them.   Given the custom and practice in corporate finance and mergers, a significant merger like the AOL/Time Warner Merger could not be accomplished in the absence of such a fairness opinion.

266.    In the context of AOL's acquisition of Time Warner, an independent fairness opinion to the Time Warner shareholders from a sophisticated and independent investment banker was especially important.   This was because this was an unusual transaction in which a large, well-established company with extremely valuable assets and proven earning power was, in essence, being sold to a newer company, AOL, in an emerging business area, *i.e.*, "the Internet," and where the terms of the acquisition were such that Time Warner shareholders were to end up with only 45% of the equity in the new company, compared to 55% for the former AOL shareholders, even though by most traditional measures Time Warner was a much larger company with larger profits and much larger cash flow.

267.    Because of the nature of the Merger and because of the size and market capitalization of the companies involved, it was necessary that the transaction be structured as a stock-for-stock exchange rather than a cash acquisition, as neither company had sufficient cash resources to acquire the other for cash.  Stock-for-stock merger transactions without a collar – as was the case here – are extremely complex and fragile, especially where the so-called exchange ratio of the stock to be exchanged in the merger is fixed, as was the case in the AOL/Time Warner Merger.  This is because if the business, and therefore the stock price, of one of the companies to the transaction declines materially, the shareholders of the other company may perceive that the merger is no longer fair to them.  If the decline were significant enough, the directors of the enterprise being acquired would have to invoke the "material adverse change" provisions contained in the merger agreement to scuttle the deal.  In this context, the financial advisors to the companies involved in the proposed merger are highly motivated to help support the stock prices of the companies and positioned to do so by issuing very favorable reports concerning the proposed merger.  Given the prestige of these investment bankers, such reports have significant impact on the market prices of the stocks involved. All the more so in the merger context, where investors rightly believe that the financial advisors involved in a large merger transaction have access to material non-public information about the companies involved in the transaction as part of their due diligence and fairness opinion evaluation activities.  Thus, the opinions of the financial advisors of the companies involved in a large merger like the AOL/Time Warner Merger, carry special weight with investors and have special influence on the market.

268.    In the AOL/Time Warner Merger, Morgan Stanley and Salomon Smith Barney each played indispensable roles in disseminating false and misleading information to investors and the market regarding the quality, strength and growth of AOL's business, as well as the quality, strength and growth prospects of the company to be created by the Merger, and most importantly, the fairness

of the terms of the Merger to the Time Warner shareholders, all of which was significantly relied upon, directly or indirectly, by the plaintiff in this action in either exchanging its Time Warner shares for shares of AOLTW in the Merger, in voting to approve the sale of Time Warner to AOL via merger (or failing to approve said Merger) and/or in purchasing AOLTW stock in the open market subsequent to the Merger.

269.    The structure of the fees to be paid to Salomon Smith Barney and Morgan Stanley highly incentivized them to take whatever steps were necessary to bring about completion of the Merger by inflating the price of AOL's stock in advance of the Merger, by helping to disseminate false and misleading information regarding the strength, quality and growth of AOL's business, especially its subscriber growth for its "online Internet access business" as well as its "e-commerce advertising business," by securing the approval of the Time Warner shareholders to the Merger and by supporting the price of AOLTW stock after the Merger so as to continue the illusion of the success of the Merger while the AOLTW insiders bailed out by selling off millions of shares of their new AOLTW stock at artificially inflated levels.  Part of the incentives for the financial advisors to do this included the manner in which their compensation was structured, whereby they received only a small part of their potential total compensation ($135 million) when the Merger agreement was signed, but received the vast bulk of their compensation upon and after shareholder approval of the transaction and on the actual closing of the Merger.  And, in the case of Morgan Stanley, it would receive additional bonus compensation worth $15 million if the new AOLTW stock traded at high levels in the few weeks following the consummation of the Merger – which it did.  Thus, the compensation arrangements for the financial advisors incentivized them to do everything necessary to inflate the price of AOL stock prior to the Merger, obtain Time Warner shareholder approval of the Merger, get the Merger closed, and keep the AOLTW stock trading at as high a price level as possible for as long as they could after the Merger was closed.  Thus the financial advisors had an

enormous financial interest in bringing about shareholder approval of the Merger and closing the Merger, but little, if any, in how the business of the new entity, AOLTW, performed in the long-term after the Merger was closed.

270.    In the period after the Merger was announced, and up to and including shareholder approval of the Merger, Salomon Smith Barney and Morgan Stanley each issued false and misleading research reports about AOL, Time Warner and AOLTW that helped to artificially inflate the price of AOL stock and make AOL appear to be a more successful company than it really was. And Morgan Stanley issued the critical "fairness opinion" contained in the Merger Registration Statement which represented that the terms of the Merger were fair from a financial point of view to Time Warner shareholders when they knew, or should have known, that this opinion was false and they had no reasonable grounds for believing that the transaction was, in fact, fair.  After the shareholder vote approving the deal and up through and including the closing of the Merger, it continued to be very important to make it appear that AOL's business was continuing to achieve strong success and growth and that the enterprise to be formed as a result of the Merger of AOL and Time Warner would continue to achieve huge revenue, EBITDA and free cash flow growth. Salomon Smith Barney and Morgan Stanley continued to pepper the market with false and misleading reports in this regard.

271.    After the Merger closed, Morgan Stanley and Salomon Smith Barney continued to help perpetuate the illusion of the success of the Merger and the strength and growth being achieved by AOLTW by continuously issuing false and misleading research reports as specified earlier.

272.    On and after the closing of the Merger, Morgan Stanley and Salomon Smith Barney were constantly buying and selling AOLTW stock in their own proprietary trading accounts as well as accounts they managed for other entities and investors.

273.     One of the reasons that Salomon Smith Barney and Morgan Stanley were willing to participate in this wrongful course of conduct and issue the false and misleading opinions and reports, as alleged, was that they had illegally taken steps to attempt to insulate themselves from the consequences of such misconduct by requiring that AOL, Time Warner and AOLTW indemnify them and hold them harmless from any financial impact (including legal fees) from any alleged or proven violation of the securities laws in connection with the Merger transaction.  Because of the size and assets of AOL, Time Warner and AOLTW and the fact that each of the companies carried very substantial directors' and officers' liability insurance running into the hundreds of millions of dollars, Salomon Smith Barney and Morgan Stanley knew that it was essentially risk-free financially for them to participate in and further the wrongdoing while pocketing fees – the largest investment banking fees in history – of $135 million.  Thus, Salomon Smith Barney and Morgan Stanley lent their considerable expertise and reputations to the successful consummation of the Merger which created AOLTW, and enriched the corporate executives who hired them by over $797 million, permitting Salomon Smith Barney and Morgan Stanley to pocket millions in fees for themselves.

## INSIDER SELLING

274.     During 7/00-8/00, when AOL stock was artificially inflated in anticipation of the Merger of AOL and Time Warner, as set forth earlier, top AOL insiders sold off some 2.2 million shares of their AOL stock at as high as $58 per share, pocketing over $125 million.  This insider selling is shown below:

| INSIDER | SHARES SOLD BETWEEN 07/14/00–08/30/00 | PROCEEDS |
|---------|----------------------------------------|----------|
| James Barksdale | 700,000 | $38,095,100 |
| Case | 1,000,000 | $56,367,000 |
| Kelly | 70,000 | $3,999,800 |
| Novack | 96,634 | $5,412,772 |
| Pittman | 394,745 | $21,833,346 |
| TOTALS: | 2,261,379 | $125,708,018 |

Then, after the Merger and prior to the final revelations of early 2/03, AOLTW insiders unloaded over 21.6 million shares of their AOLTW common stock, pocketing more than $672 million in insider trading proceeds.  This insider selling is shown below:

| INSIDER | SHARES SOLD BETWEEN 01/01/01–8/27/02 | PROCEEDS |
|---|---|---|
| James Barksdale | 2,297,125 | $78,964,065 |
| Case | 2,000,000 | $100,396,300 |
| Colburn | 180,000 | $9,060,600 |
| Kelly | 400,000 | $19,072,000 |
| Novack | 744,366 | $34,731,161 |
| Parsons | 700,000 | $35,267,400 |
| Pittman | 1,500,000 | $72,715,000 |
| Ted Turner | 13,804,752 | $332,001,979 |
| TOTALS: | 21,626,243 | $672,208,505 |

Thus, while AOL's and AOLTW's stocks were artificially inflated in anticipation of and in consequence of the Merger, AOL and AOLTW insiders unloaded a total of 23.8 million shares, pocketing $797 million of illegal insider trading proceeds, as shown below:

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Barksdale | 24-Jul-00 | 240,000 | $55.420 | $13,300,800 |
| | 24-Jul-00 | 50,000 | $56.010 | $2,800,500 |
| | 25-Jul-00 | 10,000 | $56.250 | $562,500 |
| | 25-Jul-00 | 50,000 | $55.810 | $2,790,500 |
| | 27-Jul-00 | 20,000 | $54.380 | $1,087,600 |
| | 27-Jul-00 | 30,000 | $54.140 | $1,624,200 |
| | 28-Jul-00 | 200,000 | $53.000 | $10,600,000 |
| | 28-Jul-00 | 100,000 | $53.290 | $5,329,000 |
| | 20-Feb-01 | 200,000 | $47.180 | $9,436,000 |
| | 07-Mar-01 | 25,000 | $46.000 | $1,150,000 |
| | 07-Mar-01 | 25,000 | $45.560 | $1,139,000 |
| | 07-Mar-01 | 75,000 | $45.500 | $3,412,500 |
| | 07-Mar-01 | 25,000 | $45.150 | $1,128,750 |
| | 07-Mar-01 | 25,000 | $45.190 | $1,129,750 |
| | 07-Mar-01 | 25,000 | $45.580 | $1,139,500 |
| | 12-Mar-01 | 202,250 | $39.310 | $7,950,448 |
| | 19-Apr-01 | 200,000 | $48.600 | $9,720,000 |
| | 25-Apr-01 | 25,000 | $47.670 | $1,191,750 |
| | 25-Apr-01 | 25,000 | $47.650 | $1,191,250 |

| 25-Apr-01 | 25,000 | $47.800 | $1,195,000 |
| 25-Apr-01 | 25,000 | $49.450 | $1,236,250 |
| 25-Apr-01 | 25,000 | $49.270 | $1,231,750 |
| 25-Apr-01 | 25,000 | $47.760 | $1,194,000 |
| 25-Apr-01 | 25,000 | $47.740 | $1,193,500 |
| 25-Apr-01 | 25,000 | $47.690 | $1,192,250 |
| 08-May-01 | 150,000 | $51.670 | $7,750,500 |
| 12-Feb-02 | 100,000 | $27.720 | $2,772,000 |
| 21-Feb-02 | 5,000 | $23.200 | $116,000 |
| 21-Feb-02 | 5,000 | $22.800 | $114,000 |
| 21-Feb-02 | 5,000 | $22.900 | $114,500 |
| 21-Feb-02 | 5,000 | $23.050 | $115,250 |
| 21-Feb-02 | 5,000 | $23.000 | $115,000 |
| 21-Feb-02 | 50,000 | $23.110 | $1,155,500 |
| 21-Feb-02 | 5,000 | $23.160 | $115,800 |
| 21-Feb-02 | 5,000 | $22.850 | $114,250 |
| 21-Feb-02 | 10,000 | $23.300 | $233,000 |
| 21-Feb-02 | 5,000 | $23.180 | $115,900 |
| 27-Feb-02 | 50,000 | $23.570 | $1,178,500 |
| 27-Feb-02 | 5,000 | $23.400 | $117,000 |
| 27-Feb-02 | 5,000 | $23.550 | $117,750 |
| 27-Feb-02 | 15,000 | $23.460 | $351,900 |
| 27-Feb-02 | 10,000 | $23.450 | $234,500 |
| 27-Feb-02 | 10,000 | $23.480 | $234,800 |
| 27-Feb-02 | 5,000 | $23.400 | $117,000 |
| 01-Mar-02 | 50,000 | $25.470 | $1,273,500 |
| 01-Mar-02 | 10,000 | $25.750 | $257,500 |
| 01-Mar-02 | 25,000 | $25.550 | $638,750 |
| 01-Mar-02 | 15,000 | $25.600 | $384,000 |
| 04-Mar-02 | 25,000 | $26.620 | $665,500 |
| 04-Mar-02 | 25,000 | $26.780 | $669,500 |
| 04-Mar-02 | 25,000 | $27.000 | $675,000 |
| 04-Mar-02 | 25,000 | $26.450 | $661,250 |
| 04-Mar-02 | 25,000 | $26.700 | $667,500 |
| 04-Mar-02 | 25,000 | $26.690 | $667,250 |
| 06-Mar-02 | 7,500 | $27.000 | $202,500 |
| 06-Mar-02 | 25,000 | $27.180 | $679,500 |
| 06-Mar-02 | 10,000 | $26.920 | $269,200 |
| 06-Mar-02 | 7,500 | $27.070 | $203,025 |
| 06-Mar-02 | 50,000 | $27.220 | $1,361,000 |
| 08-Mar-02 | 25,000 | $26.320 | $658,000 |
| 08-Mar-02 | 25,000 | $26.250 | $656,250 |
| 08-Mar-02 | 21,300 | $26.190 | $557,847 |
| 08-Mar-02 | 3,700 | $26.260 | $97,162 |
| 08-Mar-02 | 25,000 | $26.270 | $656,750 |

| | | | |
|---|---|---|---|
| 10-May-02 | 301 | $17.810 | $5,361 |
| 10-May-02 | 363 | $17.720 | $6,432 |
| 10-May-02 | 1,006 | $17.610 | $17,716 |
| 10-May-02 | 550 | $17.730 | $9,752 |
| 10-May-02 | 1,118 | $17.750 | $19,845 |
| 10-May-02 | 646 | $17.600 | $11,370 |
| 10-May-02 | 301 | $17.650 | $5,313 |
| 10-May-02 | 241 | $17.830 | $4,297 |
| 10-May-02 | 20,000 | $17.520 | $350,400 |
| 10-May-02 | 2,567 | $17.550 | $45,051 |
| 10-May-02 | 1,600 | $17.930 | $28,688 |
| 10-May-02 | 701 | $17.800 | $12,478 |
| 10-May-02 | 981 | $17.780 | $17,442 |
| 13-May-02 | 5,803 | $17.000 | $98,651 |
| 13-May-02 | 100 | $17.040 | $1,704 |
| 13-May-02 | 2,102 | $16.900 | $35,524 |
| 13-May-02 | 427 | $17.170 | $7,332 |
| 13-May-02 | 668 | $17.060 | $11,396 |
| 13-May-02 | 1,200 | $17.010 | $20,412 |
| 13-May-02 | 7,430 | $17.050 | $126,682 |
| 13-May-02 | 294 | $17.130 | $5,036 |
| 13-May-02 | 541 | $17.110 | $9,257 |
| 13-May-02 | 347 | $17.160 | $5,955 |
| 13-May-02 | 866 | $17.070 | $14,783 |
| 13-May-02 | 432 | $17.100 | $7,387 |
| 13-May-02 | 1,055 | $17.150 | $18,093 |
| 13-May-02 | 899 | $16.970 | $15,256 |
| 13-May-02 | 1,000 | $16.950 | $16,950 |
| 13-May-02 | 700 | $16.990 | $11,893 |
| 13-May-02 | 1,100 | $17.030 | $18,733 |
| 13-May-02 | 1,692 | $17.140 | $29,001 |
| 13-May-02 | 1,300 | $16.980 | $22,074 |
| 13-May-02 | 514 | $17.090 | $8,784 |
| 13-May-02 | 1,729 | $17.080 | $29,531 |
| 13-May-02 | 176 | $17.120 | $3,013 |
| 20-May-02 | 1,321 | $19.690 | $26,010 |
| 20-May-02 | 881 | $19.740 | $17,391 |
| 20-May-02 | 1,287 | $19.350 | $24,903 |
| 20-May-02 | 757 | $19.480 | $14,746 |
| 20-May-02 | 1,288 | $19.430 | $25,026 |
| 20-May-02 | 882 | $19.550 | $17,243 |
| 20-May-02 | 1,286 | $19.370 | $24,910 |
| 20-May-02 | 701 | $19.750 | $13,845 |
| 20-May-02 | 399 | $19.440 | $7,757 |
| 20-May-02 | 1,920 | $19.880 | $38,170 |

| | | | |
|---|---|---|---|
| 20-May-02 | 1,772 | $19.380 | $34,341 |
| 20-May-02 | 1,665 | $19.500 | $32,468 |
| 20-May-02 | 200 | $19.510 | $3,902 |
| 20-May-02 | 112 | $19.540 | $2,188 |
| 20-May-02 | 607 | $19.420 | $11,788 |
| 20-May-02 | 328 | $19.760 | $6,481 |
| 20-May-02 | 400 | $19.460 | $7,784 |
| 20-May-02 | 1,630 | $19.400 | $31,622 |
| 20-May-02 | 700 | $19.320 | $13,524 |
| 20-May-02 | 1,343 | $19.360 | $26,000 |
| 20-May-02 | 511 | $19.560 | $9,995 |
| 20-May-02 | 546 | $19.530 | $10,663 |
| 20-May-02 | 553 | $19.640 | $10,861 |
| 20-May-02 | 598 | $19.600 | $11,721 |
| 20-May-02 | 600 | $19.310 | $11,586 |
| 20-May-02 | 100 | $19.520 | $1,952 |
| 20-May-02 | 527 | $19.610 | $10,334 |
| 20-May-02 | 300 | $19.800 | $5,940 |
| 20-May-02 | 1,131 | $19.390 | $21,930 |
| 20-May-02 | 200 | $19.580 | $3,916 |
| 20-May-02 | 1,044 | $19.410 | $20,264 |
| 20-May-02 | 946 | $19.470 | $18,419 |
| 20-May-02 | 896 | $19.590 | $17,553 |
| 20-May-02 | 100 | $19.630 | $1,963 |
| 20-May-02 | 200 | $19.650 | $3,930 |
| 20-May-02 | 1,288 | $19.430 | $25,026 |
| 20-May-02 | 1,240 | $19.450 | $24,118 |
| 20-May-02 | 116 | $19.490 | $2,261 |
| 31-May-02 | 25,375 | $18.660 | $473,498 |
| 31-May-02 | 1,700 | $18.740 | $31,858 |
| 31-May-02 | 3,300 | $18.730 | $61,809 |
| 03-Jun-02 | 30,375 | $18.550 | $563,456 |
| 13-Jun-02 | 10,125 | $16.220 | $164,228 |
| 13-Jun-02 | 10,125 | $15.730 | $159,266 |
| 13-Jun-02 | 10,125 | $16.280 | $164,835 |
| 19-Jun-02 | 700 | $16.940 | $11,858 |
| 19-Jun-02 | 10,000 | $16.650 | $166,500 |
| 19-Jun-02 | 100 | $17.100 | $1,710 |
| 19-Jun-02 | 15,940 | $16.900 | $269,386 |
| 19-Jun-02 | 2,425 | $16.950 | $41,104 |
| 19-Jun-02 | 122 | $17.010 | $2,075 |
| 19-Jun-02 | 218 | $16.980 | $3,702 |
| 19-Jun-02 | 390 | $16.930 | $6,603 |
| 19-Jun-02 | 180 | $16.960 | $3,053 |
| 19-Jun-02 | 300 | $17.040 | $5,112 |

|  | | | | |
|---|---|---:|---:|---:|
|  | 27-Jun-02 | 10,000 | $13.350 | $133,500 |
|  | 27-Jun-02 | 10,000 | $13.200 | $132,000 |
|  | 27-Jun-02 | 10,375 | $14.050 | $145,769 |
|  | 02-Jul-02 | 14,950 | $12.990 | $194,201 |
|  | 02-Jul-02 | 10,125 | $12.750 | $129,094 |
|  | 02-Jul-02 | 5,300 | $12.950 | $68,635 |
|  | 08-Jul-02 | 10,125 | $14.450 | $146,306 |
|  | 08-Jul-02 | 10,125 | $13.950 | $141,244 |
|  | 08-Jul-02 | 10,125 | $13.860 | $140,333 |
|  | 15-Jul-02 | 10,125 | $12.550 | $127,069 |
|  | 15-Jul-02 | 10,125 | $12.500 | $126,563 |
|  | 15-Jul-02 | 10,125 | $12.800 | $129,600 |
|  | 26-Jul-02 | 10,125 | $10.060 | $101,858 |
|  | 26-Jul-02 | 10,125 | $10.590 | $107,224 |
|  | 26-Jul-02 | 10,125 | $10.600 | $107,325 |
|  | 29-Jul-02 | 225 | $11.200 | $2,520 |
|  | 29-Jul-02 | 10,125 | $11.450 | $115,931 |
|  | 29-Jul-02 | 10,125 | $11.280 | $114,210 |
|  | 29-Jul-02 | 9,900 | $11.180 | $110,682 |
|  |  | 2,997,125 | | $117,059,165 |
|  |  | | | |
| Case | 24-Jul-00 | 400,000 | $55.760 | $22,304,000 |
|  | 25-Jul-00 | 100,000 | $55.530 | $5,553,000 |
|  | 23-Aug-00 | 500,000 | $57.020 | $28,510,000 |
|  | 06-Feb-01 | 1,000,000 | $50.030 | $50,030,000 |
|  | 19-Apr-01 | 450,000 | $49.190 | $22,135,500 |
|  | 25-Apr-01 | 50,000 | $49.500 | $2,475,000 |
|  | 30-Apr-01 | 430,000 | $51.450 | $22,123,500 |
|  | 02-May-01 | 70,000 | $51.890 | $3,632,300 |
|  |  | 3,000,000 | | $156,763,300 |
|  |  | | | |
| Colburn | 06-Feb-01 | 30,000 | $50.000 | $1,500,000 |
|  | 15-Feb-01 | 30,000 | $50.000 | $1,500,000 |
|  | 23-Apr-01 | 30,000 | $47.730 | $1,431,900 |
|  | 25-Apr-01 | 30,000 | $48.300 | $1,449,000 |
|  | 03-May-01 | 30,000 | $50.300 | $1,509,000 |
|  | 21-May-01 | 30,000 | $55.690 | $1,670,700 |
|  |  | 180,000 | | $9,060,600 |
|  |  | | | |
| Kelly | 21-Aug-00 | 70,000 | $57.140 | $3,999,800 |
|  | 12-Feb-01 | 200,000 | $46.840 | $9,368,000 |
|  | 25-Apr-01 | 200,000 | $48.520 | $9,704,000 |
|  |  | 470,000 | | $23,071,800 |
|  |  | | | |
| Novack | 24-Jul-00 | 96,000 | $56.000 | $5,376,000 |

|          |           |            |          |              |
|----------|-----------|------------|----------|--------------|
|          | 22-Aug-00 | 634        | $58.000  | $36,772      |
|          | 02-Feb-01 | 400,000    | $48.000  | $19,200,000  |
|          | 02-Feb-01 | 100,000    | $48.050  | $4,805,000   |
|          | 19-Apr-01 | 171,366    | $48.090  | $8,240,991   |
|          | 19-Apr-01 | 25,000     | $48.090  | $1,202,250   |
|          | 19-Feb-02 | 12,000     | $25.960  | $311,520     |
|          | 05-Mar-02 | 12,000     | $27.000  | $324,000     |
|          | 12-Mar-02 | 12,000     | $26.950  | $323,400     |
|          | 19-Mar-02 | 12,000     | $27.000  | $324,000     |
|          |           | 841,000    |          | $40,143,933  |
|          |           |            |          |              |
| Parsons  | 20-Apr-01 | 350,000    | $49.050  | $17,167,500  |
|          | 27-Apr-01 | 70,000     | $50.000  | $3,500,000   |
|          | 04-May-01 | 70,000     | $49.500  | $3,465,000   |
|          | 11-May-01 | 70,000     | $52.000  | $3,640,000   |
|          | 18-May-01 | 70,000     | $53.820  | $3,767,400   |
|          | 25-May-01 | 70,000     | $53.250  | $3,727,500   |
|          |           | 700,000    |          | $35,267,400  |
|          |           |            |          |              |
| Pittman  | 24-Jul-00 | 394,745    | $55.310  | $21,833,346  |
|          | 02-Feb-01 | 1,000,000  | $47.810  | $47,810,000  |
|          | 19-Apr-01 | 250,000    | $48.100  | $12,025,000  |
|          | 07-May-01 | 250,000    | $51.520  | $12,880,000  |
|          |           | 1,894,745  |          | $94,548,346  |
|          |           |            |          |              |
| Turner   | 15-Feb-01 | 1,000,000  | $50.000  | $50,000,000  |
|          | 19-Apr-01 | 1,000,000  | $48.950  | $48,950,000  |
|          | 14-May-01 | 343,344    | $52.850  | $18,145,730  |
|          | 21-May-02 | 253,908    | $19.690  | $4,999,449   |
|          | 29-May-02 | 300,000    | $19.000  | $5,700,000   |
|          | 30-May-02 | 9,700,000  | $18.470  | $179,159,000 |
|          | 07-Jun-02 | 312,500    | $16.080  | $5,025,000   |
|          | 02-Jul-02 | 395,000    | $12.640  | $4,992,800   |
|          | 06-Aug-02 | 500,000    | $10.060  | $5,030,000   |
|          |           | 13,804,752 |          | $322,001,979 |
|          |           |            |          |              |
| Grand Total: |       | 23,887,622 |          | $797,916,523 |

## AOL SETTLEMENT OF DOJ AND SEC CRIMINAL AND CIVIL CHARGES

275.    Since 02, the DOJ and the SEC have been investigating the AOL unit of AOLTW,

including many of the transactions alleged above (such as PurchasePro.com and Bertelsmann) and

AOL's pre-merger representations regarding the number of its subscribers.  On 12/15/04, AOL and

the government agreed to a settlement of criminal and civil charges. The terms of the settlement include the following:

- AOL "*acknowledges responsibility*" for the actions of its employees giving rise to federal criminal violations in connection with PurchasePro.com's financial reporting of certain transactions.

- AOL will pay *$510 million* ($210 million to the DOJ and $300 million to the SEC).

- AOL will restate its earnings to properly account for the Bertelsmann and two other transactions.

- AOL will adopt a new internal *standard of conduct* under which it will inform the DOJ of any new matter reported to Time Warner's Audit and Finance Committee involving substantial and credible evidence of any federal crimes.

- AOL will hire and pay for an *independent monitor* for at least two years. The monitor will have full access to all details of AOL's online advertising deals and will regularly report to prosecutors concerning AOL's business conduct.

- The government will *defer prosecution* for two years and dismiss its complaint at the end of that period if the Company fully cooperates.

- AOL will assist the DOJ in its *criminal prosecution* of "six or more" current and former AOL employees (reported to include defendants Colburn and Keller), involved in the false and misleading accounting of the PurchasePro.com and other transactions.

*See* Exhibits 1–5, attached hereto, from *United States v. American Online, Inc.*, No. 04-M-1133 (E.D. Va.): Criminal Complaint, filed 12/15/04 (Ex. 1); Joint Motion of the Parties to Hold the Criminal Complaint in Abeyance for 25 Months, filed 12/15/04 (Ex. 2); the Deferred Prosecution Agreement, dated 12/15/04 (Ex. 3); Order, granting the joint motion and ordering the criminal complaint be held in abeyance for 25 months, dated 12/15/04 (Ex. 4); and a letter dated 12/15/04 from the DOJ to Richard Cullen of Mcguire Woods LLP (Ex. 5).

276. On 1/10/05, the DOJ indicted two former AOLTW employees and four PurchasePro.com employees for fraud and conspiracy based on false and misleading financial statements issued by PurchasePro.com in connection with advertising sales transactions between AOL and PurchasePro.com. The DOJ alleges that the AOL/PurchasePro transactions involved a

"scheme to swap revenue" and resulted in the reporting of false financial statements to the SEC by

PurchasePro.com.  The two former AOL executives are Kent Wakeford, former Executive Director

of AOL's Business Affairs unit, and defendant Tuli, former Vice President in AOL's NetBusiness

unit.  The Wakeford and Tuli indictment is attached hereto as Exhibit 6.

## LOSS CAUSATION/ECONOMIC LOSS

277.    During 99-02, as detailed herein, defendants engaged in a scheme to deceive the

market and a course of conduct that artificially inflated AOL's and AOLTW's stock prices and

operated as a fraud or deceit on acquirors of AOL and AOLTW stock by misrepresenting the

Company's financial results, advertising revenue, backlog and future business prospects.

Defendants achieved this façade of success, growth and strong future business prospects by blatantly

misrepresenting earnings.  Later, however, when defendants' prior misrepresentations and fraudulent

conduct were disclosed and became apparent to the market, AOLTW's stock fell as the prior

artificial inflation came out of AOLTW's stock price.  As a result of its purchases of AOLTW and/or

AOL stock, plaintiff suffered economic loss, *i.e.,* damages, under the federal securities laws.

278.    By improperly reporting its financial results, the defendants presented a misleading

picture of AOL's and AOLTW's business and prospects.  Thus, instead of truthfully disclosing that

AOL's and AOLTW's businesses were not as healthy as represented, defendants caused AOL and

AOLTW to falsely report revenues and earnings.

279.    Concurrent with the concealment of the falsification of AOL's and AOLTW's F99-01

financial statements, defendants also misled investors by asserting that AOL's advertising revenue

was increasing, backlog was healthy and future results would be highly favorable.

280.    Defendants' false and misleading statements had the intended effect and caused AOL

and AOLTW stock to trade at artificially inflated levels, enabling defendants to complete the

Merger.  As news began to leak out about advertising revenue, AOLTW stock declined, removing

the inflation from AOLTW's stock price, causing real economic loss to plaintiff who had acquired the stock prior to the ultimate disclosures.

281. The decline in AOLTW's stock price from 7/01 when advertising revenues were questioned to 7/02 when AOL's accounting was questioned was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The magnitude of AOLTW's stock price declines from above $50 per share to below $10 per share negate any inference that the loss suffered by plaintiff was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

## FIRST CLAIM FOR RELIEF

### For Violation of §§11 and 15 of the 1933 Act Against
### AOLTW, Case, Levin, Parsons, Novack, Pittman, Kelly,
### Bollenbach, Cappuccio, Ernst & Young and Morgan Stanley

282. Plaintiff incorporates ¶¶1-281, except allegations of fraud, scienter or intentional misconduct.

283. This cause of action is brought against defendants AOLTW, Ernst & Young, Morgan Stanley, Case, Levin, Parsons, Novack, Pittman, Kelly, Bollenbach and Cappuccio for violation of §§11 and 15 of the 1933 Act.

284. Plaintiff asserts only strict liability and negligence claims in this claim. Plaintiff does **not** assert claims of fraud or intentional misconduct.

285. On 2/11/00, AOL and Time Warner and their respective officers, directors, financial advisors and Ernst & Young filed the first draft of the Merger Registration Statement with the SEC to issue and register the new AOLTW shares to be sold in an initial public offering of their shares in the Merger. From and after this date, AOL, Time Warner and AOLTW were "in registration" and all their (and their agents Salomon Smith Barney's and Morgan Stanley's) subsequent written and

oral statements prior to the 6/23/00 shareholder votes approving the Merger give rise to §11 1933 Act liability under SEC regulations.

286.    On 5/19/00, the Merger Registration Statement for the new shares of AOLTW stock to be issued in connection with the Merger became effective with the SEC.  The Merger Registration Statement contained AOL's F99 financial statements and its financial statements for the quarters ended 9/30/99, 12/31/99 and 3/31/00.  AOL has subsequently restated its 00 financial statements due to improper accounting for AOL Europe due to a transaction occurring on 3/17/00.  The 99-00 financial statements were also false and in violation of GAAP as described herein.  The offering and sale of AOLTW stock pursuant to the Merger Registration Statement was an initial public offering of AOLTW's stock, which stock had never before existed, been issued or been publicly traded.  Therefore, the "safe harbor" under the 1933 Act does not apply to statements made in the Merger Registration Statement.

287.    In connection with the AOL/Time Warner Merger, all the shares of AOLTW necessary to cover the previously granted stock options of AOL and Time Warner to their employees were registered with the SEC pursuant to a series of registration statements (the "Stock Option Registration Statements") filed and effective on 1/11/01.  The Merger Registration Statement stated:

> ***AOL Time Warner will file a registration statement covering the issuance of the shares of AOL Time Warner common stock subject to each America Online and Time Warner option and restricted shares and will maintain the effectiveness of that registration statement for as long as any of the options or restricted shares remain outstanding.***

288.    The Stock Option Registration Statements, which became effective with the SEC on 1/11/01, each incorporated the following documents by reference:

- AOL's Annual Report on Form 10-K for the fiscal year ended 6/30/00 (filing date 9/22/00), as amended by Amendment No. 1 thereto on Form 10-K/A dated 10/27/00 (filing date 10/30/00).

- AOL's Quarterly Report on Form 10-Q for the quarterly period ended 9/30/00 (filing date 11/9/00).

289.     Thus, all the AOLTW shares of stock issued in the Merger or thereafter entering the trading market pursuant to AOLTW employee option exercise or sale were issued pursuant to the false and misleading Merger Registration Statement or the Stock Option Registration Statements. The Stock Option Registration Statements and the statements made therein were issued and made in connection with the initial public offering of AOLTW's stock.  Therefore, the "safe harbor" under the 1933 Act does not apply to statements made in the Stock Option Registration Statements.

290.     The Individual Defendants named herein were officers or directors of AOLTW who each signed, authorized the signing on his behalf or consented to being named a director in the Merger Registration Statement and/or Stock Option Registration Statements as described in ¶51(a)-(g).  AOLTW was the issuer of those shares issued and sold via the Merger and Stock Option Registration Statements.

291.     Ernst & Young consented to the inclusion of its opinions on AOL's 98, 99 and 00 financial statements in the Merger Registration Statement and Stock Option Registration Statements and reviewed and approved the interim unaudited financial results included in the Merger Registration Statement and Stock Option Registration Statements.

292.     AOLTW is strictly liable for the false Merger Registration Statement and Stock Option Registration Statements.  Each of the defendants named in this claim owed to the purchasers of the AOLTW stock issued in the Merger and/or purchased in the aftermarket, including plaintiff, the duty to make a reasonable and diligent investigation of the statements contained in the Merger Registration Statement and Stock Option Registration Statements at the time they became effective, to ensure that they were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  In the exercise of reasonable care, these defendants knew or should have known of the material misstatements and omissions contained in these Registration Statements.

293.    None of the defendants named in this claim made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Merger Registration Statement and Stock Option Registration Statements were true and did not omit any material facts and were not misleading.

294.    The defendants named in this claim caused to be issued and participated in the issuance of the materially false and misleading statements in the Merger Registration Statement and Stock Option Registration Statements, which misrepresented or failed to disclose, *inter alia*, the adverse facts set forth above.  Thus, these defendants violated §§11 and 15 of the 1933 Act.

295.    Plaintiff purchased AOLTW stock traceable to the false and misleading Merger Registration Statement and Stock Option Registration Statements without knowledge of the untruths or omissions alleged herein.  Plaintiff could not have reasonably discovered the nature of these untruths and omissions, and relied either directly or indirectly on the false and misleading Merger Registration Statement and Stock Option Registration Statements in making its purchases of AOLTW stock.

296.    As a result of its purchases of AOLTW stock issued pursuant to the false Merger Registration Statement and Stock Option Registration Statements, plaintiff has suffered damages.

297.    This action was brought within the applicable statue of limitations, as tolled by the pendency of *In re AOL Time Warner, Inc. Securities and "ERISA" Litigation*, 02-Civ-5575(SWK) (S.D.N.Y.) (the "Class Action").

### SECOND CLAIM FOR RELIEF

**For Violation of §12(a)(2) of the 1933 Act
Against Defendant AOLTW**

298.    Plaintiff incorporates ¶¶1-297, except allegations of fraud, scienter or intentional misconduct.

299.    On 2/11/00, AOL and Time Warner and AOLTW filed the initial draft registration statement for the shares to be sold and issued in the Merger.  From and after this date, AOL, Time Warner and AOLTW were "in registration" and all their (and their agents Salomon Smith Barney's and Morgan Stanley's) subsequent written and oral statements prior to the 6/23/00 shareholder votes approving the Merger give rise to §11 and §12(a)(2) 1933 Act liability under SEC regulations.

300.    The Joint Proxy-Prospectus/Merger Registration Statement contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. AOLTW owed plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Merger Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  AOLTW, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Joint Proxy-Prospectus/Merger Registration Statement as set forth above.

301.    AOLTW did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Joint Proxy-Prospectus/Merger Registration Statement were true and did not omit any material facts and were not misleading.

302.    Plaintiff did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Merger Registration Statement at the time it acquired AOLTW stock.

303.    By reason of the conduct alleged herein, AOLTW violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violation, plaintiff sustained substantial damages in connection with its purchases of AOLTW stock in the Merger.

304.    This action was brought within the applicable statute of limitations, as tolled by the pendency of the Class Action.

### THIRD CLAIM FOR RELIEF

**For Violation of §§10(b) and 20(a) of the 1934 Act and Rule 10b-5 Against Defendants AOL, AOLTW, Ernst & Young, Morgan Stanley, Salomon Smith Barney and the Individual Defendants (Except Bollenbach and Cappuccio)**

305.    Plaintiff incorporates ¶¶1-304.

306.    This claim is brought by plaintiff against the defendants named below:

      (a)    AOL

      (b)    AOLTW

      (c)    AOLTW's top executives and directors:

            Stephen M. Case
            Gerald M. Levin
            Richard D. Parsons
            Kenneth J. Novack
            Robert W. Pittman
            J. Michael Kelly
            Wayne H. Pace
            Steven Rindner
            David M. Colburn
            Eric Keller
            Joseph A. Ripp
            Barry M. Schuler
            Pascal Desroches
            John P. Tuli
            Myer Berlow

      (d)    Ernst & Young

      (e)    The investment banks:

            Morgan Stanley
            Salomon Smith Barney

307.    Each of the defendants named herein participated in defendants' wrongful scheme, the implementation of the manipulative devices discussed herein and/or in the preparation and dissemination of the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts

necessary in order to make the statement made, in light of the circumstances under with they were made, not misleading.

308.    Defendants violated §§10(b) and 20(a) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff in connection with their purchases and acquisitions of AOL and/or AOLTW securities.

(d)    Defendants' material misrepresentations and/or omissions were made knowingly and/or with reckless disregard of the truth and for the purpose and effect of concealing AOL's and AOLTW's falsified financial results, operating condition and prospects from plaintiff and supporting the artificially inflated prices of AOL and AOLTW stock.  Plaintiff would not have purchased AOL and/or AOLTW stock at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by defendants' wrongful scheme and/or false and misleading statements.

(e)    Defendants Morgan Stanley and Salomon Smith Barney controlled each of their respective subsidiaries and affiliates.

309.    This claim is brought within the applicable statute of limitations which was tolled by the pendency of the Class Action as to defendants named in the Class Action.  As to defendants not named in the Class Action, these claims were brought within two years after discovery of these defendants' participation in the false statements alleged herein and within five years of these defendants' participation in the false statements.

- 206 -

## FOURTH CLAIM FOR RELIEF

**For Violation of §14(a) of the 1934 Act and Rule 14a-9 Against AOL,
Time Warner AOLTW, Case, Levin, Kelly, Cappuccio, Novack,
Pittman, Ernst & Young and Morgan Stanley**

310.    Plaintiff incorporates ¶¶1-309.  Plaintiff expressly disclaims any allegations of fraud. Plaintiff held Time Warner common stock at the close of business on 5/18/00, the record date for eligibility for the Merger vote, and on 6/23/00, the date of the shareholder meeting in which the Merger was voted on and approved.

311.    AOL, Time Warner, AOLTW, Case, Levin, Kelly, Cappuccio, Novack, Pittman, Ernst & Young and Morgan Stanley violated §14(a) of the 1934 Act and Rule 14a-9 in that these defendants solicited proxies or permitted the use of their names to solicit proxies by means of the Joint Proxy-Prospectus issued by both AOL and Time Warner that contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.  Ernst & Young, in particular, is liable based on its materially false 6/30/99 audit opinion included in the Joint Proxy-Prospectus.  Morgan Stanley's opinion that the exchange ratio for the Merger was fair was included in the Joint Proxy-Prospectus. This opinion was materially false and misleading as the exchange ratio was not fair and Morgan Stanley had no basis to stated that the ratio was fair.

312.    The proxy solicitations were an essential link for the Merger since the Merger required and received a majority vote by the shareholders of AOL and TimeWarner at the two companies' shareholder meetings both held on 6/23/00.  The false and misleading Joint Proxy-Prospectus was an essential link in the accomplishment of the Merger.

313.    The Joint Proxy-Prospectus and other oral proxy statements pleaded contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  The

defendants named in this claim were negligent, and acted without due care, in making those statements and/or permitting them to be made.

314.    Defendants' false and misleading statements as alleged herein artificially inflated the price of AOL's and AOLTW's stocks at such times as the stocks were purchased, exchanged or otherwise acquired by plaintiff, causing plaintiff to lose millions of dollars due to such inflation and the subsequent decline of AOLTW's stock price as news of the false statements and undisclosed facts eventually emerged.

315.    As a result, plaintiff was denied the opportunity to make an informed decision in voting on the Merger, and has been damaged due to the harm inflicted on its equity ownership of Time Warner.  Plaintiff suffered damages as a result of the Merger which was approved through the use of the Joint Proxy-Prospectus in violation of §14(a) of the 1934 Act and Rule 14a-9 there under.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Awarding preliminary and permanent injunctive relief in favor of plaintiff against defendants and their counsel, agents and all persons acting under, in concert with, or for them, including an accounting of and the imposition of a constructive trust and/or an asset freeze on defendants' insider trading proceeds;

B.    Ordering an accounting of defendants' insider-trading proceeds;

C.    Ordering disgorgement of defendants' insider-trading proceeds;

D.    Awarding restitution to plaintiff of any monies of which it was defrauded;

E.    Awarding compensatory damages in favor of plaintiff against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

F.    Awarding rescission or a rescissory measure of damages;

G.    Awarding plaintiff its reasonable costs and expenses incurred in this action, including

counsel fees and expert fees; and

H.    Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: _____, 2006                LAW OFFICES OF ROGER M. ADELMAN
                                                              ROGER M. ADELMAN (Bar # 56358)


                                                    _____
                                                              ROGER M. ADELMAN

                                                    1100 Connecticut Avenue, N.W., Suite 730
                                                    Washington, DC  20036
                                                    Telephone:  202/822-6762
                                                    202/828-8528 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
JOHN J. STOIA, JR.
MICHAEL J. DOWD
THEODORE J. PINTAR
DAVID C. WALTON
PATRICK W. DANIELS
KATHLEEN A. HERKENHOFF
ANDREW J. BROWN
THOMAS E. EGLER (DC Federal Bar # PA0014)
DAVID A. THORPE
RYAN A. LLORENS
ELIZABETH A. ACEVEDO
JESSICA D. TALLY
ANDREA N. SALOW
CHRISTIE SURIEL


_____
WILLIAM S. LERACH

655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
ELI R. GREENSTEIN
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone:  415/288-4545
415/288-4534 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
RANDI D. BANDMAN
MICHAEL F. GHOZLAND
9601 Wilshire Blvd., Suite 510
Los Angeles, CA  90210
Telephone:  310/859-3100
310/278-2148 (fax)

Attorneys for Plaintiff